## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

**FEDERAL TRADE COMMISSION,**

    Plaintiff,

       v.

**WV UNIVERSAL MANAGEMENT, LLC,**
    a Florida limited liability company, also
    dba Treasure Your Success,

**GLOBAL FINANCIAL ASSIST, LLC,**
    a Florida limited liability company,

**LEADING PRODUCTION, LLC,**
    a Florida limited liability company,

**WILLY PLANCHER,**
    individually and as a member of
    WV Universal Management, LLC,
    Global Financial Assist, LLC, and
    Leading Production, LLC,

**VALBONA TOSKA**, aka Val Jones,
    individually and as a member of
    WV Universal Management, LLC,
    Global Financial Assist, LLC, and
    Leading Production, LLC,

    Defendants.

Civ No. 6:12cv1618-Orl-22KRS

**PLAINTIFF FEDERAL TRADE
COMMISSION'S**

**MEMORANDUM IN SUPPORT OF
MOTION FOR TEMPORARY
RESTRAINING ORDER**



2012 OCT 29  PM 2:02
US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

FILED



## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................ 1

II.  THE PARTIES ................................................................................................... 3

   A.  Plaintiff ......................................................................................................... 3

   B.  Defendants .................................................................................................... 3

      1.  Global Financial Assist, LLC ................................................................ 3

      2.  WV Universal Management, LLC .......................................................... 4

      3.  Leading Production, LLC ....................................................................... 4

      4.  Willy Plancher ....................................................................................... 5

      5.  Valbona Toska ....................................................................................... 5

III.  DEFENDANTS' UNLAWFUL CREDIT CARD INTEREST RATE REDUCTION SERVICES SCHEME .......................................................................................... 6

   A.  Defendants Engage in Illegal Telemarketing Practices When Soliciting Consumers. ... 6

   B.  Defendants Offer and Sell Credit Card Interest Rate Reduction Services but Fail to Provide Consumers Any Service or the Promised Results. ................................. 8

   C.  Defendants Charge Advance Fees for their Credit Card Interest Rate Reduction Services and Charge Consumers without Authorization. ................................. 11

   D.  Defendants Have a History of Violating the Law and Do Not Intend to Stop Their Unlawful Practices. ...................................................................... 13

IV.  LEGAL DISCUSSION – ENTRY OF A TRO IS WARRANTED IN THIS CASE ..... 16

   A.  The FTC Is Likely to Prevail in Its Action Against Defendants ................................. 17

      1.  The FTC Is Likely to Demonstrate that Defendants Violated the FTC Act. ........... 17

      2.  The FTC Is Likely to Demonstrate That Defendants Violate the TSR ................... 20

      3.  The Individual Defendants Are Personally Liable for Injunctive and Monetary Relief ....................................................................... 21

   B.  The Balance of Equities Favors Entry of the TRO. ....................................................... 22

   C.  An *Ex Parte* TRO Is Necessary to Prevent Defendants from Dissipating Assets and Destroying Evidence. ...................................................................... 23

   D.  An Asset Freeze and Immediate Access to Business Premises Are Warranted. ......... 24

   E.  Appointment of a Temporary Receiver Is Warranted. ................................................. 24

V.  CONCLUSION ................................................................................................... 25

i

# TABLE OF AUTHORITIES

## Cases

*Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663 (1974)......................................... 23

*FTC v. 1st Guar. Mortg. Corp.*, No. 09-cv-61840, 2011 U.S. Dist. LEXIS 38152 (S.D. Fla. Mar. 30, 2011).................................................................................................................. 19

*FTC v. Affordable Media*, LLC, 179 F.3d 1228 (9th Cir. 1999) ....................................... 17, 22

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989).................................................. 21

*FTC v. Bishop*, 425 Fed. App'x 796 (11th Cir. 2011) ........................................................... 17

*FTC v. Career Hotline, Inc.*, No. 8:09-cv-1483-T-17TGW (M.D. Fla. Aug. 4, 2009) .......... 24

*FTC v. Commerce Planet, Inc.*, Case No. 8:09-cv-01324-CJC(RNBx), 2012 U.S. Dist. LEXIS 97905 (C.D. Cal. June 22, 2012) ............................................................................ 11

*FTC v. Direct Benefits Grp.*, No. 6:11-cv-01186-JA-GJK (M.D. Fla. July 19, 2011) .......... 23

*FTC v. Five Star Auto Club*, 97 F. Supp. 2d 502 (S.D.N.Y. 2000) ....................................... 18

*FTC v. Freecom Commc'ns Inc.*, 401 F.3d 1192 (10th Cir. 2005)......................................... 18

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir.1996) ................................................. 21, 23

*FTC v. Global Mktg. Grp.*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008) ..................................... 19

*FTC v. Home Assure, LLC*, No. 8-09-cv-547-T-23TBM (M.D. Fla. Mar. 26, 2009)............. 24

*FTC v. JPM Accelerated Servs. Inc.*, No. 6:09-cv-2021-ORL-28-KRS (M.D. Fla. Nov. 30, 2009) ............................................................................................................................... 23

*FTC v. Nat'l Solutions LLC*, No. 6:11-cv-1131-22GJK (M.D. Fla. July 12, 2011) ............... 23

*FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994)..................................................... 17, 19

*FTC v. Para-Link Int'l, Inc.*, No. 8:00-cv-2114-T-17E, 2000 U.S. Dist. LEXIS 21509 (M.D. Fla. Nov. 21, 2000) ........................................................................................................... 16

*FTC v. RCA Credit Servs. LLC*, 727 F. Supp. 2d 1320 (M.D. Fla. 2010) ............................. 21

*FTC v. RCA Credit Servs.*, No. 8:08-CV-2062-T-27MAP (M.D. Fla. Oct. 17, 2008)........... 24

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)................................................................ 18

*FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247 (S.D. Fla. 2007).............................. 21

*FTC v. Univ. Health*, 938 F.2d 1206 (11th Cir. 1991)........................................................... 17

*FTC v. Vacation Prop. Servs., Inc.*, No. 8:11-cv-595-T-27MAP (M.D. Fla. Mar. 23, 2011) 23

*FTC v. Vocational Guides*, No. 3:01-0170, 2008 WL 4908769 (M.D. Tenn. Nov. 12, 2008)22

*FTC v. Wilcox*, 926 F. Supp. 1091 (S.D. Fla. 1995)................................................................ 18

*FTC v. World Travel Vacation Brokers*, 861 F.2d 1020 (7th Cir. 1988)........................... 17, 18

*FTC v. World Wide Factors*, 882 F.2d 344 (9th Cir. 1989)..................................................... 22

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)................................................................... 19

*Orkin Exterminating Co. v. FTC*, 849 F.2d 1354 (11th Cir. 1988) ........................................ 19

*Porter v. Warner Holding Co.*, 328 U.S. 395 (1946).............................................................. 23

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir. 1989) ............................................ 18

*SEC v. First Fin. Grp.*, 645 F.2d 429 (5th Cir. 1981)............................................................. 25

## Statutes

15 U.S.C. § 45(a) .................................................................................................................. 17

15 U.S.C. § 45(n) .................................................................................................................. 19

15 U.S.C. § 53(b) ........................................................................................................ 3, 16, 23

Fla. Stat. 608.4431 .................................................................................................................. 4

Section 5 of the FTC Act .......................................................................................... 11, 13, 17, 19

## Federal Rules of Civil Procedure

Fed. R. Civ. P. 65(b) ............................................................................................................. 23

**Federal Regulations and Rules**

16 C.F.R. Part 310.............................................................................................. 2, 3, 17

16 C.F.R. Part 310.2.................................................................................................. 20

16 C.F.R. Part 310.3.................................................................................................. 20

16 C.F.R. Part 310.4.......................................................................... 2, 6, 7, 8, 13, 20

16 C.F.R. Part 310.8.................................................................................................... 7

## I.    INTRODUCTION

Plaintiff Federal Trade Commission ("FTC") filed its Complaint for Permanent Injunction and Other Equitable Relief ("Complaint") to stop Defendants' unlawful credit card interest rate reduction services ("CCIRR services").

Since at least November 2011, Defendants have been targeting consumers who have substantial balances on their credit cards through the use of illegal pre-recorded voice messages, or "robo-calls," and calls to telephone numbers listed on the National Do Not Call Registry ("Registry"). *See, infra*, Section III.A. Once Defendants' representative establishes contact with a consumer, the representative pitches Defendants' CCIRR service. The representative promises to deliver one or more of the following results: (1) a substantial reduction in the consumer's credit card interest rate, to as low as three percent; (2) thousands of dollars in savings, typically at least $2,500; and (3) cheaper, easier, and faster credit card debt repayment plans. *See, infra*, Section III.B.

Defendants' charge consumers a substantial fee for their service, ranging from $593.93 to $1,593.93. To hook consumers, the representative tells consumers that the fee is not charged until the consumers achieve the promised savings or results or until they sign a written contract. In reality, however, Defendants charge the fee on the same or immediately following day of the initial solicitation phone call, before consumers realize any savings or even see a written contract. *See, infra*, Section III.C. In some instances, Defendants charge consumers even though the consumers never agree to the transaction. In all known instances, Defendants fail to deliver the services and promised results to consumers. *See, infra*, Section III.B.

Defendants' business practices are deceptive and unfair, and they violate Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Defendants also violate the FTC's Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310, which prohibits the telemarketing of the very service that Defendants purport to offer - advance fee debt relief services.[1] Defendants violate the TSR in numerous other ways: they contact consumers via pre-recorded messages without prior consent; they call consumers whose numbers are in the Do Not Call Registry; they fail to honor specific requests to cease calling; they fail to disclose information required by the TSR, such as their identity; and they fail to access the Registry to obtain a list of phone numbers not to call.

Defendants' have a history of violating the law and changing only their corporate entity, while still peddling the same scheme. There is no indication that Defendants intend to stop their unlawful practices. Indeed, Defendants are currently pushing the same credit card interest rate reduction service to consumers. *See, infra*, Section III.D.

The FTC's Complaint seeks a permanent injunction and other equitable relief to redress injury to consumers, including rescission or reformation of contracts, restitution, and disgorgement of ill-gotten gains. The FTC's Motion for Temporary Restraining Order and Preliminary Injunction, now before the Court, would stop Defendants' unlawful practices during this litigation and would protect the effectiveness of the final relief by freezing Defendants' assets, appointing a receiver to manage the corporate Defendants, and grant the

---

[1] Credit card interest rate reduction services fall clearly within the definition of a "debt relief service" under the TSR. *See* 16 C.F.R. Part 310(m); *see also, infra*, Section IV.A.1.b. Under the TSR, it is illegal, in connection with telemarketing a debt relief service, to charge a fee before delivering concrete results. *See* 16 C.F.R. § 310.4(a)(5)(i); *see also, infra*, Section IV.A.1.b.

receiver immediate access to Defendants' business premises for the purpose of preserving assets and evidence.

## II. THE PARTIES

### A. Plaintiff

The Federal Trade Commission is an independent agency of the United States government, created by the FTC Act, 15 U.S.C. § 41, *et seq.* The FTC's responsibilities include enforcing the FTC Act's prohibitions on deceptive and unfair acts or practices, 15 U.S.C. § 45(a), as well as enforcing the Rules it has promulgated under its rulemaking authority, including the TSR, 16 C.F.R. Part 310. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to bring suit in district court to enjoin violations of laws it enforces and to secure other appropriate equitable relief.

### B. Defendants

#### 1. Global Financial Assist, LLC

Global Financial Assist, LLC ("GFA") was a Florida limited liability company formed on March 16, 2010 by managing members, Willy Plancher ("Plancher") and Valbona Toska ("Toska"). (PX1, ¶ 4 and Attachment A). Plancher served as GFA's registered agent. (*Id.*). GFA began operating out of 600 Crown Oak Center, Longwood, Florida 32750 and then moved its operations to 1265 South Semoran Boulevard, Suite 1245, Winter Park, Florida 32792 on April 29, 2011. GFA also used 383 Emerson Plaza, Suite 416, Altamonte Springs, Florida 32701 as a business address. (*Id.*; PX 20, p. 6; PX 21, p. 11). Doing business as "Treasure Your Success" ("TYS"), (PX18, ¶ 1), GFA was the first corporate entity that Defendants used to market and sell their CCIRR services. GFA continued

operating until around August, 2012, and Plancher and Toska dissolved GFA on October 7, 2012, stating that the company is "No Longer in Business." (PX1, ¶ 4 and Attachment A).

### 2.   WV Universal Management, LLC

WV Universal Management, LLC ("WVUM") was a Florida limited liability company formed by Plancher and Toska, as managing members, on November 9, 2011. (*Id.*, ¶ 5 and Attachment B). WVUM maintained its principal place of business at 1265 South Semoran Boulevard, Suite 1250, Winter Park, Florida 32792, (*Id.*), but it also used 383 Emerson Plaza, Suite 416, Altamonte Springs, Florida 32701 as a business address. (PX20, p. 12). Like GFA, WVUM used Treasure Your Success as its business name and marketed and sold Defendants' CCIRR services. (*Id.*, p. 3). As GFA did, WVUM continued its operations until around August, 2012. Then, Plancher and Toska dissolved WVUM on October 7, 2012, stating the reason "No Longer in Business," just as they did for GFA. (PX1, ¶ 5 and Attachment B).[2]

### 3.   Leading Production, LLC

Leading Production, LLC ("LP") is a Florida limited liability company formed by Plancher and Toska, as managing member and manager, respectively, on August 30, 2012. (*Id.*, ¶ 6 and Attachment C). Toska is the registered agent of LP, which is currently operating out of 931 South Semoran Boulevard, Suite 206, Winter Park, Florida 32792. (PX19, ¶ 3). Much like the recently dissolved GFA and WVUM entities, LP markets and sells CCIRR services. (*Id.*, ¶ 5).

---

[2] Under Florida law, dissolution does not prevent a limited liability company from suing or being sued in its own name. Fla. Stat. 608.4431(2)(b).

4

### 4.    Willy Plancher

Willy Plancher is a resident of the State of Florida with a last known address of 383 Emerson Plaza, Suite 416, Altamonte Springs, Florida 32701. (PX20, p. 3). Plancher was a managing member of GFA and WVUM, now dissolved, and currently holds the same position in LP. (PX 1, ¶¶ 4-6 and Attachments A-C). With Toska, Plancher shared extensive authority and control over the business. They formed the companies, made the necessary corporate filings, and paid the filing fees. (*Id.*). They picked and changed the business locations for their operations. (*Id.*, ¶ 4 and Attachment A [changed business location from 600 Crown Oak Center to 1265 South Semoran Boulevard]). They hired the telemarketers, created the training materials, and directly trained the telemarketers who peddled their CCIRR services to consumers. (PX18, ¶ 3 [declaration of Defendants' former employee who worked as a telemarketer and was put in charge of training after only one week of employment]). Plancher was in charge of the "front end processing" which meant he controlled the volume of calls with consumers that the company gets. (*Id.*, ¶ 5). Jointly with Toska, Plancher had control over the companies' finances, and they managed the businesses' merchant accounts. (PX20, pp. 3-5, 12-14). As the managing member of LP, it is believed that Plancher has the same or similar extensive authority and control over the business.

### 5.    Valbona Toska

Valbona Toska, also known as Val Jones, (PX18, ¶ 3; PX 1, p. 9), is a resident of the State of Florida with a last known address of 383 Emerson Plaza, Suite 416, Altamonte Springs, Florida 32701. Toska and Plancher share the Emerson Plaza residence. (PX20, p. 3). Toska was a managing member of GFA and WVUM, now dissolved, and is currently a

manager in LP. (PX1, ¶¶ 4-6 and Attachments A-C). As detailed above, Toska shared with Plancher extensive authority and control over the business operations of GFA and WVUM. *See, supra*, Section II.B.4. Toska was also in charge of the "back end processing" which involved the companies' "verification" and "fulfillment" processes. (PX18, at ¶ 5). As the manager of LP, it is believed that Toska has the same or similar extensive authority and control over the business.

### III. DEFENDANTS' UNLAWFUL CREDIT CARD INTEREST RATE REDUCTION SERVICES SCHEME

#### A. Defendants Engage in Illegal Telemarketing Practices When Soliciting Consumers.

To solicit consumers, Defendants engage in illegal telemarketing practices. Defendants send pre-recorded voice messages, or "robo-calls," to consumers who have never consented to receive robo-calls from Defendants. (PX4, ¶¶ 2, 32; PX6, ¶¶ 3, 15; PX7, ¶¶ 2, 21; PX9, ¶¶ 2, 4, 13; PX11, ¶¶ 2-3, 5, 7; PX13, ¶¶ 2, 4; PX14, ¶¶ 2-3; PX24, ¶¶ 2-3). Telemarketing using pre-recorded messages to consumers who have not consented to receive such calls is a violation of the TSR, 16 C.F.R. Part 310.4(b)(1)(v)(A).[3] These robo-calls never identify any of the Defendants or disclose the name of the company or person on whose behalf the pre-recorded voice message is sent. (PX4, ¶ 2; PX6, ¶¶ 3, 15; PX7, ¶ 2; PX9, ¶¶ 2-4; PX11, ¶¶ 2-3; PX13, ¶¶ 2, 4; PX14, ¶ 4; PX24, ¶¶ 3-4). Failure to state such information violates the TSR, 16 C.F.R. Part 310.4(b)(1)(v)(B)(ii).[4]

---

[3] This violation is alleged as Count Eight of the Complaint.
[4] This violation is alleged as Count Nine of the Complaint.

A typical robo-call instructs the consumer: "To lower your credit card interest rate, press 1." When the consumer presses the number as instructed, the consumer is connected to a live representative who is ready to pitch Defendants' CCIRR services.

In addition to using illegal robo-calls, Defendants place outbound calls to consumers indiscriminately, including to those whose telephone and mobile phone numbers are listed in the Registry and with whom Defendants had never had previous dealings. (PX1, ¶ 11; PX4, ¶¶ 2, 3132; PX7, ¶¶ 2, 20-21; PX8, ¶¶ 2, 17-18; PX9, ¶¶ 2-10, 12-13; PX10, ¶¶ 2-4; PX11, at ¶¶ 2, 5, 7; PX12, ¶¶ 2, 32-33; PX13, ¶¶ 2, 4; PX14, ¶¶ 2-3; PX15, ¶¶ 2-3; PX25, ¶¶ 2-3; PX26, ¶¶ 2-3). Such calls are prohibited by the TSR, 16 C.F.R. Part 310.4(b)(1)(iii)(B).[5]

Telephone records obtained from the provider for WVUM show that, during the period from December 6, 2011 to August 10, 2012, Defendants made a total of 86,693 calls to active telephone and mobile phone numbers. (PX2, ¶ 13; PX3). Of this total, Defendants made 24,919 calls to active phone numbers that were listed on the Registry at the time the calls were made. (*Id.*) The TSR requires telemarketers to access the Registry in order to obtain the list of telephone numbers on the Registry. Defendants have never done so. Thus, they have never paid the access fee required of telemarketers under the TSR, 16 C.F.R. Part 310.8.[6] (PX1, ¶ 14 and Attachment D).

Defendants also place outbound calls to consumers repeatedly, even to those who have previously instructed Defendants not to call again and to remove the consumers from Defendants' call list. (PX6, ¶ 17 [continued to receive calls from Defendants even after requesting, on two separate occasions, to be removed from the call list]); (PX9, ¶¶ 4-10

---

[5] This violation is alleged as Count Six of the Complaint.
[6] This violation is alleged as Count Ten of the Complaint.

[requested on three separate occasions that Defendants remove her from the call list]). Calling a consumer who has specifically requested not to be called by a particular telemarketer violates the TSR, 16 C.F.R. Part 310.4(b)(1)(iii)(A).[7]

When Defendants successfully establish contact with a consumer through an outbound call, their representative makes the same or a similar sales pitch to the consumer.[8]

## B. Defendants Offer and Sell Credit Card Interest Rate Reduction Services but Fail to Provide Consumers Any Service or the Promised Results.

In their sales pitch, Defendants promise consumers that Defendants will substantially reduce the consumer's credit card interest rate by over half of the current interest rate or to as low as three percent. (PX4, ¶¶ 6, 8 [promised interest rate reduction by "over half" which was later revised to "at least half"]; PX6, ¶ 7 [reduction to "as low as 4.9%" within a single billing period]; PX8, ¶ 4 [reduction to "between 5% and 7%"]; PX10, ¶¶ 4-5 [reduction sufficient to result in substantial savings "in three to four months"]; PX12, ¶ 5 [reduction to "about three to four percent"; PX13, ¶ 5 [reduction sufficient to result in thousands in savings]; PX14, ¶ 6 [reduction for the first card from 17.99% to 2.99% and for the second card from 18.99% to 12.99%]; PX15, ¶ 3 [reduction sufficient to result in substantial savings]; PX24, ¶ 6 [reduction "so low" that consumer could "pay off debt faster"]).

---

[7] This violation is alleged as Count Seven of the Complaint.

[8] In an attempt to lend credibility to themselves and their CCIRR services, Defendants lie to consumers about who they are. Defendants falsely claim or imply that they are employees of the issuer of consumers' credit cards. (PX6, ¶ 5 [claimed to be calling from "Card Member Service"]); (PX7, ¶ 4 [claimed to be calling from Visa]). In fact, Defendants train their telemarketers to lie about their corporate identity. (PX18, ¶ 14 [telemarketers are trained to give a "generic name, like 'Card Member Services'"). Also, Defendants falsely claim to have advantageous relationships or affiliations. (PX6, ¶ 6 [claimed that service is part of a "stimulus program" administered by the "Federal Reserve" and provided the consumer a "federal ID number"]); (PX10, ¶ 5 [claimed to have "special relationships" with credit card issuers]); (PX13, ¶ 4 [robo-call claimed that "[due to a] Federal Government Stimulus, you are entitled to lower your interest rate"]); (PX24, ¶ 3 [robo-call claimed that caller is affiliated with a "government program" and "working as part [of the] Obama plan" to help families]).

Along with the substantial reduction in interest rates, Defendants guarantee consumers thousands of dollars in savings, typically at least $2,500. (PX4, ¶¶ 6, 8 [guaranteed savings of "at least $3,000"]; PX7, ¶ 6 [guaranteed savings of "$2,500"]; PX8, ¶ 4 [guaranteed savings of "at least $2,000"]; PX10, ¶ 5 [guaranteed savings of "at least $1,200"]; PX12, ¶ 5 [guaranteed savings of "at least $2,500"]; PX13, ¶ 5 [guaranteed savings of "at least $2,000"]; (PX14, ¶ 5 [guaranteed to "save a lot of money"]; PX15, ¶ 3 [guaranteed savings enough to recoup the cost of the service "in two to three months"]; PX26, ¶¶ 6-8 [told by three different representatives that she could save "hundreds of dollars every month," get a "minimum savings" of $2,500, and get "savings of between $6,000 and $18,000").

Finally, Defendants assure consumers that they will negotiate consumers' credit card debts with the credit card companies so that consumers' payments are cheaper, easier, and can be completed faster. (PX4, ¶ 5; PX5, ¶ 4; PX10, ¶ 5; PX24, ¶ 6).

Once Defendants hook consumers, Defendants ask for sensitive personal and financial information, including the consumer's Social Security number, date of birth, address, and credit card account information, including the credit card's three- or four-digit security code. (PX4, ¶ 8; PX6, ¶ 11; PX7, ¶ 9; PX8, ¶ 7; PX10, ¶ 9; PX12, ¶ 8; PX14, ¶ 4 [TYS asked for both the consumer's and the consumer's husband's information]; PX15, ¶ 3; PX24, ¶ 5 [TYS claimed to already have the consumer's credit card number but needed the consumer to verify over the phone]; PX26, ¶ 4). In at least two instances, Defendants even sent the consumer a "Personal/Financial Profile" sheet that demands detailed personal and

financial information on not only the consumer but also on the consumer's spouse and children. (PX8, ¶ 12 and Attachment C; PX15, ¶ 3 and Attachment B).

Defendants tell consumers that they need this sensitive information either to begin the process of negotiating with credit card companies or to do a preliminary check of whether Defendants' will be able to assist the consumers. (PX4, ¶ 8; PX6, ¶ 11; PX7, ¶ 9; PX8, ¶ 7; PX10, ¶ 9; PX12, ¶ 8). In practice, however, Defendants use the information chiefly to charge consumers fees even before delivering on their promises and sometimes even before consumers agree to the transaction. *See, infra*, Section III.C.

In fact, Defendants do not make good on their promises. Numerous consumers complained to the Better Business Bureau that Defendants had taken their money and done nothing for them.[9] Defendants did not even bother to respond to the complaints. (PX17, ¶¶ 8-10). Several of these consumers have filed declarations detailing their experiences. (PX4-15, 24-26).

Records from Defendants' merchant account show that they had a chargeback rate of over 20% on their consumer transactions from December 2011 to August 2012. (PX 20, pp. 7-11, 17-18). According to Defendants' ex-employee, the chargeback rate was widely known to be 70%! (PX 18, ¶ 6). In the credit card industry, a chargeback rate of over 1% is enough for a business to be placed in a chargeback monitoring program and even be fined. *See, e.g.*,

---

[9] To add insult to injury, Defendants refuse to refund consumers' money, despite failing to provide any service or the promised results. Indeed, none of the consumers known to the FTC ever received a refund from Defendants. (PX4, ¶ 30; PX5, ¶ 16; PX7, ¶ 18; PX8, ¶ 15; PX10, ¶ 16; PX12, ¶ 30; PX13, ¶ 12; PX14, ¶ 11; PX15, ¶ 9; PX24, ¶14; PX25, ¶ 6). Defendants' refusal to provide refunds contrasts with the "refund guarantee" that they represent to consumers. (PX5, ¶ 4; PX6, ¶ 8; PX10, ¶ 7). Even worse in some instances, Defendants assure consumers that they will receive a refund, only to string them along until so much time lapses that the consumers become ineligible to receive a chargeback from their credit card issuer. (PX12, ¶¶ 13-29 [detailing the lengthy and grueling process that the consumer went through to get a refund from Defendants, ultimately without success]).

*FTC v. Commerce Planet, Inc.*, Case No. 8:09-cv-01324-CJC(RNBx), 2012 U.S. Dist. LEXIS 97905 (C.D. Cal. June 22, 2012), at *65-66 (stating that "[t]he average chargeback rate in the United States is 0.2%" and citing a company that consistently had chargeback rates exceeding the 1% threshold and thus was placed in multiple chargeback monitoring programs). At least one court has found that chargeback rates exceeding 5%, 7%, or 8% are indicative of fraud. *Id.* at *66-68 (opining that such percentages demonstrate a "history of excessive chargeback rates [that is] consistent with deceptive website marketing").

It is not surprising that Defendants were unable to deliver on their promises. As Lisa Wilhelm, an expert in consumer finance explains, the kinds of savings that Defendants promise are totally unrealistic. (PX 16, ¶¶ 22-33) Financial, economic, and credit card market realities explain this. (PX 16, ¶ 22 ["[T]he likelihood of success in engaging credit card issuers to lower interest rates for customers making on-time payments in the recent credit card interest rate environment, even after a case-by-case assessment by the creditor, would be extremely low."]). [10]

### C. Defendants Charge Advance Fees for their Credit Card Interest Rate Reduction Services and Charge Consumers without Authorization.

Defendants charge consumers a substantial fee for their CCIRR services, ranging from $593.93 to $1,593.93. When soliciting consumers, Defendants typically tell consumers that they will not charge a fee until consumers achieve the promised savings and results or until the consumers sign a written contract. (PX7, ¶ 7 [told by Defendants, "It won't cost you anything until you get the $2,500 savings."]; PX13, ¶ 10 [told by Defendants that she will not

---

[10] Defendants' deceptions in pitching their service violate Section 5 of the FTC Act and the TSR. These violations are alleged in Counts One and Four of the Complaint.

be charged the fee until her credit card interest rate is reduced]; PX25, ¶¶ 3-4, 6 [told by Defendants that she will not be charged the fee until she signs Defendants' service contract]). Scripts used by Defendants in 2010 promised consumers that there would be no out of pocket cost. (PX23, pp. 15-16).

Similarly, Defendants state in the service contract that they sometimes provide consumers that they will not charge consumers fees until they deliver the promised results. (PX4, ¶ 15 and Attachment A [no charge until the "minimum savings of at least $3000.00 has been achieved"]); PX7, ¶ 16 and Attachment A [minimum savings of $2,500.00 "will be achieved prior to the CORPORATION processing the CLIENT'S one time authorized payment for services rendered"]; PX8, ¶ 12 and Attachment B [according to the service contract, no charge until consumer achieves $2,000 in savings]; PX12, ¶ 9 and Attachment A [according to the service contract, no charge until consumer achieves $2,500 in savings]; PX14, ¶ 8 and Attachment A [according to the service contract, no charge until consumer achieves $2,500 in savings]).

In practice, Defendants charge consumers fees even before providing any service or delivering any result. Indeed, Defendants typically charge consumers these advance fees either on the day of the solicitation phone call or the immediately following day. (PX4, ¶ 14; PX5, ¶ 9; PX7, ¶ 14; PX8, ¶ 10; PX10, ¶ 14; PX12, ¶ 12; PX13, ¶ 7; PX14, ¶ 9; PX15, ¶ 3; PX24, ¶ 8; PX26, ¶ 10). Some consumers are charged even though they have not agreed to the transaction or even received a written contract. (PX25, ¶¶ 3-4, 6 and Attachment B). Consumers do not find out about these unauthorized advance fee charges until they receive their credit card account statements, usually weeks after the charges are incurred.

These facts show Defendants' disregard of the TSR's ban on charging advance fees for their CCIRR services. *See* 16 C.F.R. § 310.4(a)(5)(i). They also show Defendants' unfair and deceptive practice of charging consumers' credit card accounts without authorization.[11]

### D. Defendants Have a History of Violating the Law and Do Not Intend to Stop Their Unlawful Practices.

Defendants have a history of illegal telemarketing that begins as far back as March 2010, and the facts show that they do not intend to put a stop to their unlawful practices.

Defendants began their scheme as Global Financial Assist, LLC in March 2010. *See, supra,* Section II.B.1. On April 21, 2010, the Florida Department of Agriculture and Consumer Services ("FDACS") conducted an on-site investigation of GFA and found out that it was operating without a telemarketing license. (PX23, ¶ 7). In fact, Plancher and Toska had not even applied to get GFA licensed. (*Id.*, p. 6 [Investigator's Field Report on GFA]). Further, FDACS found out that Plancher and Toska themsel ves were operating without individual salesperson licenses. (*Id.*, pp. 8, 10 [Investigator's Field Reports on Toska and Plancher, respectively]).

Consequently, on April 22, FDACS issued a cease and desist order to GFA and to Plancher and Toska, individually. (*Id.*, pp. 5, 7, 9). Only after getting caught did Defendants decide to obtain the necessary telemarketing license (which expired on June 27, 2012) and post the required bond (which was cancelled on May 22, 2012) for their business. (*Id.*, ¶¶ 9-10).

---

[11] These violations of Section 5 of the FTC Act and the TSR are charged in Counts Two, Three, Five, and Eleven of the Complaint.

Scripts found on the premises by FDACS show that GFA was already committing the violations alleged in the Complaint. Its telemarketers identified themselves as "Account Services," "Lead Services," and "Client Services" and claimed a special relationship with the credit card companies and other lenders. (PX23, pp. 12, 15-16). They knew they were calling consumers whose numbers were listed in the Do Not Call Registry. (*Id.*, p. 12). They promised to reduce consumers' credit card interest rates, (*Id.*, pp. 12-16), and they told consumers they would not pay anything out of pocket. (*Id.*, pp. 15-16).

Kamelia Oliver, an ex-employee who worked for Defendants from April through June, 2012, confirms that Defendants were doing the same things during her tenure. (PX 23). They ignored the Do Not Call Registry, used robo-calls, declined to identify themselves, promised to lower consumers' credit card interest rates, and charged consumers' accounts immediately. (*Id.*)

While GFA's operations were ongoing, Defendants created another corporate entity, WVUM, and placed that new entity's operations in a different location.[12] (PX1, ¶ 5 and Exhibit B). However, Defendants engaged in the same or similar violations of the law. Just as they failed to do for GFA, Plancher and Toska failed to register and to obtain the necessary license for WVUM. (PX23, ¶ 5). Just as they did through GFA, Defendants unlawfully marketed and sold their CCIRR services through WVUM. A number of consumer complaints filed against WVUM, then doing business as TYS, bear out this fact. (PX4-15, 24-26 [consumer declarations]); *see also, supra*, Section III.A-D (detailing Defendants' unlawful practices).

---

[12] This new location is somewhat of a change. In fact, Defendants picked a different suite only, moving from Suite 1245 to Suite 1250, but stayed in the same address at 1265 South Semoran Boulevard in Winter Park, Florida. *See, supra,* Section II.B.1-2.

In August 2012, Defendants shut down their GFA, WVUM, and TYS operations, but they created yet again a new corporate entity, Leading Production, LLC, behind which they continue to hawk their CCIRR services. As LP, Defendants opened a new telemarketing boiler room at 931 South Semoran Boulevard in Winter Park, Florida – less than one-half of a mile from their old boiler room at 1265 South Semoran Boulevard in Winter Park. (PX19, ¶¶ 3-6 [declaration from a Florida Attorney General's Office investigator who went undercover to LP's location on October 4, 2012, where she saw and heard Defendants' ongoing operations]). In their new hub, Defendants are directing at least twenty telemarketers. (*Id.*, ¶ 5).

Defendants persist in their scheme for a good reason: it is very lucrative for them. So far, Defendants have grossed approximately $3.995 million from their scheme. Specifically, GFA made revenues of $162,614 in 2010 and $1,801,429.16 in 2011. (PX20, p. 6 [GFA's 2010 tax return]); (PX21, p. 26 [GFA's 2011 profit and loss report]). As TYS, WVUM made revenues of $100,339.39 in 2011 and $1,930,813.26 in 2012. (PX20, pp. 7, 9 [TYS's merchant statements for 2011 and 2012]).

For Defendants' victims, however, this scheme has been nothing but devastating. Consumers feel "sad," "cheated," "betrayed," "deceived," "worried," "angry," "scam[med]," and "upset," "concerned," to mention a few. (PX4, ¶ 33; PX5, ¶ 18; PX6, ¶ 18; PX7, ¶ 22; PX8, ¶ 19; PX10, ¶ 18; PX12, ¶ 34; PX14, ¶ 12; PX24, ¶ 15; PX26, ¶ 12). Defendants have robbed consumers not only of substantial amounts of money but also of the sense of security over their personal and financial information. (PX6, ¶ 18; PX7, ¶ 22; PX8, ¶ 19; PX10, ¶ 18; PX13, ¶ 14; PX14, ¶ 12; PX24, ¶ 15; PX26, ¶ 12). Regardless of whether Defendants have

abused consumers' information, beyond charging their credit cards for Defendants' services, there is a real fear in consumers that Defendants who engage in deception and illegal telemarketing will do so.[13]

Defendants' ongoing operations are in open defiance of the law, and their quick changes from one corporate entity to another demonstrate that, unless the Court acts *ex parte* to enjoin Defendants' actions, freeze their assets, and put their operations into receivership, Defendants will continue to exploit vulnerable consumers who are in debt and annoy thousands more with illegal robo-calls and unwanted phone calls.

## IV. LEGAL DISCUSSION – ENTRY OF A TRO IS WARRANTED IN THIS CASE

The FTC seeks, and the Court has the authority to grant, a Temporary Restraining Order ("TRO"), where, as here, there is overwhelming evidence that the FTC will prevail on the merits, and the equities favor issuing the injunction. The FTC requests an *ex parte* TRO, including an asset freeze, the appointment of a temporary receiver, and immediate access to Defendants' business premises, to prevent Defendants from dissipating assets and destroying evidence pending a full hearing on this matter.

The FTC seeks a TRO pursuant to Section 13(b) of the FTC Act. The standard for preliminary injunctive relief under Section 13(b) differs significantly from the standard typically applied to private litigants. As a threshold matter, "[t]o obtain a preliminary injunction, the FTC is not required to prove irreparable harm." *FTC v. Para-Link Int'l, Inc.*, No. 8:00-cv-2114-T-17E, 2000 U.S. Dist. LEXIS 21509, at *6-7 (M.D. Fla. Nov. 21, 2000)

---

[13] The proposed TRO specifically prohibits Defendants from making further use of any information they have obtained from customers. Proposed TRO at ¶ IX.

(citing *FTC v. Univ. Health*, 938 F.2d 1206, 1217 (11th Cir. 1991)). Rather, a court may issue a TRO if supported by: (1) a likelihood of success on the merits; and (2) a balance of the equities. *See FTC v. Bishop*, 425 Fed. App'x 796, 797 (11th Cir. 2011); *FTC v. Affordable Media*, LLC, 179 F.3d 1228, 1233 (9th Cir. 1999). Regarding the first part of this test, unlike a private litigant who generally must show a strong or substantial likelihood of success on the merits, the FTC only needs to show a likelihood of ultimate success. *See FTC v. World Travel Vacation Brokers*, 861 F.2d 1020, 1029 (7th Cir. 1988). Further, when the court balances the equities, the public interest "must receive far greater weight" than any private concerns. *Id.* In this case, entry of a TRO is appropriate because the FTC is likely to prevail on the merits, and the equities weigh in favor of issuing a TRO.

## A. The FTC Is Likely to Prevail in Its Action Against Defendants.

The FTC is likely to establish that Defendants have violated Section 5 of the FTC Act, 15 U.S.C. § 45, and the Telemarketing Sales Rule, 16 C.F.R. § 310 *et seq.*

### 1. The FTC Is Likely to Demonstrate that Defendants Violated the FTC Act.

Section 5(a) of the FTC Act prohibits deceptive acts or practices in or affecting commerce. *See* 15 U.S.C. § 45(a). An act or practice is deceptive "if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); *see also FTC v.*

17

*Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. Wilcox*, 926 F. Supp. 1091, 1098 (S.D. Fla. 1995).[14]

As discussed at length above, *see, supra,* Section III.B, Defendants violate the FTC Act by making material false and misleading representations to sell their credit card interest rate reduction service. Specifically, they falsely claim that: (1) Consumers who purchase Defendants' credit card interest rate reduction services will have their credit card interest rates reduced substantially, including to as low as 3%; (2) Consumers who purchase Defendants' credit card interest rate reduction services will save thousands of dollars in a short time as a result of lowered credit card interest rates; and  (3) Consumers who purchase Defendants' credit card interest rate reduction services will be able to pay off their debts much faster as a result of lowered credit card interest rates.

In fact, Defendants fail to reduce consumers' interest rates; consumers who use Defendants' services do not save thousands of dollars; and consumers are not able to pay off their debts much faster. *See, supra,* Section III.B.

A representation is likely to mislead consumers, and thus violate Section 5 of the FTC Act "if it has the capacity or tendency to deceive; that is, it is either false or lacks a reasonable basis." *Tashman*, 318 F.3d at 1280, n.5. Because they are false and critical to their pitch, Defendants' claims are likely to mislead consumers.

In addition, the materiality requirement is satisfied if the misrepresentation or omission involves information that is likely to affect a consumer's choice of, or conduct

---

[14] The FTC need not prove that Defendants' misrepresentations were made with an intent to defraud or deceive, or were made in bad faith. *See, e.g., FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005); *World Travel Vacation Brokers*, 861 F.2d at 1029; *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1495 (1st Cir. 1989); *FTC v. Five Star Auto Club*, 97 F. Supp. 2d 502, 526 (S.D.N.Y. 2000).

regarding, a product or service. *See Kraft, Inc. v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992); *FTC v. 1st Guar. Mortg. Corp.*, No. 09-cv-61840, 2011 U.S. Dist. LEXIS 38152, at *49 (S.D. Fla. Mar. 30, 2011) (citing *Kraft* and finding that representations at issue "were material to consumers since they were instrumental in affecting consumers' decisions to pay for goods and services"). Here, Defendants' representations, including regarding lower interest rates and substantial savings, were material because they were express claims, which are "presumed to be material," *Pantron I Corp.*, 33 F.3d at 1095-96, and because they convinced consumers to purchase Defendants' CCIRR service.

The Complaint also alleges that the Defendants engage in an unfair practice under Section 5 by charging a fee to consumers who have not even agreed to use their services. A practice is unfair, within the meaning of Section 5, if it has caused or is likely to cause substantial injury to consumers that is not reasonably avoidable and that is not outweighed by countervailing benefits to consumers or competition. *See* 15 U.S.C. § 45(n); *see also Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1364 (11th Cir. 1988); *FTC v. Global Mktg. Grp.*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008) (citing the standard, as enunciated in *Orkin*, and finding defendants who processed payments for deceptive foreign telemarketers liable for unfair acts and practices). Here, Defendants' practice causes substantial injury, in the form of bogus charges totaling between $593 and $1593. Consumers cannot reasonably avoid this injury because Defendants simply charge consumers' credit card accounts without telling the consumers. Finally, there is no conceivable benefit to consumers or to competition from Defendants' charging consumers without authorization.

### 2.    The FTC Is Likely to Demonstrate
### that Defendants Violate the TSR.

The TSR prohibits telemarketers who sell "debt relief services" from (1) requesting or receiving payment before providing debt relief services, 16 C.F.R. § 310.4(a)(5)(i), and from (2) misrepresenting any material aspect of any debt relief service, including but not limited to the amount of money a customer may save by using such service. 16 C.F.R. § 310.3(a)(2)(x). A "debt relief service" is "any program or service represented...to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors..., including...a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor...." 16 C.F.R. § 310.2(m).

Defendants' CCIRR services constitute "debt relief services" because they claim to renegotiate terms of the debt – specifically, the interest rates – between customers and their creditors. As sellers of debt relief services, Defendants violate the TSR by requesting and receiving payments – between $593 and $1593 – before taking any steps to contact consumers' creditors and renegotiate their interest rates.[15]   *See, supra,* Section III.C. Defendants further violate the TSR by misrepresenting material aspects of the debt relief service.  Specifically, as discussed above, they falsely claim that: (1) they will negotiate lower credit card interest rates for consumers; (2) consumers will save thousands of dollars in a short time as a result of the lowered interest rates; and (3) consumers will be able to pay off their debts much faster as a result of Defendants' services. *See, supra,* Section III.B. Accordingly, Defendants violate the foregoing two provisions of the TSR.

---

[15] Even if Defendants call the credit card company while the consumer is on the line and negotiate a lower rate, they are still not permitted to collect a fee until the consumer has made a payment under the new agreement.  16 C.F.R. Part 310.3(a)(5)(i)(B)

### 3. The Individual Defendants Are Personally Liable for Injunctive and Monetary Relief.

Individuals are liable for injunctive relief if they participated directly in, or had the authority to control, the deceptive acts or practices. *See FTC v. Gem Merch. Corp.,* 87 F.3d 466, 470 (11th Cir. 1996). The authority to control is presumed when individuals act as officers of small, closely-held corporations. *See FTC v. Transnet Wireless Corp.,* 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007). In addition, individuals are liable for restitution if they had "some knowledge" of the deceptive acts or practices. *Gem Merch. Corp.,* 87 F.3d at 470. The FTC may demonstrate knowledge by proving "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *FTC v. Amy Travel Serv., Inc.,* 875 F.2d 564, 574 (7th Cir. 1989); *FTC v. RCA Credit Servs., LLC,* 727 F. Supp. 2d 1320, 1339 (M.D. Fla. 2010) (citing *Amy Travel*).

Defendants Toska and Plancher are individually liable for injunctive relief because, as corporate officers or managers of corporate Defendants GFA, WVUM, and LP, *see, supra,* Section II.B.4-5, they have the authority to control these entities. *See Amy Travel,* 875 F.2d at 573 (holding that authority to control the company can be evidenced by assuming the duties of a corporate officer); *see also Transnet Wireless Corp.,* 506 F. Supp. at 1270 (same).

Moreover, Toska and Plancher also are personally liable for restitution because they have knowledge of, and participate in, the deceptive practices of GFA, WVUM, and LP. At the very least, they know of a high probability of fraud, yet they intentionally avoid the truth. *See Amy Travel,* 875 F.2d at 574. Toska and Plancher trained telemarketers how to sell their CCIRR services. (PX18, ¶ 3-4; PX23, ¶ 7). Both were directly involved in the "front end

processing" and "back end processing" of their operations. *See, supra*, Section II.B.4-5. They were personally cited in 2010 for failing to comply with state telemarketing laws. (PX23, ¶ 7). Clearly, they participate in the illegal practices, with knowledge of exactly what their companies have been doing.

### B. The Balance of Equities Favors Entry of the TRO.

In addition to the FTC's overwhelming showing of a likelihood of success on the merits, the public equities tip decidedly in favor of entering a TRO. The public has a strong interest in preserving the Court's ability to order a meaningful remedy for Defendants' unfair and deceptive practices, including restitution for consumers. Indeed, in an FTC enforcement action, the public interest is entitled to greater weight. *See FTC v. Affordable Media*, 179 F.3d at 1236. Where, as here, Defendants have engaged in widespread unfair and deceptive telemarketing, the public interest in preserving assets and preventing the destruction of evidence outweighs any pecuniary interest Defendants have in keeping ill-gotten gains.

Defendants, by contrast, have no legitimate interest in continuing to deceive consumers, dissipating their assets, or destroying evidence. *See FTC v. World Wide Factors*, 882 F.2d 344, 347 (9th Cir. 1989) (upholding district court finding that there is "no oppressive hardship to defendants in requiring them to comply with the FTC Act, refrain from fraudulent representation or preserve their assets from dissipation or concealment."). Indeed, when considering the equities, the hardship , if any, experienced by defendants is afforded "little weight" in order to "protect the public at large." *FTC v. Vocational Guides*, No. 3:01-0170, 2008 WL 4908769, at *1 (M.D. Tenn. Nov. 12, 2008).

22

### C. An *Ex Parte* TRO Is Necessary to Prevent Defendants from Dissipating Assets and Destroying Evidence.

The Court has broad authority to order preliminary relief necessary to preserve the possibility of a full and complete remedy. *See Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) (stating that "the comprehensiveness of [the district court's] equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command"); *Gem Merch. Corp.*, 87 F.3d at 468 ("[T]he unqualified grant of statutory authority to issue an injunction under section 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits.").

Moreover, an *ex parte* TRO is warranted in this case because, pursuant to Federal Rule of Civil Procedure 65(b)(1), specific facts show that "immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1). Indeed, it is likely that Defendants will dissipate assets or destroy evidence if they receive notice of the Commission's filings before service of the requested TRO. In such circumstances, the entry of an order without notice to a defendant is proper. *See, e.g., Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 678-79 (1974) (postponing notice and hearing until after seizure of a yacht in part because pre-seizure notice might have prompted defendant to destroy, conceal, or remove the property). Courts in the Middle District of Florida have granted motions for *ex parte* TRO with similar ancillary relief in numerous FTC cases.[16]

---

[16] *See, e.g.,* FTC v. Direct Benefits Grp., No. 6:11-cv-01186-JA-GJK (M.D. Fla. July 19, 2011); FTC v. Nat'l Solutions LLC, No. 6:11-cv-1131-22GJK (M.D. Fla. July 12, 2011); FTC v. Vacation Prop. Servs., Inc., No. 8:11-cv-595-T-27MAP (M.D. Fla. Mar. 23, 2011); FTC v. JPM Accelerated Servs. Inc., No. 6:09-cv-2021-ORL-28-KRS (M.D. Fla. Nov. 30, 2009); FTC v. Career Hotline, Inc., No. 8:09-cv-1483-T-17TGW (M.D. Fla.

Here, to prevent asset dissipation and evidence destruction, and to preserve the possibility of effective final relief, the FTC seeks a TRO with, among other things, an asset freeze, immediate access to the business premises, and the appointment of a temporary receiver.

### D.   An Asset Freeze and Immediate Access to Business Premises Are Warranted.

Plaintiff seeks a TRO freezing Defendants' assets and authorizing immediate access to Defendants' business premises,[17] in order to preserve records that relate to Defendants' business practices or business and personal finances.  Such measures are necessary because Defendants are likely to dissipate assets and destroy evidence, based on (1) their blatant disregard for law enforcement, *see, supra,* Section III.D.; (2) their previous record of disposing of important documents, see, FTC's *ex parte* Motion to Temporarily Seal Entire File and Memorandum in Support, filed herewith; and (3) their practice of switching business names and locations to avoid detection, *see supra,* Section III.D.

### E.   Appointment of a Temporary Receiver Is Warranted.

The appointment of a temporary receiver over corporate Defendants GFA, WVUM and LP is critical to preserving assets for consumer redress.  When a corporate defendant, through its management, has defrauded members of the public, "it is likely that, in the absence of the appointment of a receiver to maintain the *status quo*, the corporate assets will

---

Aug. 4, 2009); FTC v. Home Assure, LLC, No. 8-09-cv-547-T-23TBM (M.D. Fla. Mar. 26, 2009); FTC v. RCA Credit Servs., No. 8:08-CV-2062-T-27MAP (M.D. Fla. Oct. 17, 2008).

[17]  The proposed TRO authorizes immediate access to all of Defendants' business premises including but not limited to: 931 South Semoran Boulevard, Suite 206, Winter Park, Florida 32792. The proposed TRO also requires Plancher and Toska to cooperate with the receiver and turn over business records that can be found at their residence at 383 Emerson Plaza, Suite 316, Altamonte Springs, Florida 32701, which they have also used as a business address for GFA and WVUM.

be subject to diversion and waste," further harming the victims of the fraud. *SEC v. First Fin. Grp.*, 645 F.2d 429, 438 (5th Cir. 1981). As shown above, Defendants are likely to liquidate assets, destroy evidence, and continue to injure consumers, if given the opportunity. A temporary receiver is necessary, therefore, to manage the businesses lawfully while preserving critical evidence about the scope of Defendants' fraud and maximizing the amount of compensation available for those consumers. Courts in this district routinely appoint temporary receivers for corporate defendants in FTC enforcement actions. *See, supra*, n.16.

## V.  CONCLUSION

For the foregoing reasons, the FTC requests that the Court grant its *Ex Parte* Motion for a Temporary Restraining Order with Ancillary Equitable Relief and for a Preliminary Injunction.

Respectfully Submitted,

Dated: /0/29/2012

**MICHAEL MILGROM**, OH Bar # 0012959
Trial Counsel
**JONATHAN L. KESSLER**, CO Bar # 15094
**FIL M. DE BANATE**, OH Bar # 0086039
Federal Trade Commission
1111 E. Superior Ave., Suite 200
Cleveland, Ohio 44114
(216) 263-3419 (telephone) (Milgrom)
(216) 263-3436 (telephone) (Kessler)
(216) 263-3413 (telephone) (de Banate)
(216) 263-3426 (facsimile)
mmilgrom@ftc.gov;  jkessler@ftc.gov
fdebanate@ftc.gov
Attorneys for Plaintiff
FEDERAL TRADE COMMISSION