# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>   **Plaintiff,**<br><br>   **v.**<br><br>**WV UNIVERSAL MANAGEMENT, LLC,**<br>   a Florida limited liability<br>   company, also dba<br>   Treasure Your Success,<br><br>**GLOBAL FINANCIAL ASSIST, LLC,**<br>   a Florida limited liability<br>   company,<br><br>**LEADING PRODUCTION, LLC,**<br>   a Florida limited liability<br>   company,<br><br>**WILLY PLANCHER,**<br>   individually and as a member of<br>   WV Universal Management, LLC,<br>   Global Financial Assist, LLC, and<br>   Leading Production, LLC,<br><br>**VALBONA TOSKA, aka Val Jones,**<br>   individually and as a member of<br>   WV Universal Management, LLC,<br>   Global Financial Assist, LLC, and<br>   Leading Production, LLC,<br><br>**HES MERCHANT SERVICES COMPANY, INC.,**<br>   a Florida corporation,<br><br>**BUSINESS FIRST SOLUTIONS, INC.,**<br>   a Florida corporation, | **Civ. No. 6:12-cv-1618-Orl-22-KRS**<br><br>**PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

**VOICEONYX CORP.**
        **a Florida corporation,**

**HAL E. SMITH, aka H.E. Smith, Harold**
        **E. Smith, and Howell E. Smith,**
        **individually and as an officer of**
        **HES Merchant Services**
        **Company, Inc.,**

**JONATHON E. WARREN, aka Jon**
**Warren,**
        **individually and as an officer of**
        **Business First Solutions, Inc.,**
        **and VoiceOnyx Corp.,**

**RAMON SANCHEZ-ORTEGA, aka**
        **Ramon Sanchez and**
        **Ramon Ortega, individually,**

**UNIVERSAL PROCESSING SERVICES**
**OF WISCONSIN, LLC,**
        **a New York limited liability**
        **company, also dba Newtek**
        **Merchant Solutions,**

**DEREK DEPUYDT,**
        **individually and as an officer of**
        **Universal Processing Services of**
        **Wisconsin, LLC,**

        **Defendants.**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.   The FTC brings this action under Sections 13(b) and 19 of the Federal Trade Commission

Act ("FTC Act"), 15 U.S.C. §§ 53(b) and 57b, and the Telemarketing and Consumer

Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to

obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation

of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies,

and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Trade Regulation Rule entitled "Telemarketing Sales Rule" ("TSR"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 57b, 6102(c), and 6105(b).

3. Venue is proper in this district under 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b).

## PLAINTIFF

4. The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.  The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108.   Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts and practices.

5. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.  15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c) and 6105(b).

## DEFENDANTS

6. WV Universal Management, LLC ("WVUM"), is a Florida limited liability company with its principal place of business at 1265 South Semoran Boulevard, Suite 1250, Winter

Park, Florida 32792.   Doing business as Treasure Your Success ("TYS"), WVUM transacts or has transacted business in this district and throughout the United States.

7. Global Financial Assist, LLC ("GFA"), is a Florida limited liability company with its principal place of business at 1265 South Semoran Boulevard, Suite 1250, Winter Park, Florida 32792.   GFA transacts or has transacted business in this district and throughout the United States.

8. Leading Production, LLC ("LP"), is a Florida limited liability company with its principal place of business at 931 South Semoran Boulevard, Suite 206, Winter Park, Florida 32792.   LP transacts or has transacted business in this district and throughout the United States.

9. Willy Plancher ("Plancher") is a member, partner, and/or manager of WVUM, GFA, and LP.   At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.   Plancher resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

10. Valbona Toska ("Toska") is a member, partner, and/or manager of WVUM, GFA, and LP.   At all times material to this Complaint, acting alone or in concert with others, she has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.   Toska resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this

district and throughout the United States.  In connection with the matters alleged herein, Toska has also used the name "Val Jones."

11. HES Merchant Services Company, Inc. ("HES"), is a Florida corporation with a last known principal place of business at 240 Windsor Drive, Kissimmee, Florida 34746. HES transacts or has transacted business in this district and throughout the United States.

12. Business First Solutions, Inc. ("BFS"), is a Florida corporation with a last known principal place of business at 984 Glenview Circle, Winter Garden, Florida 34787. BFS transacts or has transacted business in this district and throughout the United States.

13. VoiceOnyx Corp. ("VoiceOnyx"), is a Florida corporation with a last known principal place of business at 6150 Metrowest Boulevard, Suite 305-306, Orlando, Florida 32835. VoiceOnyx transacts or has transacted business in this district and throughout the United States.

14. Hal E. Smith ("Smith") is the owner, officer, and operator of HES. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of HES as set forth in this Complaint. Smith formerly resided in this district and is now believed to be a resident of Indiana and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.  In connection with the matters alleged herein, Smith has also used the name "H.E. Smith."

15. Jonathon E. Warren ("Warren") is the owner, officer, and operator of BFS and VoiceOnyx. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or

participated in the acts and practices of BFS and VoiceOnyx as set forth in this Complaint.  Warren resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.  In connection with the matters alleged herein, Warren has also used the name "Jon Warren."

16. Ramon Sanchez-Ortega ("Sanchez") is a provider of telemarketing services. Sanchez resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.  In connection with the matters alleged herein, Sanchez has also used the name "Ramon Sanchez" and "Ramon Ortega."

17. Universal Processing Services of Wisconsin, LLC, also doing business as Newtek Merchant Solutions, ("Newtek") is a New York limited liability company with its principal place of business at 744 North Fourth Street, Suite 500, Milwaukee, Wisconsin 53203. Newtek transacts or has transacted business in this district and throughout the United States.

18. Derek Depuydt ("Depuydt"), at times relevant to the complaint, was the president of Newtek.  He had the authority to control and did control Newtek. He personally participated in the acts and practices of Newtek alleged in this complaint and transacted business in this district and throughout the United States.

19. Together, WVUM, GFA, LP, Plancher, Toska, HES, BFS, VoiceOnyx, Smith, and Warren shall be referred to as "the TYS Defendants."

20. Defendants BFS and VoiceOnyx have operated as a common enterprise while engaging in the acts and practices set forth below through shared ownership, operations, and control. Warren controlled and directed the affairs of both corporations and used both in furtherance of the telemarketing scheme described below. BFS and VoiceOnyx used a joint invoice to bill TYS. Because BFS and VoiceOnyx have operated as a common enterprise, they are jointly and severally liable for the acts and practices alleged below.

## COMMERCE

21. At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANTS' OPERATIONAL SETUP

22. From at least March 2010 to around September 2011, Plancher and Toska operated GFA, which telemarketed and sold credit card interest rate reduction services ("CCIRRS") for third party companies that purportedly fulfilled or provided those CCIRRS for consumers.  These services were marketed deceptively in violation of Section 5 of the FTC Act and the TSR.

23.  Around October 2011, Smith and Warren, both of whom had been and were then involved in telemarketing in the Orlando area, proposed to Plancher and Toska a business that would be a one-stop shop for the telemarketing, sale and fulfillment of CCIRRS. Toska and Plancher agreed to the proposal and immediately joined Warren and Smith to execute their telemarketing venture, which became TYS.

**Role of Defendants Warren, BFS and VoiceOnyx**

24. In furtherance of the telemarketing scheme, Warren and BFS provided the following: (A) consulting services used to set up the telemarketing "boiler room" or sales room; (B) advice in setting up verification and fulfillment operations, including training on how to handle consumer complaints and how to use the TYS website BFS created;  (C) monitoring services, including on-site personnel to help address day-to-day operational issues; (D) information technology equipment and services, including (i) internet and email services used to solicit and communicate with consumers; (ii) computer servers; and (iii) a dedicated information technology personnel to make sure that the equipment and services performed as intended; (E) a Client Records Management database ("CRM") used to collect and store consumers' personal and financial information, transaction details, and payment histories, among other things; (F) a business website— www.treasureyoursuccess.com—used to solicit and communicate with consumers; and (G) template contracts and forms provided to consumers who agreed to use the CCIRRS offered by TYS.

25. Warren and BFS created the website, www.treasureyoursuccess.com, without input or assistance from Plancher or Toska. Through this website, the TYS Defendants provided information about TYS and its fictional employees, its CCIRRS and service contract, and the methods through which consumers could contact TYS. The website enabled consumers to provide their personal and contact information to TYS, if they wished to receive more information. Finally, the website gave consumers who fell for the

telemarketing scheme access to a "Customer Portal" or "User Portal" in order to check the purported progress of their accounts.

26. Warren and BFS created and made available to consumers the email account, cs@treasureyoursucces.com, which consumers used generally for customer support purposes, such as getting updates on their accounts and requesting refunds, among other things.

27. Warren personally monitored the business and was frequently on the business premises, especially during the initial set up phase of the sales room when he was on the premises every day. After setting up the sales room, he periodically showed up on the premises to inspect the business, including how Plancher and Toska were managing the operations.

28. In furtherance of the telemarketing scheme, Warren and VoiceOnyx provided the telephone equipment and services used by TYS to solicit and communicate with consumers. TYS made available to consumers several telephone numbers, including (888) 816-8966 and (302) 857-0302, which consumers used generally for customer support purposes, such as getting updates on their accounts and requesting refunds, among other things.

29. For their contributions to the telemarketing scheme, Warren and BFS took payment every month equal to one percent (1%) of the gross sales for the month. For their contributions to the telemarketing scheme, Warren and VoiceOnyx took payment, also on a monthly basis, by charging Plancher, Toska, and WVUM for the equipment and services.

**Role of Defendant Sanchez**

30. In furtherance of the telemarketing scheme, Sanchez provided telemarketing services by using prerecorded voice messages (also known as "robocalls" or "voice broadcasting") and outbound telephone calls to solicit consumers on behalf of TYS.

31. Hired by Plancher and Toska, Sanchez received payment on a daily basis, ranging from $1,500 to $2,500 per day, depending on the number of consumers forwarded to TYS from the robocalls and outbound calls made by Sanchez.

**Role of Defendants Smith and HES**

32. In furtherance of the telemarketing scheme, Smith and HES provided the following: (A) merchant accounts through Newtek that enabled TYS to charge the upfront fees for the CCIRRS on consumers' credit card accounts; (B) "win-back" or "chargeback recovery" services used to dispute and reverse chargebacks obtained by consumers; (C) monitoring services, including on-site personnel, to help address day-to-day operational issues; and (D) computer tablets provided to consumers purportedly as part of the CCIRRS.

33. Smith created two merchant accounts for TYS at Newtek: one account, on November 22, 2011, called "Treasure Your Success," and another account, on May 3, 2012, called "Treasure Your Success 2."

34. During the period between November 2011 and July 2012, TYS charged consumers' credit card accounts approximately $2.8 million. Without Smith's merchant accounts, it would have been impossible for TYS to charge consumers the upfront fees for the CCIRRS.

35. When a consumer requested a chargeback (*i.e.* a return credit of a previously charged amount) from the bank or credit card issuer, Smith and HES disputed the request by claiming that the charge was valid. Through their win-back or chargeback recovery efforts, Smith and HES successfully reversed many chargebacks obtained by consumers.

36. Smith personally monitored the business and was periodically on the business premises, giving advice and establishing requirements for Plancher and Toska. Even when he was not personally on the premises, he often sent his representatives to monitor the business.

37. One of the requirements that Smith imposed was for Plancher and Toska to provide consumers a computer tablet as part of the CCIRRS. The purpose of providing the computer tablets was to help prevent or reverse chargebacks by characterizing the CCIRRS transaction as a sale of goods which had been delivered as promised. Plancher and Toska had to purchase these computer tablets, which were of low quality and frequently did not work, from another company that Smith owns.

38. For their contributions to the telemarketing scheme, Smith and HES took payment every month equal to up to forty-two percent (42%) of the gross sales made by TYS in that month. During the period between November 2011 and July 2012, Smith and HES took payments in an estimated total of $1.18 million. Further, Smith and HES took additional payment for each chargeback that they successfully reversed, equal to ten percent (10%) of the amount of the reversed chargeback. Finally, Smith took additional payments for the computer tablets, on a per order basis.

39. Warren and Smith had complete access to TYS's CRM and merchant accounts. This enabled them to monitor and control the flow of money into the business and ultimately

to take their respective payments automatically and from the business' gross sales, before factoring in the other business expenses.

### Role of Defendants Plancher and Toska

40. In furtherance of the telemarketing scheme, Plancher and Toska: (A) managed the day-to-day operations of the sales room; (B) hired and fired telemarketers, negotiators, and other workers; (C) provided the telemarketing scripts used to solicit and sell the CCIRRS to consumers; and (D) paid employees and other creditors, such as utility providers, robocallers, an employee leasing company, and the building landlord.

### Role Of Defendants Newtek and Depuydt

### Credit Card Processing, Chargebacks, and Refunds Generally

41. In order to accept credit card payments from consumers, a merchant must establish a merchant account with a merchant bank (also referred to as an "acquiring bank").

42. Merchant banks are members of the credit card associations, such as MasterCard and Visa, and frequently enter into contracts with payment processors that manage the bank's merchant processing program.

43. A merchant account is used to transmit credit card transaction data and allocate or settle funds between merchants and consumers.

44. A merchant may establish a merchant account directly with a merchant bank.  In most cases, however, a merchant will establish a merchant account with a merchant bank through a payment processor.

45. Payment processors, such as Newtek, are entities that process credit or debit card transactions between merchants and consumers.

46. When a merchant obtains a merchant account through a payment processor, it typically enters into a merchant processing agreement with a merchant bank and the payment processor.

47. Before entering into a credit card processing agreement with a merchant, payment processors typically perform an underwriting of the account to determine the merchant's risk profile.

48. Rules set by credit card associations require that merchant banks and their processors take steps to verify that merchants who seek to charge consumer credit cards are bona fide businesses and are in compliance with applicable laws.

49. Consumers have the ability to dispute charges that appear on their credit bills through a process that is known as the "chargeback" process.

50. The chargeback process is intended to protect consumers from fraud and unauthorized charges on their credit card bills.

51. A consumer initiates the chargeback process by contacting her credit card issuing bank to dispute a charge appearing on her credit card account statement.

52. A consumer's right to initiate a credit card chargeback is guaranteed by Regulation Z of the Truth in Lending Act, 15 U.S.C. §§ 1601-1616.

53. When a consumer successfully disputes a charge through the chargeback process, the consumer's issuing bank credits the consumer's credit card for the amount of the disputed charge.  The issuing bank, in turn, recovers the amount of the chargeback from the merchant bank, which typically collects that amount from the payment processor.  The

payment processor then typically collects the amount of the chargeback from the merchant.

54. Credit card associations – such as Visa and MasterCard – have rules regarding the chargeback process. Those rules provide that merchants may dispute an attempted chargeback by arguing that the charge was, in fact, valid. If the merchant disputes the attempted chargeback, the credit card association rules govern the manner in which the dispute is resolved. If the merchant is successful in disputing the chargeback, the issuing bank reverses any provisional credit issued to the consumer and the consumer becomes financially responsible for the disputed charge. When a consumer's chargeback is successful, the disputed charge is removed from the consumer's account or an offsetting credit is issued.

55. Each chargeback receives a chargeback reason code that describes the nature of the dispute, such as "consumer claims to have never received the goods as promised at the time of purchase," "services not provided," "services or goods not as described," "credit not processed," "requested/required authorization not obtained," or "fraudulent transaction."

56. Guidance issued by credit card associations warns payment processors to be on the lookout for these types of chargeback codes as an indicator that the merchant may be involved in fraud.

57. In contrast to a chargeback, a refund occurs when a consumer contacts the merchant directly to obtain a reversal of charges to his or her credit card account. Refunds issued by merchants directly to consumers do not result in chargebacks. In some instances, a

merchant may refund money to consumers while a chargeback is pending, which may help the merchant avoid the fees associated with the chargeback process.

58. Guidance issued by federal regulatory authorities as early as 2008 and provided to payment processors warns of heightened risks of fraud for merchants engaged in telemarketing, notes the importance of proper initial due diligence, effective underwriting, and ongoing monitoring of chargeback rates for telemarketers, and advises that the failure to have rigorous due diligence, underwriting, monitoring, and prompt termination for telemarketers with high chargeback rates could result in the processor being viewed as assisting and facilitating a telemarketer's fraud or illegal activity.

**Newtek and Depuydt Processed Payments for TYS Despite Numerous**

**Indications that TYS Engaged in Illegal Activity**

59. Newtek provided credit card payment processing services to TYS. Depuydt personally oversaw all of the accounts funneled by Smith into Newtek, and approved TYS's application to use Newtek's services. Newtek's payment processing services enabled the charges on consumers' credit card accounts to clear through the credit card network. During the period between November 2011 and July 2012, Newtek processed credit card charges totaling approximately $2.8 million. Without Newtek's and Depuydt's assistance in providing the payment processing services, it would have been impossible for the TYS Defendants to charge consumers the fees for the CCIRRS.

60. Newtek received a substantial fee for its credit card payment processing services. Newtek also withheld up to twenty percent (20%) of the gross sales every month and placed the funds in a reserve account used to cover consumer chargebacks.

61. Newtek and Depuydt substantially assisted and facilitated the TYS Defendants' violations of the TSR by providing them the credit card payment processing services. Newtek and Depuydt knew, or consciously avoided knowing, that the TYS Defendants were engaged in the unlawful practices described below in paragraphs 64 through 75.  A) By November 2011, when Plancher and Toska applied for processing services through Smith, Newtek and Depuydt already knew that many of Smith's accounts were connected to operations that were likely engaged in fraud.  B) Plancher's and Toska's application for a merchant account showed that they were engaged in telemarketing.  C) Though Newtek's procedures required the applicants to produce their telemarketing scripts and contracts, they did not do so, and Newtek simply ignored this deficiency, which would have alerted them to the TYS Defendants' TSR violations.  D) The credit reports obtained by Newtek and Depuydt during the application process stated specifically that Plancher and Toska had substantial debts and serious delinquencies and were at high risk for fraud.

62. Once Plancher and Toska obtained a merchant account, additional indicia of fraud surfaced quickly.  A) By January 2012, after only two full months of operation, TYS was already incurring substantial chargebacks, the rate of which continued to increase.  B) MasterCard put TYS on a monitoring list and investigated it for fraud.  C) Newtek and Depuydt knew of the excessive chargebacks and the action by MasterCard but took no action other than to increase the amount of TYS's revenue that they held as a reserve against chargebacks.

63.  In May 2012, Plancher and Toska applied for another merchant account using the name "Treasure Your Success 2."   Again, Newtek and Depuydt obtained and reviewed individual credit reports showing substantial delinquent debts and specifically labeling Plancher and Toska as high risk for fraud. Again, Newtek and Depuydt failed to obtain and review the applicants' telemarketing scripts and contracts as required by Newtek's company procedures.   Despite these indicia of fraud and the pattern of excessive chargebacks from the first TYS merchant account, Newtek and Depuydt approved the application again.   Newtek never took any action in response to TYS's fraudulent activities other than to increase the amount it withheld from TYS's revenue.

### DEFENDANTS' BUSINESS PRACTICES

64. From at least November 2011 until July 2012, the TYS Defendants and Sanchez telemarketed CCIRRS to consumers nationwide in the United States. After TYS disbanded around August 2012, Plancher and Toska formed LP and continued to telemarket CCIRRS until the Court issued its temporary restraining order in this matter.

65. In many instances, the TYS Defendants' and Sanchez's telemarketing calls were initiated using prerecorded voice messages or robocalls. The robocalls often offered consumers the purported opportunity to secure substantially lower credit card interest rates and instructed consumers to press a number on their phone to be connected to a live representative.   When consumers pressed the number, they were connected to a live representative who worked for the TYS Defendants.  The TYS Defendants also marketed their CCIRRS via the Internet on a website, www.treasureyoursuccess.com.

66. During telemarketing calls, the TYS Defendants claimed to have the ability to reduce substantially consumers' credit card interest rates.   In many instances, the TYS Defendants claimed that they could obtain very low interest rates, such as three percent (3%), for consumers. The TYS Defendants also often claimed that their CCIRRS would provide substantial savings to consumers, typically at least $2,500, in a short period of time, and would enable consumers to pay off their debt much faster, typically three to five times faster.

67. During telemarketing calls, the TYS Defendants typically took information from consumers regarding their credit card accounts along with other personal information, such as birthdays and Social Security numbers.

68. The TYS Defendants charged consumers an upfront fee ranging from $593.93 to $1,593.93 for the CCIRRS.  They typically placed this charge on consumers' credit cards during or immediately following the telemarketing calls. During telemarketing calls, however, the TYS Defendants represented that the fee would not be charged until the consumer had achieved the promised savings or, on other occasions, until the consumer had signed a written contract.   In fact, in numerous instances, the TYS Defendants charged their fee on the consumer's credit card even though the consumer had not signed, or even received, the written contract.  Some consumers who were charged had not even orally agreed to the transaction.

69. After the telemarketing call and after they charged their fee on the consumer's credit card, the TYS Defendants sometimes sent the consumer a written contract and forms to complete and return, listing again all of the consumer's credit card account information

and other sensitive personal information, such as date of birth and Social Security number. The TYS Defendants also, or instead, sent the consumer a computer tablet purportedly to record and keep track of their financial situation as TYS Defendants improved it.  In fact, if the consumer received a computer tablet, it was of very low quality and frequently did not work.

70. In numerous instances, the TYS Defendants failed to provide consumers with the significant reductions in credit card interest rate and the minimum savings promised during the initial telemarketing calls. Typically, the TYS Defendants failed to provide any reduction in consumers' credit card interest rate or any savings at all. Consequently, consumers were not able to pay their credit card debts faster than they could have without the CCIRRS.

71. Despite failing to deliver on their promises to consumers, the TYS Defendants rarely refunded the fee charged to consumers for purchasing the CCIRRS. Consumers who discovered that the TYS Defendants had placed a charge on their credit card accounts before providing any service, but who called to cancel, were often promised a refund but did not receive one.

72. While telemarketing their program, the TYS Defendants and Sanchez, acting directly or through one or more intermediaries, made numerous calls to telephone numbers listed on the National Do Not Call Registry ("Registry") and to consumers who previously asked the TYS Defendants not to call them again.

73.  In numerous instances, the TYS Defendants and Sanchez, acting directly or through one or more intermediaries, initiated telemarketing calls that failed to disclose truthfully,

promptly, and in a clear and conspicuous manner to the person receiving the call: (A) the identity of the seller; (B) that the purpose of the call is to sell goods or services; or (C) the nature of the goods or services.

74. In numerous instances, the TYS Defendants and Sanchez, acting directly or through one or more intermediaries, initiated prerecorded telemarketing calls to consumers that failed to promptly make such disclosures, or to immediately thereafter disclose the mechanism for consumers to assert a Do Not Call request.

75. In numerous instances, the TYS Defendants and Sanchez, acting directly or through one or more intermediaries, made outbound prerecorded calls that delivered messages to induce the sale of goods or services when the persons to whom these telephone calls were made had not expressly agreed, in writing, to authorize the seller to place prerecorded calls to such persons.

76. The TYS Defendants and Sanchez have called telephone numbers in various area codes without first paying the annual fee for access to the telephone numbers within such area codes that are included in the National Do Not Call Registry.

## VIOLATIONS OF THE FTC ACT

77. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

78. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.  15 U.S.C. § 45(a).

79. Acts or practices are unfair under Section 5 of the FTC Act if they cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT ONE

### Misrepresentations in Violation of Section 5

80. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit card interest rate reduction services, the TYS Defendants have represented, directly or indirectly, expressly or by implication, that:

   A. Consumers, who purchase the TYS Defendants' credit card interest rate reduction services, will have their credit card interest rates reduced substantially, including to as low as three percent (3%);

   B. Consumers, who purchase the TYS Defendants' credit card interest rate reduction services, will save thousands of dollars in a short time as a result of lowered credit card interest rates; and

   C. Consumers, who purchase TYS Defendants' credit card interest rate reduction services, will be able to pay off their debts much faster as a result of lowered credit card interest rates.

81. In truth and in fact, the representations set forth in Paragraph 80 were false or not substantiated at the time the representations were made.

82. Therefore, the TYS Defendants' representations, as set forth in Paragraph 80, are false and misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO

### Misrepresentations in Violation of Section 5

83. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of credit card interest rate reduction services, the TYS Defendants have represented, directly or indirectly, expressly or by implication, that they will not charge consumers for their services until:

    A.  After consumers have realized the promised savings; or

    B.  After consumers have had time to review, sign, and return a written contract which the TYS Defendants promised to mail to them.

84. In truth and in fact, the TYS Defendants' practice is to charge their fee on the consumer's account immediately or within one day after the consumer orally agrees to accept the TYS Defendants' services.

85. Therefore, the TYS Defendants' representations, as set forth in Paragraph 83, are false and misleading and constitute deceptive acts or practices in violation of Section (a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT THREE

### Unauthorized Billing

86. In numerous instances, the TYS Defendants have caused billing information to be submitted for payment without having obtained previously consumers' express informed consent.

87. The TYS Defendants' actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

88. Therefore, the TYS Defendants' practice, as described in Paragraph 86, constitutes an unfair act or practice in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and 45(n).

### THE TELEMARKETING SALES RULE

89. Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108.  The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain provisions thereafter.  16 C.F.R. Part 310.

90. As amended, effective September 27, 2010, and October 27, 2010, the TSR addresses the telemarketing of debt relief services.  The amendments effective September 27, 2010, among other things, prohibit misrepresentations about material aspects of debt relief services.  The amendments effective October 27, 2010, prohibit sellers and telemarketers from charging or collecting an advance fee before renegotiating, settling, reducing, or otherwise altering consumers' debts.

91. The TYS Defendants and Sanchez are "seller[s]" and/or "telemarketer[s]" engaged in "telemarketing," and they have initiated, or have caused telemarketers to initiate, "outbound telephone call[s]" to consumers to induce the purchase of goods or services, as those terms are defined in the TSR, 16 C.F.R. § 310.2(v), (aa), (cc), and (dd).  The TYS

Defendants and Sanchez also are sellers or telemarketers of "debt relief service[s]," as defined by the TSR, 16 C.F.R. § 310.2(m).

92. Under the TSR, an "outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase of goods or services or to solicit a charitable contribution.  16 C.F.R. § 310.2(v).

93. As amended, effective September 27, 2010, the TSR prohibits sellers and telemarketers from misrepresenting, directly or by implication, in the sale of goods or services, any material aspect of any debt relief service.  16 C.F.R. § 310.3(a)(2)(x).

94. The TSR prohibits sellers and telemarketers from causing billing information to be submitted for payment, directly or indirectly, without the express informed consent of the consumer.  16 C.F.R. § 310.4(a)(7).

95. As amended, effective October 27, 2010, the TSR prohibits sellers and telemarketers from requesting or receiving payment of any fee or consideration for any debt relief service until and unless:

A. The seller or telemarketer has renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer;

B. The consumer has made at least one payment pursuant to that settlement agreement, debt management plan, or other valid contractual agreement between the customer and the creditor or debt collector; and

C. To the extent that debts enrolled in a service are renegotiated, settled, reduced, or otherwise altered individually, the fee or consideration either (1) bears the same

proportional relationship to the total fee for renegotiating, settling, reducing, or altering the terms of the entire debt balance as the individual debt amount bears to the entire debt amount; or (2) is a percentage of the amount saved as a result of the renegotiation, settlement, reduction, or alteration.

16 C.F.R. § 310.4(a)(5)(i).

96. The TSR, as amended in 2003, established a "do-not-call" registry (the "National Do Not Call Registry" or "Registry"), maintained by the FTC, of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can register their telephone numbers on the Registry without charge either through a toll-free telephone call or over the Internet at www.donotcall.gov.

97. Consumers who receive telemarketing calls to their registered numbers can complain of Registry violations the same way they registered, through a toll-free telephone call or over the Internet at www.donotcall.gov, or by otherwise contacting law enforcement authorities.

98. The FTC allows sellers, telemarketers, and other permitted organizations to access the Registry over the Internet at www.telemarketing.donotcall.gov to pay any required fee(s) and to download the numbers not to call.

99. The TSR prohibits sellers and telemarketers from calling any telephone number within a given area code unless the seller on whose behalf the call is made has paid the annual fee for access to the telephone numbers within that area code that are included in the Registry.  16 C.F.R. § 310.8

100. The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to telephone numbers on the Registry.  16 C.F.R. § 310.4(b)(1)(iii)(B).

101. The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to any person when that person previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered.  16 C.F.R. § 310.4(b)(1)(iii)(A).

102. The TSR requires telemarketers in an outbound telephone call to disclose truthfully, promptly, and in a clear and conspicuous manner, the following information:

A.  The identity of the seller;

B.  That the purpose of the call is to sell goods or services; and

C.  The nature of the goods or services.

16  C.F.R. § 310.4(d).

103. As amended, effective December 1, 2008, the TSR prohibits a telemarketer from engaging, and a seller from causing a telemarketer to engage, in initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the message promptly discloses:

A.  The identity of the seller;

B.  That the purpose of the call is to sell goods or services; and

C.  The nature of the goods or services.

16  C.F.R. § 310.4(b)(1)(v)(B)(ii).

104. As amended, effective September 1, 2009, the TSR prohibits initiating a telephone call that delivers a prerecorded message to induce the purchase of any good or service unless

the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the recipient of the call to receive calls that deliver prerecorded messages by or on behalf of a specific seller. The express agreement must include the recipient's telephone number and signature, must be obtained after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person, and must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service. 16 C.F.R. § 310.4(b)(1)(v)(A).

105. The TSR prohibits a person from providing substantial assistance or support to any seller or telemarketer when that person "knows or consciously avoids knowing" that the seller or telemarketer is engaged in acts or practices that violate Sections 310.3(a), (c) or (d), or 310.4 of the TSR. 16 C.F.R. § 310.3(b).

106. Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## VIOLATIONS OF THE TELEMARKETING SALES RULE

### COUNT FOUR

**Misrepresentation of Debt Relief Service in Violation of the TSR**

107. In numerous instances on or after September 27, 2010, in connection with the telemarketing of debt relief services, the TYS Defendants have misrepresented, directly

or by implication, material aspects of the debt relief services, including, but not limited to, that:

A. Consumers, who purchase the TYS Defendants' credit card interest rate reduction services, will have their credit card interest rates reduced substantially, including to as low as three percent (3%);

B. Consumers, who purchase the TYS Defendants' credit card interest rate reduction services, will save thousands of dollars in a short time as a result of lowered credit card interest rates;

C. Consumers, who purchase the TYS Defendants' credit card interest rate reduction services, will be able to pay off their debts much faster as a result of lowered credit card interest rates;

D. The TYS Defendants will not charge consumers a fee for their services until consumers have achieved the promised savings; and

E. The TYS Defendants will not charge consumers a fee for their services until after consumers have had time to review, sign, and return a written contract which the TYS Defendants promised to mail to them.

108. The TYS Defendants' acts and practices, as described in Paragraph 107, are deceptive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.3(a)(2)(x).

## COUNT FIVE

### Charging or Receiving a Fee in Advance of Providing Debt Relief Services

109. In numerous instances on or after October 27, 2010, in the course of telemarketing debt relief services, the TYS Defendants have requested or received payment of a fee or consideration for a debt relief service before:

A.  They have renegotiated, settled, reduced, or otherwise altered the terms of at least one debt pursuant to a settlement agreement, debt management plan, or other such valid contractual agreement executed by the customer; and

B.  The customer has made at least one payment pursuant to that agreement.

110. The TYS Defendants' acts or practices, as described in Paragraph 109, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(5)(i).

## COUNT SIX

### Violating the National Do Not Call Registry

111. In numerous instances, in connection with telemarketing, the TYS Defendants and Defendant Sanchez have engaged, or caused a telemarketer to engage, in initiating an outbound telephone call to a telephone number listed on the National Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(B).

## COUNT SEVEN

### Failing to Honor Do Not Call Requests

112. In numerous instances, in connection with telemarketing, the TYS Defendants and Defendant Sanchez have engaged, or caused a telemarketer to engage, in initiating an outbound telephone call to a person who previously has stated that he or she does not

wish to receive an outbound telephone call made by or on behalf of the TYS Defendants or Defendant Sanchez, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(iii)(A).

## COUNT EIGHT

### Initiating Unlawful Prerecorded Messages On or After September 1, 2009

113. In numerous instances on or after September 1, 2009, the TYS Defendants and Defendant Sanchez have made, or caused others to make, outbound telephone calls that delivered prerecorded messages to induce the purchase of goods or services, in violation of the TSR, 16 C.F.R. § 310.4(b)(1)(v).

## COUNT NINE

### Failing to Make Required Oral Disclosures

114. In numerous instances, including on or after December 1, 2008, in the course of telemarketing goods and services, the TYS Defendants and Defendant Sanchez have made, or caused others to make, outbound telephone calls that deliver a prerecorded message in which the telemarketer or message failed to disclose truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call:

A.  The identity of the seller;

B.  That the purpose of the call is to sell goods or services; and

C.  The nature of the goods or services.

115. The TYS Defendants' and Defendant Sanchez's acts and practices, as described in Paragraph 114, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(b)(1)(v)(B)(ii) and (d).

## COUNT TEN

### Failing to Pay National Registry Fees

116. In numerous instances, in connection with telemarketing, the TYS Defendants and Defendant Sanchez have initiated, or caused others to initiate, an outbound telephone call to a telephone number within a given area code when neither TYS Defendants nor Defendant Sanchez had, either directly or through another person, paid the required annual fee for access to the telephone numbers within that area code that are included in the National Do Not Call Registry, in violation of the TSR, 16 C.F.R. § 310.8.

## COUNT ELEVEN

### Unauthorized Billing

117. In numerous instances, in the course of telemarketing goods and services, the TYS Defendants have caused billing information to be submitted for payment without the express informed consent of the consumer.

118. The TYS Defendants' acts and practices, as described in Paragraph 117, are abusive telemarketing acts or practices that violate the TSR, 16 C.F.R. § 310.4(a)(7).

## COUNT TWELVE

### Assisting and Facilitating Deceptive and Abusive Telemarketing Acts and Practices

119. Defendant Newtek and Defendant Depuydt provided substantial assistance or support to the TYS Defendants who they knew, or consciously avoided knowing, were engaged in the violations of the TSR set forth in Counts Four, Five, Six, Eight, Nine and Eleven of this First Amended Complaint.

120. Defendant Newtek's and Defendant Depuydt's acts or practices alleged in Paragraph 119 constitute deceptive telemarketing acts or practices, in violation of the TSR, 16 C.F.R. § 310.3(b).

## CONSUMER INJURY

121. Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act and the TSR.  In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

122. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC.  The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

123. Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorize this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiff FTC, pursuant to Sections 13(b) and 19 of the FTC Act, 15 U.S.C. § 53(b) and 57b, Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

A.  Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including, but not limited to, temporary and preliminary injunctions, an order freezing assets, immediate access, and the appointment of a receiver;

B.  Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

C.  Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

D.  Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Respectfully Submitted,

**DAVID C. SHONKA**
Acting General Counsel

**JON MILLER STEIGER**
Regional Director
East Central Region

Dated:  June 18, 2013

*/s/ Michael Milgrom*
**MICHAEL MILGROM**, OH Bar # 0012959
     Trial Counsel
**JONATHAN L. KESSLER**, CO Bar # 15094
**FIL M. DE BANATE**, OH Bar # 0086039
Federal Trade Commission
1111 E. Superior Ave., Suite 200
Cleveland, Ohio 44114
(216) 263-3419 (telephone) (Milgrom)
(216) 263-3436 (telephone) (Kessler)
(216) 263-3413 (telephone) (de Banate)
(216) 263-3426 (facsimile)
mmilgrom@ftc.gov
jkessler@ftc.gov
fdebanate@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

*CERTIFICATE OF SERVICE*

I certify that I electronically filed the forgoing PLAINTIFF FEDERAL TRADE COMMISSION'S FIRST AMENDED COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF on June 18, 2013. The Court-appointed Receiver, Michael L. Gore, will be served by operation of the Court's electronic system. I further certify that, on June 18, 2013, I sent copies of the filing to Defendants Valbona Toska and Willy Plancher by electronic mail at valbona.toska@yahoo.com and by United States Mail, addressed to the following:

> Valbona Toska
> Willy Plancher
> WV Universal Management, LLC
> Global Financial Assist, LLC
> Leading Production, LLC
> 140 Gardenridge Road, # 304
> Winter Spring, FL 32708

Dated: June 18, 2013                                    */s/ Michael Milgrom*
                                                       **MICHAEL MILGROM**
                                                       Attorney for Plaintiff