**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>**Plaintiff,**<br><br>v.<br><br>**WV UNIVERSAL MANAGEMENT, LLC; GLOBAL FINANCIAL ASSIST, LLC; LEADING PRODUCTION, LLC; WILLY PLANCHER; VALBONA TOSKA; HES MERCHANT SERVICES COMPANY, INC.; BUSINESS FIRST SOLUTIONS, INC.; VOICEONYX CORP.; HAL E. SMITH; JONATHON E. WARREN; RAMON SANCHEZ-ORTEGA; UNIVERSAL PROCESSING SERVICES OF WISCONSIN, LLC; DEREK DEPUYDT,**<br><br>**Defendants.** | **Civ. No. 6:12-cv-1618-Orl-22-KRS** |

**PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM
IN OPPOSITION TO THE MOTION TO DISMISS BY DEFENDANTS
HES MERCHANT SERVICES COMPANY, INC. AND HAL E. SMITH**

**PRELIMINARY STATEMENT**

Defendants Hal E. Smith and HES Merchant Services Company, Inc. claim that the Federal Trade Commission's First Amended Complaint "fails to adequately allege" sufficient facts against them. In fact, over the course of sixty-nine paragraphs of facts, the First Amended Complaint states a detailed and legally sufficient case. The Motion to Dismiss, Doc. 87, should be denied.

**ARGUMENT**

**I.    Procedural Background and Summary of the Argument**

The Federal Trade Commission ("FTC" or "Commission") filed its original Complaint against Global Financial Assist, LLC ("GFA"), WV Universal Management, LLC, doing business as Treasure Your Success, ("TYS"), Leading Production, LLC ("LP"), and their principals, Willy Plancher ("Plancher") and Valbona Toska ("Toska"), to enjoin them from deceptively marketing and selling fraudulent credit card interest rate reduction services ("CCIRRS") and to require them to provide redress to injured consumers. (Doc. 1). Subsequently, the Court entered a preliminary injunction against these Defendants. (Doc. 31). After these Defendants filed an Answer, (Doc. 40), discovery ensued.[1]

During discovery, the FTC learned that Hal E. Smith ("Smith") and his company, HES Merchant Services Company, Inc. ("HES"), and the other newly added Defendants were an integral part of the original Defendants' CCIRRS scheme. Accordingly, with the Court's approval, (Doc. 60), the FTC filed its First Amended Complaint, (Doc. 61), ("Amended Complaint"), adding Smith and HES, along with Jonathon E. Warren ("Warren"), Business First

---

[1] As noted to the Court, the FTC Commissioners are considering for approval a settlement agreement between the Commission and the original Defendants, GFA, TYS, LP, Plancher and Toska. (Doc. 79).

Solutions, Inc., VoiceOnyx Corp., Ramon Sanchez-Ortega, Universal Processing Services of Wisconsin, LLC, doing business as Newtek Merchant Solutions ("Newtek"), and Derek Depuydt as Defendants in this case. (Doc. 61). Smith and HES have now moved to dismiss the Amended Complaint. (Doc. 87).  For the following reasons, this Court should deny the Motion to Dismiss.

The Amended Complaint describes in great detail the Defendants, (Doc. 61, ¶¶ 6-20), and their CCIRRS scheme, including when they all agreed to form and execute their "telemarketing venture, which became TYS" (Doc. 61, ¶ 23); the ways in which each Defendant directly participated in and controlled the scheme, (Doc. 61, ¶¶ 24-63); and how they jointly operated the scheme that victimized consumers to the tune of millions of dollars (Doc. 61, ¶¶ 34, 64-76). These sixty-nine paragraphs show that Smith and HES were not merely disinterested third parties providing goods and services to TYS in arms-length transactions. Rather, they show that Smith and HES were direct participants in the TYS venture and controlled its business practices, which they knew were unfair and deceptive, in turn, forming the basis for the claims alleged against them.

Despite these allegations, the movants argue for dismissal of the Amended Complaint based on the FTC's "fail[ure] to adequately allege that HES and SMITH were engaged in an enterprise with the named Defendants." (Doc. 87, p. 3). They contend that the only way the FTC can prove their liability for their involvement in the TYS venture is by specifically alleging that they were engaged in a common enterprise with the rest of the Defendants. (Doc. 87, pp. 4-6). Their argument shows that they misunderstand the basis of their liability. The FTC is not required to specifically allege that a common enterprise exists between the movants and the rest of the schemers in this case.  While common enterprise might ultimately form a basis for liability, here, the FTC alleges that the movants directly initiated, executed, participated in, and

controlled the TYS venture and its business practices, which they knew were unlawful. (Doc. 61, ¶¶ 11, 14, 23, 32-39, 64-76). Taken as true, these allegations are sufficient to state claims under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a) ("FTC Act") and the Telemarketing Sales Rule, 16 C.F.R. Part 310 *et seq.* ("TSR"). *See, e.g., FTC v. GEM Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (discussing liability based on the defendant's direct participation in or control over practices that the defendant knew were unfair or deceptive); *FTC v. Windward Mktg., Ltd.*, No. 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114, at *38 (N.D. Ga. Sept 30, 1997); *FTC v. Atlantex Assocs.*, No. 87-0045-CIV-NESBITT, 1987 U.S. Dist. LEXIS 10911, at *30 (S.D. Fla. Nov. 25, 1987); *cf. FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271-72 (M.D. Fla. 2012) (discussing an alternative basis for liability centered on the defendant's participation in a common enterprise).

The movants also argue for dismissal of the Amended Complaint as to HES, citing the FTC's "fail[ure] to adequately allege that HES violated Section 5 of the FTC Act or the Telemarketing Rule." (Doc. 87, p. 4) They claim that HES never made representations or telephone calls to consumers and therefore cannot be liable under the FTC Act or TSR. In this argument, they imply that the only way the FTC can prove HES's liability is by alleging that HES directly participated in *the acts that constitute law violations*. (Doc. 87, pp. 6-7). Their argument misconstrues the FTC's claim. The FTC alleges that Smith and HES directly participated in *and* controlled *the TYS venture and its practices*, which they knew were unlawful. Taken as true, allegations of HES's direct participation *and* control are sufficient to state claims under the FTC Act and TSR. *See, e.g., GEM Merchandising*, 87 F.3d at 470; *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114 at *38; *Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911 at *30.

3

The movants further argue for dismissal of the Amended Complaint as to Smith based on the FTC's "fail[ure] to adequately allege why Smith is individually liable." (Doc. 87, p. 4). According to Defendants, the Amended Complaint is defective because it fails to allege that: (1) Smith was part of a common enterprise (Doc. 87, p. 8); or (2) Smith directly participated in or controlled TYS's unlawful practices (Doc. 87, pp. 8). This argument suffers from the same fatal reasons stated above. The Amended Complaint alleges numerous facts from which the Court can conclude that Smith, directly and through HES, participated in and/or controlled the acts and practices of the TYS venture. Smith cannot escape liability for his direct participation in and control over the TYS venture and its business practices, which he knew were unlawful, even if he did not personally talk on the phone with consumers. *See, e.g., GEM Merchandising*, 87 F.3d at 470; *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114 at \*38; *Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911 at \*30.

Finally, the movants argue for dismissal of the Amended Complaint because the FTC has "improperly lumped the Defendants together and HES and SMITH cannot ascertain the actual claims made against them." (Doc. 87, p. 4). Under this argument, they are, in part, just rehashing their arguments above. Under the applicable law, the FTC's allegations are sufficient to state claims under the FTC Act and TSR. *See, e.g., GEM Merchandising*, 87 F.3d at 470; *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114 at \*38; *Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911 at \*30. These allegations also aid the Court in understanding the Defendants' scheme as a whole and in weighing the claims relating to each Defendant. *See, e.g., FTC v. Sterling Precious Metals*, No. 12-80597-CIV-MARRA, 2013 U.S. Dist. LEXIS 20879, at \*11-13 (S. D. Fla. Feb. 14, 2013) (opining that "allegations pertaining to Defendants *as a whole* provide the context,"

which helps the court review the sufficiency of a complaint) (emphasis in original); *FTC v. Innovative Mktg., Inc.*, 654 F. Supp. 2d 378, 388 (D. Md. 2009) (same).

As further shown below, the Amended Complaint pleads sufficient factual allegations that, accepted as true and construed in the light most favorable to the FTC, state a claim for relief against Defendants Smith and HES. Therefore, the Court should deny their Motion to Dismiss.

## II. Standard for Motion to Dismiss under Rule 12(b)(6)

Federal Civil Procedure Rule 8 establishes the general standard of pleading and requires only that a complaint "contain…a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 does not require "detailed factual allegations," but it requires more than "labels or conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted).

A complaint will survive a Rule 12(b)(6) motion to dismiss, if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id*. at 678 (internal quotes omitted). Determining whether a complaint states a plausible claim to relief is "a context-specific task that requires the court to draw on its judicial experience and common sense." *Id*. at 679; *see also Innovative Mktg.*, 654 F. Supp. 2d at 388. In making that determination, the court must "accept the allegations in the complaint as true and construe them in the light most favorable to the nonmoving party." *Carvel v. Godley*, 404 Fed. Appx. 359, 360 (11th Cir. 2010). The plausibility standard is not a "probability requirement." *Iqbal*, 556 U.S. at 678, 696 ("[T]he relevant question is whether…the plaintiff has stated a ground for relief that is plausible. That is…a plaintiff must 'allege facts' that, taken as true, are 'suggestive of illegal conduct.'") (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 564 (2007)).

5

### III. The Amended Complaint Pleads Facts Sufficient to State a Claim for Relief Against Defendants Smith and HES.

#### A. The Amended Complaint Sufficiently Alleges that TYS Has Violated the FTC Act and TSR.

The TYS venture was masterminded by four individuals deeply involved in the fraudulent telemarketing industry. Prior to TYS, Plancher and Toska operated GFA, (Doc. 61, ¶ 22), while Smith and Warren had long been involved in other telemarketing ventures. (Doc. 61, ¶ 23). In October 2011, Smith and Warren convinced Plancher and Toska to "join[] [together]" and operate a "one-stop shop" for CCIRRS. The movants do not dispute that they "propos[ed] [this] plan" and "business venture." (Doc. 87, pp. 5, 9). This one-stop shop meant that their venture would perform all aspects of their CCIRRS scheme—telemarketing, sales, *and* fulfillment, thereby cutting ties with third-party fulfillment companies and allowing them to keep all of the revenues generated by their venture. (Doc. 61, ¶¶ 22-23).

With this lucrative goal in mind, these four individuals joined forces, conscripted their respective companies, and agreed to use TYS as the front company for their scheme. (Doc. 61, ¶ 23). Through TYS, they designed, controlled, and, in various levels, participated in the actions that made their telemarketing venture a success during its alleged operational period of November 2011 until July 2012. (Doc. 61, ¶¶ 64). As alleged in detail in the Amended Complaint, TYS unlawfully telemarketed, misrepresented, charged illegal fees for, and failed to provide their CCIRRS, depriving consumers of $2.8 million in the process. (Doc. 61, ¶¶ 34, 64-76). These allegations form the basis for the FTC's claims under the FTC Act and TSR against the front company, TYS. (Doc. 61, ¶¶ 77-118).

In their Motion to Dismiss, Defendants Smith and HES do not argue that the FTC's allegations as to TYS's business practices are deficient. Their argument is that the Amended Complaint fails to "adequately" tie them to those practices.

6

        **B.    The Amended Complaint Sufficiently Alleges that
Smith and HES Directly Participated In and Controlled TYS's
Business Practices and that HES was part of an enterprise with TYS.**

While Smith and HES do not dispute the sufficiency of the Amended Complaint as to TYS's liability, they argue that the FTC has "failed to adequately allege that [they] were engaged in a[] [common] enterprise" with the rest of the Defendants, (Doc. 87, p. 3); thus, they cannot be liable for the actions of TYS or any of the members of their "business venture." (Doc. 87, p. 9). This argument assumes, incorrectly, that the only way the FTC can prove liability on the part of Smith and HES is through a "common enterprise" theory. It also concludes, incorrectly, that the Amended Complaint fails to allege sufficient facts from which a common enterprise can be found.

In a case brought by the FTC, corporate and individual defendants are directly liable for their own acts or practices that violate the FTC Act. The common enterprise doctrine is a basis for liability where multiple corporate defendants knowingly act together to create and implement the unlawful practices done in the name of one of them. *See. e.g., Del. Watch Co. v. FTC,* 332 F. 2d 745, 746 (2nd Cir. 1964); *Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271-72 (M.D. Fla. 2012). Numerous fact patterns support the finding of a common enterprise. Defendants Smith and HES mention only one of them, the pattern in the *Washington Data Resources* case, which contains little discussion of the facts of that case or of the common enterprise doctrine. For a more complete discussion of the common enterprise doctrine in recent cases and the various types of fact patterns that support it, see, e.g., *FTC v. Kennedy,* 574, F. Supp. 2d 714, 722-724 (S.D. Tex. 2008) and *FTC v. Grant Connect*, *LLC*, 827 F. Supp. 2d 1199, 1215-1218 (D. Nevada 2011). These cases discuss the numerous factors that justify a common enterprise finding and make clear that they are not exhaustive. Rather, "the pattern and frame-work of the whole enterprise must be taken into consideration." *Del. Watch*, 332 F.2d at 746; *cf. SkyBiz.com, Inc.,* 2001 WL

7

1673649, at *3, 5 (finding common enterprise, despite a failure to establish common control, sharing of office space, shared officers, or unified advertising).

For example, the existence of a common control group is an important factor that may justify a finding of a common enterprise. *See Kennedy*, 574 F. Supp. 2d at 722. Indeed, "[i]t is not necessary that the FTC prove any particular number of entity connections and any specific connection. Instead, it must prove that the defendants maintained an "unholy alliance." *Id*. Similarly, the common enterprise doctrine applies where "all of the companies were beneficiaries of and participants in a shared business scheme," which makes the "common revenue generated in the course of that scheme…the proper subject of the court's equitable powers under the FTC Act." *Grant Connect,* 827 F. Supp. 2d at 1216 (quoting *FTC v. Network Servs. Depot, Inc.,* 617 F.3d 1127, 1143 (9th Cir. 2010)).

Defendants Smith and HES, however, expect the FTC to know, when it files the complaint, exactly how the various corporate defendants are connected in order to sustain a complaint alleging joint liability. They cite no authority for this proposition. As detailed below, where we discuss individual liability, the Amended Complaint alleges that Smith and HES were part of—indeed, a controlling part of—the TYS scheme, even if they did not have overlapping officers or finances. Defendants' motion fails to explain why these allegations are insufficient.

Enterprise liability, however, is not the sole basis of liability. An individual defendant is also liable for a corporate defendant's violations if the FTC shows that: (1) the corporation violated the FTC Act; (2) the individual participated directly in *or* controlled the unlawful acts or practices of the corporation; and (3) the individual had some knowledge of the unlawful acts or practices. *See*, *e.g*., *GEM Merchandising*, 87 F.3d at 470 ("Once the FTC has established corporate liability, "the FTC must show that the individual defendants participated directly in the

8

practices or acts or had authority to control them....The FTC must then demonstrate that the individual had some knowledge of the practices.") (quoting *FTC v. Amy Travel Service, Inc.,* 875 F.2d 564, 573 (7th Cir.)); *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *38; *Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911, at *30-32 ("[D]irect participation in the fraudulent practices is not a requirement for liability….The relevant principle is that one may not enjoy the benefits of fraudulent activity and then insulate oneself from liability by contending that one did not participate directly in the fraudulent practices.").

In showing an individual's control over a corporation's unlawful practices, the individual's ownership status or official position within the corporation, if any, is not solely determinative; in fact, the individual does not even have to be an employee of the corporation. More probative is the individual's actual exercise of control over the unlawful practices. *See, e.g.*, *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *15-16 ("Control over activities can be accomplished in a number of ways; and in determining whether a person has control over activities, the Court does not look solely to a person's position, but also considers the control that a person actually exercises over given activities. [An individual] did not have to be [the corporate defendant's] employee, or even an officer, to control [the corporate defendant's] activities.").

In showing an individual's knowledge of the unlawful practices, the FTC is required to show only that the individual had or should have had knowledge or awareness of such practices. *See, e.g.*, *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *29 ("This knowledge requirement may be satisfied by showing that [the defendant] had either (1) actual knowledge of material misrepresentations, (2) reckless indifference to the truth or falsity of such representations, or (3) awareness of a high probability of fraud along with an intentional avoidance of the truth."). In other words, the FTC is not required to show that the individual "had actual knowledge of the

misrepresentations being made on the sales floor." *Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911, at *33; *see also Innovative Mktg.*, 654 F. Supp. 2d at 387 ("[T]he degree of participation in business affairs is probative of knowledge….") (citing *Amy Travel,* 875 F.2d at 574).

Here, the Amended Complaint sufficiently alleges Smith's and HES's direct participation in misrepresentations to consumers as well as their control over the TYS scheme and its business practices.

As to Smith's and HES's direct participation in misrepresentations to consumers, the FTC alleges that they provided computer tablets "purportedly as part of the CCIRRS," (Doc. 61, ¶ 32), so that consumers could "record and keep track of their financial situation as TYS Defendants improved it." (*Id*., ¶ 69). In fact, the computer tablets that Smith and HES shipped to consumers, if they did at all, "w[ere] of very low quality and frequently did not work," (*Id*.), and were intended merely to "help prevent or reverse chargebacks by characterizing the CCIRRS transaction as a sale of goods which had been delivered as promised." (*Id*.,¶ 37). Accepted as true, these allegations show that Smith and HES directly deceived consumers into believing that they would get the reduction in their credit card interest rate or some other benefit promised to them by TYS. (*Id*., ¶66). The computer tablets were an integral part of the CCIRRS scheme, both to entice consumers to sign up for the CCIRRS services and to then prevent them from getting their money back when the promised services did not materialize.

Further, the FTC alleges that Smith and HES provided "'win-back' and 'chargeback recovery' services used to dispute and reverse chargebacks obtained by consumers." (*Id*., ¶ 32). Many TYS consumers, who realized that they had been scammed and thus wrongfully charged fees, initiated chargebacks to get their money back, a right they have under the law. (*Id*., ¶¶ 35, 49-56.). In turn, Smith and HES reversed many chargebacks by "disput[ing] the request[s] by

claiming that the charge[s] [were] valid." (*Id.*, ¶ 35). Taken as true, these allegations show how Smith and HES continued to lie to consumers and financial institutions regarding their fraudulent venture. By disputing and reversing the chargebacks, Smith and HES helped TYS (and themselves) to retain more of consumers' money.

As to Smith's and HES's control over the TYS scheme and its business practices, the FTC alleges that:

(1) Smith masterminded the entire CCIRRS scheme by "*propos[ing]…the telemarketing, sale, and fulfillment of CCIRRS*" and then agreeing with Warren, Plancher, and Toska to "execute[] their telemarketing venture, which became TYS" (*Id.*, ¶ 23) (emphasis added);

(2) Smith and HES "provided merchant accounts through Newtek *that enabled TYS to charge the upfront fees* for the CCIRRS on consumers' credit card accounts," (*Id.*, ¶ 32) (emphasis added), without which the entire TYS venture could not have operated (*Id.*, ¶¶ 41-45) (explaining that merchants need merchant accounts "in order to accept credit card payments from consumers");

(3) Smith and HES provided TYS two merchant accounts, "Treasure Your Success" and "Treasure Your Success 2" (*Id.*, ¶ 33);

(4) Smith and HES provided "monitoring services, including on-site personnel, *to help address day-to-day operational issues*" (*Id.*, ¶ 32) (emphasis added);

(5) Smith "*personally monitored the business and was periodically on the business premises, giving advice and establishing requirements* for Plancher and Toska. Even when he was not personally on the premises, he often sent his representatives to monitor the business" (*Id.*, ¶ 36) (emphasis added);

(6) Smith "imposed" requirements on TYS, including providing consumers computer tablets, which "Plancher and Toska had to purchase…from another company that Smith owns" (*Id.*, ¶ 37);

(7) Smith and HES took substantial payments from TYS that amounted to $1.18 million (*Id.*, ¶ 38) of the $2.8 million that the entire TYS venture generated during its alleged period of operation from November 2011 to July 2012 (*Id.*, ¶ 34); and

(8) Smith and HES had "complete access" to TYS's merchant accounts that "*enabled them to monitor and control the flow of money into the business* and ultimately to take their respective payments automatically and from the business' gross sales, before factoring in the other business expenses." (*Id.*, ¶ 39) (emphasis added).

Taken as true, these detailed allegations show the undeniable control that Smith and HES exercised over TYS and its business practices. Smith and HES helped mastermind every aspect of TYS's business model, including its "telemarketing, sale, and fulfillment of CCIRRS," (*Id.*, ¶ 23), and had a hand in TYS's "day-to-day operational issues." (*Id.*, ¶ 32). They also "advise[d]," "establish[ed] requirements," and "imposed" obligations on the business. (*Id.*, ¶¶ 36-37). Then, they "monitor[ed]" the business to make sure that their advice, requirements, and obligations, were implemented according to their wishes. (*Id.*, ¶¶ 32, 36).

Another area where Smith's and HES's control over the TYS venture was manifest—and perhaps, the most telling—was TYS's finances. Taken as true, the allegations about Smith's and HES's providing TYS its merchant accounts, (*Id.*, ¶¶ 32-33), explain how they were able to control TYS, Plancher, and Toska: without the merchant accounts, the entire TYS venture would not have worked because Plancher and Toska would not have been able to take consumers'

money. (*Id.*, ¶¶ 32, 41-45). Put simply, TYS, Plancher, and Toska needed Smith and HES to stay in business.

Applying the controlling law, these allegations, taken as true, provide sufficient basis for the FTC's claims under the FTC Act and TSR against Smith and HES, based on both individual liability and enterprise liability. At the outset, given the allegations of their direct participation in and control over TYS's alleged unlawful practices, the FTC is simply not required to allege specifically the existence of a common enterprise. *See GEM Merchandising*, 87 F.3d at 470; *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *38 (N.D. Ga. Sept 30, 1997); *Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911, at *30 (S.D. Fla. Nov. 25, 1987); *cf. FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271-72 (M.D. Fla. 2012).

As to TYS's unlawful practices that Smith and HES are not alleged to have directly participated in, *see supra* Section III.A (discussing allegations concerning TYS's corporate liability), the FTC has sufficiently alleged that the movants controlled those practices. The FTC does not allege that Smith and HES were owners, officers, or even employees of TYS. However, the law does not require this, when showing control. *See, e.g.*, *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114, at *15 ("[An individual] did not have to be [the corporate defendant's] employee, or even an officer, to control [the corporate defendant]'s activities."). What is more probative is "the control that a person actually exercises over given activities." *Id.* As shown above, the Amended Complaint alleges in several places the control that Smith and HES "actually exercise[d]" over TYS and its business practices. *Id.* Finally, the FTC's allegations show that, by virtue of their control over TYS and their considerable monetary incentive to ensure its success, Smith and HES sufficiently knew that TYS's practices were unlawful, even assuming that they did not "ha[ve] actual knowledge of the misrepresentations being made on the sales floor."

13

*Atlantex.*, 1987 U.S. Dist. LEXIS 10911, at *33; *see also Innovative Mktg.*, 654 F. Supp. 2d at 387 (citing *Amy Travel,* 875 F.2d at 574).

The foregoing discussion also addresses Smith's and HES's second and third arguments. Under the second argument, the movants profess that the FTC has "failed to adequately allege that HES violated Section 5 of the FTC Act or the Telemarketing Rule." (Doc. 87, p. 4). At its core, they are arguing that HES never made representations or telephone calls to consumers and therefore cannot be liable under the FTC Act or TSR. As detailed above, allegations of HES's control over TYS and its business practices, through Smith, provide sufficient basis for the FTC's claims against HES.

Under the third argument, the movants state that the FTC has "failed to adequately allege why Smith is individually liable." (Doc. 87, p. 4). The crux of this argument is two-fold: (1) Smith was not part of a common enterprise and thus cannot be liable for the unlawful practices of HES, TYS, or the other participants in TYS venture (Doc. 87, p. 8); and (2) Smith did not participate in or control those unlawful practices, which "he would never have known of" because his "involvement in this business venture is so remote." (Doc. 87, pp. 8-9). Far from being "remote," Smith initiated, executed, participated in, and controlled the TYS venture and its business practices. (Doc. 61, ¶¶ 11, 14, 23, 32-39, 64-76). He personally participated in and controlled the acts and practices that violated the law. Moreover, the common enterprise argument, as to Smith's individual liability, is misplaced. The common enterprise doctrine is a basis for liability where multiple corporate defendants knowingly act together to create and implement the unlawful practices done in the name of one of them. *See Del. Watch,* 332 F. 2d at 746; *Wash. Data Res.*, 856 F. Supp. 2d at 1271-72.

C.   **The Amended Complaint Provides Smith and HES Adequate Notice.**

Under their fourth argument, the movants argue that the FTC has "improperly lumped the Defendants together and HES and Smith cannot ascertain the actual claims made against them." (Doc. 87, p. 4). Under this argument, they are, in part, rehashing their previous arguments—specifically, that they did not directly participate in any of the acts that constitute law violations and thus cannot be liable under the FTC Act and TSR. Assuming without admitting that Smith and HES did not directly participate in *all* of TYS's unlawful practices, the Amended Complaint sufficiently alleges that they initiated, executed, and controlled those practices, which they knew were unlawful. Under the applicable law, these allegations are sufficient to state claims under the FTC Act and TSR. *See, e.g., GEM Merchandising*, 87 F.3d at 470; *Windward Mktg.*, 1997 U.S. Dist. LEXIS 17114 at *38; *Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911 at *30.

Finally, under this argument, the movants also assert that this "lumped" pleading leaves them with "inadequate notice of the accusations against them...." (Doc. 87, p. 11). This assertion is hollow. Indeed, the Amended Complaint alleges in great detail each Defendant's involvement in the TYS venture and, separately, the Defendants' joint execution of that fraudulent telemarketing venture. (Doc. 1, ¶¶ 6-20, 23-76).

This method of pleading factual allegations is not only proper, but it is also helpful to the reviewing court. *See, e.g., Sterling Precious Metals*, 2013 U.S. Dist. LEXIS 20879, at *13 (explaining that "allegations pertaining to Defendants *as a whole* provide the context that allows this Court to understand and weigh the significance of the FTC's claims that [the individual defendant] formulated, directed, controlled, had the authority to control, or participated in the acts and practices of [the corporate defendant] that violate the FTCA and the Telemarketing Act") (emphasis in original); *Innovative Mktg.*, 654 F. Supp. 2d at 388 (opining that the

15

defendant's contention that "in weighing the sufficiency of the Complaint, this Court should disregard the allegations relating to the Defendants collectively…is misguided" because such allegations is helpful to the court). Consistent with pleading standards, the FTC's detailed allegations not only provide adequate notice to Smith and HES, but they also aid the Court in its "context-specific task that requires [it] to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Specifically, the FTC's allegations aid the Court in understanding the Defendants' CCIRRS scheme as a whole and in weighing the claims relating to each Defendant, including Smith and HES.

### IV. Conclusion

For the foregoing reasons, the Court should deny the Motion to Dismiss. However, to the extent the Court finds any portion of the First Amended Complaint's factual allegations lacking, the FTC respectfully seeks leave to file an amended complaint to cure such deficiency.

Respectfully submitted,

Dated: August 23, 2013

/s/ Michael Milgrom
**MICHAEL MILGROM**, OH Bar # 0012959
   Trial Counsel
**JONATHAN L. KESSLER**, CO Bar # 15094
**FIL M. DE BANATE**, OH Bar # 0086039
Federal Trade Commission
1111 E. Superior Ave., Suite 200
Cleveland, Ohio 44114
(216) 263-3419 (telephone) (Milgrom)
(216) 263-3436 (telephone) (Kessler)
(216) 263-3413 (telephone) (de Banate)
(216) 263-3426 (facsimile)
mmilgrom@ftc.gov
jkessler@ftc.gov
fdebanate@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

       I certify that I electronically filed the forgoing Plaintiff Federal Trade Commission's Memorandum in Opposition to the Motion to Dismiss by Defendants HES Merchant Services Company, Inc. and Hal E. Smith on August 23, 2013, and all parties that are served by the operation of the Court's electronic system were so served. I further certify that I sent copies of this filing to Defendants Valbona Toska and Willy Plancher by electronic mail at valbona.toska@yahoo.com and by United States Mail, addressed to the following:

        Valbona Toska
        Willy Plancher
        WV Universal Management, LLC
        Global Financial Assist, LLC
        Leading Production, LLC
        140 Gardenridge Road, #304
        Winter Springs, Florida 32708


Dated: August 23, 2013                                            /s/ Michael Milgrom
                                                                     **MICHAEL MILGROM**
                                                                       Attorney for Plaintiff