**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff,** | **Civ. No. 6:12-cv-1618-Orl-22-KRS** |
| **v.** | |
| **WV UNIVERSAL MANAGEMENT, LLC,** *et al.* | |
| **Defendants.** | |

**PLAINTIFF FEDERAL TRADE COMMISSION'S**
**MEMORANDUM IN OPPOSITION TO MOTION FOR**
**SUMMARY JUDGMENT BY DEFENDANT UNIVERSAL PROCESSING**
**SERVICES OF WISCONSIN, LLC**

## I.   INTRODUCTION

The Federal Trade Commission ("FTC" or "Commission") has alleged that Defendant Universal Processing Services of Wisconsin, LLC, d/b/a Newtek Merchant Solutions, ("UPS"[1]) violated the Telemarketing Sales Rule ("TSR") by providing substantial assistance or support to the other Defendants ("the TYS Defendants") with knowledge, or conscious avoidance of knowledge, of their illegal telemarketing activities.  (Doc. 61, ¶¶ 119-120).

---

[1]  The First Amended Complaint, (Doc. 61), refers to Defendant UPS, which does business as Newtek Merchant Solutions, as "Newtek." Defendant's motion for summary judgment, (Doc. 94), refers to the parent company of UPS, Newtek Business Services, Inc., as "Newtek," and refers to the named Defendant as "UPS."  This Memorandum adopts Defendant's mode of reference in order to keep the references consistent for purposes of this motion, at least.

UPS has moved for summary judgment asserting that there are no material facts in dispute and that it is entitled to judgment as a matter of law. (Doc. 94). UPS contends that, regardless of the actual knowledge (or conscious avoidance thereof) on the part of its then-president, Derek Depuydt, it escapes liability based on the "adverse agent exception" to the general rule of imputing an agent's knowledge to its principal.

The Motion should be denied. There are at least three areas of factual dispute as to whether the adverse agent exception should be applied in this case, and, in all three, the evidence so far weighs against UPS. First, at all relevant times, Depuydt was acting, and intended to act, in the interest of UPS and not for his own interest. Second, the relevant actions were known to others in the company who were in positions of responsibility and were not secret. Third, as president of UPS, Depuyt's knowledge is imputable to his company regardless of his interest. In addition, even if the adverse agent doctrine were applicable, the facts show that the "sole actor" exception to that doctrine would also apply, thus defeating UPS's motion.

## II.  LEGAL STANDARD

Summary judgment is not appropriate unless there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Under this standard, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. The evidence and factual inferences from the evidence are construed in favor of the party opposing summary judgment. *Reynolds v. Bridgestone/Firestone, Inc.* 989 F.2d 465, 469 (11th Cir. 1993), quoted in *Haynes v. Wilder Corp. of Del.*, 721 F. Supp. 2d 1218,

1220 (M.D. Fla. 2010);  *Int'l Ship Repair & Marine Services, Inc. v. Estate of Morales-Montalvo*, 2010 WL 181575 at 1 (M.D. Fla. 2010).

### III. THE ADVERSE INTEREST DOCTRINE DOES NOT EXCUSE UPS FROM COMPLYING WITH THE FTC ACT AND THE TSR.

UPS is subject to the Federal Trade Commission Act ("FTC Act") and the TSR.  As such, it has a non-delegable duty to comply with those laws.  A corporation that fails to comply is liable, even if its non-compliance was the result of an employee's misconduct. *See New York C. & H. R. R. Co. v. U.S.*, 212 U.S. 481, 493-94 (1908).  *New York C&H R.R.* involved corporate agents granting rebates from published rates, contrary to the law that required that the published rates be charged.  As noted by the Supreme Court, the employees giving the rebates were responsible for establishing, filing, and publishing those rates.  Having been given those responsibilities, the employees were required to comply with the law in carrying out their duties.  Their failure to comply with the law in performing their duties could be imputed to the corporation.

Similarly, in *In re Mifflin Chemical Corp.,* 123 F.2d 311 (3d Cir. 1941), the government sought taxes from a seller of denatured alcohol because the alcohol sold exceeded the buyer's reasonable requirements.   The seller's agents were salespersons employed to sell alcohol who knew the buyers did not reasonably require the quantities being purchased and that the excess was being illegally diverted to other uses.  The Third Circuit court assumed that the salespersons did not tell their employer of the illegal diversion, and noted that one of the salespersons received a commission or gift from the recipients of the excess alcohol. Further, it stated:

Even then, we believe unquestionably that Mifflin is charged with responsibility for the knowledge of its employees. [It] is elementary law that the knowledge of an agent or employee obtained within the sphere of his agency or employment will be imputed to the corporation.  The very job these salesmen were employed to do was to sell alcohol and selling alcohol they were, although in an improper way.  Of course they were doing it to make money; the difference between doing it in a proper and an improper way was that doubtless they made more by the latter course.  But: The mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if the agent is acting for the principal's interests.  Restatement, Agency § 282, Comment b.

Counsel for Mifflin have cited authorities where courts have held that when an agent departs from his employment and acts adversely to his principal the latter is no longer responsible for facts known to the wrongdoing employee. But in these cases the agent was found either to be actively cheating or defrauding his principal or acting adversely as the other party to the same transaction in which he was serving as his principal's agent.

* * *

One need not talk about actual knowledge by Mifflin or a presumption that the employer knows everything that the employee knows. It has been conceded that these employees were violating instructions and that they concealed from their superiors in the Mifflin organization the knowledge of their activities in promoting illegal diverson [sic] of the alcohol. That does not, on principles of agency, ipso facto relieve the employer of liability.  Responsibility of an employer for things his agent does is not imposed on the basis of knowledge in fact, but under the general rule of respondeat superior.  No reliance need be made on any fictional attributing of knowledge to Mifflin.  The employers are responsible for the knowledge of the facts had by their agents in doing the very business for which they were employed.

*Mifflin*, 123 F.2d at 315-16 (footnotes omitted).

This principle was repeated as recently as September 5, 2013 by the Court of Appeals for the Federal Circuit in *Kellogg, Brown, & Root Servs. v. U.S.*, 2013 U.S. App. LEXIS 18447, at *15-16, 2013 WL 4749921 (Fed. Cir. 2013). In reversing the district court, the appellate court noted that the corporation benefitted from the actions of the agents in question and held it liable for statutory violations although the agents who committed the misconduct

were not at management level. *Id.* at *15-16. Here, Depuydt was president of UPS.  He had the authority to approve processing accounts, and he approved Defendant Hal Smith's accounts, including the accounts used by the TYS Defendants ("the TYS Accounts"). Depuydt permitted those accounts to continue processing through UPS long after the chargeback rates became excessive. Having given him the authority to make decisions, UPS cannot now disclaim its liability for the actions he took on behalf of the company.

## IV.   EVEN CONSIDERING THE ADVERSE AGENT DOCTRINE, UPS IS RESPONSIBLE FOR DEPUYDT'S KNOWLEDGE OF THE TYS ACCOUNTS

UPS admits that standard agency doctrine imputes to UPS Depuydt's knowledge, or conscious avoidance of knowledge, of the TSR violations by Hal Smith and the other participants in TYS. UPS asserts, however, that the adverse agent exception applies here so that Depuydt's knowledge cannot be imputed to UPS. UPS misapplies the doctrine and ignores the facts surrounding Depuydt's misconduct.

A corporation or other principal is responsible for the knowledge held by its agent. "Corporations act through their employees; the general rule is that an agent's knowledge is imputed to the principal when employees are acting within the scope of their authority or employment, absent special circumstances." *Kellogg*, 2013 U.S. App. LEXIS 18447, at *52, (citing *Long Island Sav. Bank, FSB v. United States,* 503 F.3d 1234, 1250 (Fed. Cir. 2007)). The adverse interest situation is a "narrow exception" to this rule and applies only "when the agent's conduct is "entirely" in the agent's interest without even incidental benefit to the principal." *Kellogg*, 2013 U.S. App. LEXIS 18447, at *52-53.  The agent must be acting secretly, and the "mere fact that the agent's primary interests are not coincident with those of the principal does not prevent the latter from being affected by the knowledge of the agent if

5

the agent is acting for the principal's interests." *Long Island Sav. Bank*, 503 F.3d at 1249 (quoting *Restatement (Second) of Agency* § 282 cmt. c).  As shown below, Depuydt's actions were neither adverse to UPS nor secret.

### A.    Depuydt's Interests Were Not Adverse to UPS's Interests.

UPS argues that it is not liable because Depuydt's interests were somehow adverse to its own.  UPS does not assert that Depuydt profited in any way the corporation did not.  All UPS argues is that Depuydt violated UPS policy and had an interest in UPS not learning of those violations, (Doc 94, p. 9).  Violations of company policy, however, do not create the kind of adverse interest that would enable the corporation to escape liability:

> And this is the rule when the act is done by the agent in the course of his employment, although done wantonly or recklessly or against the express orders of the principal.  In such cases the liability is not imputed because the principal actually participates in the malice or fraud, but because the act is done for the benefit of the principal, while the agent is acting within the scope of his employment in the business of the principal, and justice requires that the latter shall be held responsible for damages to the individual who has suffered by such conduct.

*New York C. & H. R. R. Co.,* 212 U.S. at 493.

Here, ample evidence—far more than necessary to defeat a summary judgment motion—shows that Depuydt acted in UPS's interests, not adversely to them.  Smith was a long-term client of UPS, having started with UPS before Depuydt became UPS's president. *Compare* (Doc 94-2, ¶ 16) (stating that Depuydt became UPS president in 2007) *with* Exhibit 1, p. 8 (stating that Smith and UPS had a 10-year relationship).  Smith's was among the "largest, highest risk, most profitable, and highest maintenance accounts" in UPS's portfolio. Exhibit 1 (to this memorandum), pp. 1, 5;  *see also* (Doc. 94-2, ¶ 16).  Smith brought UPS over 100 accounts, and though large portions were high risk, they were profitable, see

Exhibit 1, p. 1, with problems occurring in as few as 12 accounts.  Exhibit 1, p. 2. Depuydt may have made wrong decisions in connection with Smith, but they were decisions UPS hired Depuydt to make in the interest of promoting UPS's business.  Moreover, Depuydt received nothing from UPS's business with Smith, *see* Exhibit 1, p. 8, (other than, presumably, his compensation from UPS [2]).  In contrast, UPS netted $4 to $5 million in profits from its business with Smith.  *See* Exhibit 1, p. 8.

The facts of this case differ considerably from those in *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407 (7th Cir. 1988), relied on by UPS.  In *Lewco*, a bank claimed it was a bona fide purchaser for value of bearer bonds and other negotiable securities it had accepted as collateral for loans in two separate series of transactions.  In both series of transactions, a bank employee who was in league with the criminals and who received part of the proceeds of the scheme had accepted the bonds as collateral.  However, the court came to different conclusions as to the two sets of bonds.  With respect to that first set, the court affirmed summary judgment against the bank because it had failed to make an inquiry required by SEC regulations before accepting the bonds, which had been reported as stolen to the SEC by the plaintiff.  The court did not even reach the adverse interest doctrine with respect to those bonds. *Lewco*, 860 F.2d at 1412-1416. With respect to the second set, which had not been reported to the SEC before the bonds were accepted by the bank, the court held that the adverse agent exception applied, but remanded the case to the district court for a determination of critical facts—the full role of the dishonest employee and the

---

[2]  Assuming for purposes of this Memorandum that Depuydt's compensation from UPS was increased to some extent by the profits from Smith's business, this does not make Depuydt's interests adverse to UPS's.  *See, e.g.*, *Restatement 2d of Agency,* § 282, Illustration 4.

roles of other bank employees—in order to determine whether an exception to the adverse agent exception applied to the case. *See Lewco*, 850 F.2d at 1416-1419; see also, infra, Section V (discussing the "sole actor exception" to the adverse agent exception).

Rather than helping UPS, *Lewco* illustrates two reasons why summary judgment is inappropriate at this stage of the case.  First, UPS is alleged to have violated a duty imposed by regulation: not to assist and facilitate violations of the Telemarketing Sales Rule.  Just as the bank in *Lewco* could not hide behind the misconduct of its employee with respect to the SEC regulation, so, in this case, UPS should not be able to hide behind Defendant Depuydt's misconduct (which consisted only of violating internal policies) to shield it from its responsibility.  Second, as shown below, others at UPS were involved in the corporation's failure to investigate and monitor the activities of the TYS Defendants.

Indeed, the facts of this case are even less compelling than those in *Long Island Sav. Bank, FSB v. U.S.*  There, the chief executive officer and chairman of the board of a savings and loan (S&L) received income from his law firm, which provided legal services to the S&L. The court rejected the S&L's adverse agent exception argument, stating:

> There was a clear benefit to LISB through this arrangement because the law firm was the bank's primary outside counsel, performed mortgage closing services for and on behalf of the bank, and represented the bank in foreclosure proceedings. In addition, by signing the false certification under the Assistance Agreement, Conway enabled LISB to acquire Centereach under previously negotiated terms. In hindsight, LISB's interests probably would have been better served had Conway not perpetrated his illegal compensation arrangement, but the record fails to support the assertion that Conway entirely abandoned LISB's interests for his own. Therefore, Long Island cannot invoke the adverse interest exception because the CEO's conduct was not entirely for his own purposes, and the general rule applies imputing the agent's knowledge to the principal.

*Long Island Sav. Bank*, 503 F.3d at 1250; *see also Kellogg*, 2013 U.S. App. LEXIS 18447, at *52-53 (finding that the employees' kickbacks from a subcontractor were attributable to the corporation for purposes of applying an anti-kickback statute because the corporation received the services of the subcontractor).

**B.      Depuydt Did Not Act Secretly and Was Not the Only Person at UPS who Knew of Problems in the Smith Accounts.**

Other UPS employees knew of most of Depuydt's actions with respect to the Smith accounts.[3] Kim Olszewski, who was then Chief Operating Officer of UPS and a member of its board, was fully aware of what Depuydt was doing, although she disagreed with it. (Doc. 94-2, ¶¶16-18).  She took no action even though, as a board member, (Doc 94-1, ¶ 6), she had access to the sole entity within UPS with the legal authority and responsibility to question, investigate, and change what Depuydt did.  While she disagreed with what Depuydt was doing, she accepted his representations that he was authorized to do what he did. Clearly, Depuydt's actions were not so out-of-bounds as to cause Olszewski to investigate or doubt his representations. (Doc 94-2, ¶ 18). Rather, Olszewski's silence suggests that within the culture of UPS Depuydt's conduct, while questionable, was not clearly unacceptable. UPS makes no claim that Olszewski's interests were adverse to the corporation's.

---

[3] What other employees may not have known was that Depuydt was using a general reserve account to pay the excessive chargebacks generated by Smith's accounts.  Exhibit 1, pp. 1-2.

According to Olszewski, another employee, Marcus Shaefer,[4] also knew of and was concerned about Smith's accounts.  (Doc 94-2, ¶19).  UPS, however, makes no claim that Shaefer' interest were adverse to the corporation's.

In addition, a UPS internal investigation in 2013, before the issuance of the Strawhecker Report, (Doc. 94-s), shows that several other employees of UPS knew the relevant facts about the Smith accounts, including the TYS Accounts. The FTC does not have the final report of that investigation but UPS supplied a draft report in response to subpoena. That report is attached to this memorandum as Exhibit 1.  The unidentified author of the report interviewed Robert Abromowski, an accountant, Depuydt, Olszewski, and Shaefer. The report also identifies Steve Hauler, who was the "relationship manager" for the Smith accounts, a duty he shared with Depuydt, Exhibit 1, p. 5, as well as a processor, Julie Vander Werff, who was involved in some role in the Smith accounts. *Id*., p.4.  It is not inconceivable that others at UPS also knew, but the report goes no further.[5] At a minimum, these facts show that the FTC should be permitted to depose all relevant employees to see who, besides Depuydt, was aware of the facts concerning TYS and the other Smith accounts.[6]

---

[4]  Olszewski's declaration does not give Shaefer's title, but the report of UPS's internal investigation identifies him as vice-president of the Risk Department. *See* Exhibit 1, pp. 1, 2, 8.

[5]  Both Hauler and Vander Werff are mentioned in the Strawhecker Report. (Doc 94-s, p. 6).

[6]  Others must have been aware of something. Defendant Smith was not only a client of UPS, he was also a sales agent, who used the address of UPS as the address of Defendant HES Merchant Services, Inc. *Compare* (Doc. 6-7, pp.8-10), with (Doc. 61, ¶17).

The draft internal report also acknowledges that the malfeasance surrounding the Smith accounts was not the self-interested dealing of a single employee. Rather, the report lists nine separate causes other than Depuydt's activities that allowed this deplorable situation to evolve and continue, including breakdowns in communications at both the staff and board levels. (Exhibit 1, p.6)[7] Thus, if affiant Barry Sloane – CEO of the parent company – did not know what was going on, it was not the result of secrecy but of poor corporate governance.

Thus, UPS's own documents and declarations show that Depuydt was not acting secretly, even if no one ever formally reported his actions to the UPS board, his legal supervisor.  In its supporting memorandum, UPS emphasizes Barry Sloane's ignorance of the situation and refers to the boards of UPS and Newtek as Depuydt's principal. (Doc. 94, p. 9) Sloane, however, was not the president of UPS, which is the defendant here; rather, he is the president of a separate corporation, Newtek. Depuydt was the president of UPS, and the principal was not the board of either UPS or Newtek, but UPS itself.  It strains credulity to suggest, as UPS does, that when the president of a corporation acts within the scope of his duties, for the corporation's profit, the knowledge he holds is not the knowledge of the corporation.

---

[7]   The Strawhecker Report, though more circumspect in its language, describes similar failings. (Doc. 94-s, p. 8).

**V.    EVEN ASSUMING, *ARGUENDO*, THAT DEPUYDT ACTED ADVERSELY TO THE INTERESTS OF UPS, DEPUYDT'S KNOWLEDGE IS STILL IMPUTABLE TO UPS BY VIRTUE OF THE "SOLE ACTOR EXCEPTION."**

As demonstrated above, the known facts in this case establish, or at the very least create a material factual dispute as to whether, Depuydt acted adversely to the interest of UPS. Assuming, however, for purposes of argument, that Depuydt acted adversely to the interest of his company by approving and maintaining merchant accounts "of dubious character" (Doc. 94-1, p.2), such as the TYS Accounts, a complete exposition of the controlling law and a nuanced review of the known facts in this case would still preclude the application of the adverse agent exception.

As to the law, the case that UPS cited as the main support for its own argument, *First Nat'l Bank v. Lewco Sec. Corp*., provides a complete exposition of the controlling law that is instructive to this case. First, the *Lewco* court recognized the "general rule that a principal is charged with the knowledge of its agent acquired in the course of the principal's business." *Lewco*, 860 F.2d at 1417; *see also Curtis, Collins & Holbrook Co. v. U.S.*, 262, U.S. 215, 222 (1923) (quoted in *Lewco*); *Conn. Fire Ins. Co. v. Commercial Nat. Bank of San Antonio*, 87 F.2d 968, 969 (5th Cir. 1937)[8] ("The general rule that the principal is bound by the knowledge of his agent is recognized….").

Second, the *Lewco* court acknowledged the "adverse agent" exception, which UPS hopes this Court would apply in this case. Under this exception, the agent's knowledge

---

[8] Decisions by the former Fifth Circuit issued before October 1, 1981, are binding as precedent in the Eleventh Circuit. See Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

would not be imputed to the principal "where the agent's interests are shown to be adverse to those of his principal." *Id*. Where there is such a showing, the court explains, "[i]t is then presumed that such an agent is unlikely to fulfill his fiduciary duty of full disclosure to the principal." *Id*.

The *Lewco* court's exposition of the law, however, did not stop there. The *Lewco* court noted that, "there is…an exception to the [adverse agent] exception," *Id*., which states: "Where an adverse agent is also the *sole* representative of the principal in the transaction in question, the principal may once again be charged with the agent's knowledge." *Id*. (emphasis in original).

Indeed, the "sole actor exception" to the adverse agent exception is a rule of law that has long been recognized by the United States Supreme Court, *see, e.g., Curtis*, 262 U.S. at 222 ("[The principal] is charged with [its agent's] knowledge because he was the sole actor for the [principal] in procuring the fraudulent [property for the principal]."), and by several Circuit courts of appeals, including this Circuit. *See, e.g., Conn. Fire Ins. Co.*, 87 F.2d at 969 ("But th[e] [adverse agent] exception is not by the weight of authority to be extended to cases where the principal in the questioned transaction acted wholly through the double-dealing agent and claims a benefit thereunder against another innocent victim of the agent's conduct."); *Matanuska Valley Bank v. Arnold*, 223 F.2d 778, 781 (9th Cir. 1955) ("[U]nder the sole actor doctrine, [an agent's] knowledge is imputed to the [principal]."); *Bosworth v. Md. Cas.*, 74 F.2d 519 (7th Cir. 1935) ("[The adverse agent exception is] in applicable where the agent was the sole agent for the principal in the engagement….").

An agent is considered to be the sole actor when: (1) "the whole procedure…was entrusted by [the principal] to the initiation and execution of the agent," *Curtis*, 262 U.S. at 222; (2) "[t]he [agent], alone…, negotiated and decided on the [transaction]," *Conn. Fire Ins. Co.*, 87 F.2d at 970; (3) the agent was "in complete charge of the [principal's] affairs" and was "the sole representative of [the principal] in all dealings connected with the [transaction] upon which th[e] suit is brought," *Matanuska*, 223 F.2d at 781; or (4) the agent "directed the business of the [principal] as a superior officer to all others" and when "there is not the slightest indication that any officer or employee of the [principal,] except [the agent], exercised any independent choice or judgment." *Bosworth*, 74 F.2d at 521.

In *Curtis, Collins & Holbrook Co. v. U.S.*, the Supreme Court applied the sole actor exception and affirmed that the company president's acts and knowledge surrounding fraudulently obtained land titles were imputable to the real estate company. *See Curtis*, 262 U.S. at 222. The Court found that the president was "the sole agent acting for the Company in securing titles to land for it." *Id*. at 224. Further, even though the company knew of its president's misconduct and probable violation of company policy, it nevertheless "depended wholly on [him] to secure a good title…." *Id*. at 222, 224. Thus, in denying the company's status as a bona fide purchaser, the Court opined that, "if the Company insists on retaining the fruits of that knowledge, it must be charged with the knowledge of the agent through whom the fruits came." *Id*. at 224.

Similarly, in *Conn. Fire Ins. Co. v. Commercial Nat. Bank of San Antonio*, the former Fifth Circuit Court of Appeals applied the sole actor exception and found that a bank president's acts and knowledge involving the purchase of known stolen bonds was imputable

to the bank. *See Conn. Fire Ins. Co.*, 87 F.2d at 969-70. The Fifth Circuit court found that "[the president] was the sole actor through whom the Bank acquired the bonds." *Id.* at 970. In reversing the directed verdict that established the bank as a bona fide purchaser of the bonds, the court opined that "the principal cannot take the benefit of his agent's act without taking also the burdens resulting from the agent's knowledge and intentions." *Id.* at 969. The court then concluded that the bank was "bound as against the [the bonds' innocent owner] by [the president's] knowledge and intent." *Id.* at 970.

With guidance from the Supreme Court and other lower courts, *Lewco* similarly invoked the sole actor exception, a fact that UPS entirely ignores. The *Lewco* court was faced with the issue of whether the actions and knowledge of a bank employee surrounding stolen bonds used as collateral could be attributed to the bank, thus negating the bank's status as a bona fide purchaser of those bonds. *See Lewco*, 860 F.2d at 1416. The bank employee was the vice president and senior loan officer and was directly responsible for, among other things, verifying the bonds in question before recommending them for use as collateral. *Id.* at 1417. The vice president failed to verify the bonds (which turned out to be stolen), lied to the bank by claiming that he verified them, and then recommended them for use as collateral. *Id.* The bank argued that its vice president's malfeasance should not be imputed to it, asserting the adverse agent exception *Id.* at 1417. In turn, the court invoked the sole actor exception, explaining, "[W]here a principal cannot embrace a transaction except through the acts of an unsupervised agent, the principal must accept the consequences of the agent's misconduct because it was the principal who allowed the agent to operate without accountability." *Id.* at 1417-18.

The court concluded that, even though the bank itself "was completely honest in its dealings involving [the] stolen collateral," *Id*. at 1416, it could still be denied bona fide purchaser status based on the sole actor exception and the facts about its vice president's actions and knowledge. Reversing summary judgment, the court noted that a factual dispute remained as to the vice president's verification task and stated, "[T]here is no apparent reason why the Bank should escape liability if indeed it placed unqualified reliance on [the vice president] for verification…." *Id*. at 1418. Thus, the court remanded the case to the lower court for further factual resolution. *Id*. 1419.

Here, UPS seeks to distance itself from Depuydt's actions and knowledge involving the TYS accounts and the TYS Defendants by arguing that Depuydt's act of "open[ing] and keep[ing] the [TYS accounts] operating" was a "violation of the company policy," (Doc. 94, p.9), an adverse interest that then triggers the application of the adverse agent exception to the general rule of imputed knowledge.[9]

The facts revealed in UPS's own Motion, supporting affidavits, and other documents produced to the FTC, show that UPS permitted Depuydt to solely approve and maintain merchant accounts "of dubious character" (Doc. 94-1, p.2), including the TYS Accounts. *See, e.g*., (Doc 94, p. 4) (Depuydt "provid[ed] direction and [took] exclusive responsibility" for the accounts;); (Doc. 94-1, ¶ 2); (Doc 94-2, ¶ 18) (Kim Olszewski: "I told Derek DePuydt numerous times about my concerns about these types of merchants and my concern with Hal Smith in general. His response was always that he was confident based on his knowledge of

---

[9] As we argued above, however, a violation of company policy is not an adverse interest. *Supra*, Section IV,A.

Hal Smith and Hal's long relationship with Newtek, these merchants should be boarded….Derek indicated that he would both underwrite and make the decision to board any merchants of Hal's…."); (Doc 94-2, ¶ 19) (Kim Olszewski: "My colleague, Marcus Schaefer,…was also concerned with these types of accounts and Hal Smith in general, and…I experience Marcus expressing these concerns as well as to Derek DePuydt. Derek's response was the same as to me....He consistently stated the accounts were his responsibility and the revenue on the accounts was too important to the company."); Exhibit 1, p. 1 (Internal report: "The interviews revealed that both Kim and Marcus were opposed to these accounts and repeatedly declined them only to be overridden by Derek. At some point, [ ] Hal Smith accounts were no longer routed through Kim and Marcus, but were unilaterally approved by Derek."); *Id.*, p. 3 (Internal report: "[Depuydt] told [Kim] that because of his personal relationship with the HES accounts and Hal Smith, he would handle all aspects of the accounts."; Internal report: [Kim] said that she never signed off on anything associated with Hal Smith or the HES accounts….At some point she told Derek not to bother bringing any more HES paper to her for review because she would decline it and he would approve it so, in her words, Derek eventually cut out the middle man and approved the accounts unilaterally.") *Id.*, p. 4 (Internal report: "[Marcus] refused to review and underwrite HES paper, and expressed the same frustration (as Kim) over the constant management overriding that Derek did regarding approvals."); *Id.*, p. 5 (Internal report: "[Depuydt] [u]nilaterally approved new HES business without getting proper Credit Committee or Risk Department review and approval"); *Id.*, p. 6 (Internal report: "Risk Department abdicated underwriting

and monitoring responsibility and permitted Derek to unilaterally handle all transactions associated with the HES accounts").

These facts show that Depuydt was the sole actor with regard to the transaction or practice in question (*i.e.*, the opening and keeping of merchant accounts on UPS's portfolio), and he performed these tasks openly and notoriously. The facts also show that UPS permitted him to act as such with impunity. *See, e.g.*, Doc. 94, p 5 ("[Depuydt's] team members, despite their knowledge, failed to report his actions to the company and continued to work with Depuydt on HES/Hal Smith accounts); Exhibit 1, p. 5 ("Controls not followed – Inaction by managers when Derek's instructions were violating policy and procedure could be construed as passively abetting the situation"; "No indication that any of the HES companies were checked for validity or existence. When the Risk Department abdicated underwriting and reviewing responsibility with all HES related accounts, the reliance to perform these checks fell on the one person who was committing the improprieties from the start"); Exhibit 1, p. 6 ("Causes – Staff and management did or said nothing when clearly inappropriate activities were being promulgated by Derek. By their own admission, Kim and Marcus were well aware of the risks, the overrides, the instructions from Derek without supporting documentation").

By giving Depuydt free reign on the management of merchant accounts, UPS benefitted. *See, e.g.*, (Doc 94-2, ¶ 16) ("[Hal] Smith was one of the largest ISA's from a volume and income perspective working with UPS at the time"); (Id., ¶ 18) ("[Derek acted] to continue and grow a sales relationships with Hal as he saw fit in order to facilitate the continued income derived from Hal's office."); Exhibit 1, p. 8 ("I would estimate that in total

the relationship with Hal Smith over the past ten years has brought net profit to Newtek of between $4-$5 million.").

Applying the law on these facts, this Court could conclude that Depuydt's actions and knowledge trigger the application of the sole actor exception. Depuydt was "in complete charge" and was "the sole representative of [UPS] in all dealings connected with the [accounts] upon which this suit is brought," *Matanuska*, 223 F.2d at 781. Further, "the whole procedure…was entrusted by [UPS] to the initiation and execution of [Depuydt]," *Curtis*, 262 U.S. at 222, and he, "alone…, negotiated and decided on [the accounts]," *Conn. Fire Ins. Co.*, 87 F.2d at 970. Finally, for a considerable period, UPS "insist[ed] on retaining the fruits," *Curtis*, 262 U.S. at 224, and "[took] the benefit[s]," *Conn. Fire Ins. Co.*, 87 F.2d at 969, of Depuydt's actions and knowledge. Therefore, UPS should be "charged with the knowledge of the agent through whom the fruits came," *Curtis*, 262 U.S. at 224, and be compelled to carry the "burdens resulting from the agent's knowledge and intentions," *Conn. Fire Ins. Co.*, 87 F.2d at 969. Accordingly, the Court could find that UPS possessed the requisite knowledge to form the violation of the TSR.

At the very least, the known facts in this case create a material factual dispute as to whether Depuydt's actions and knowledge surrounding the TYS accounts and the TYS Defendants' unlawful telemarketing practices could be imputed to UPS. For this reason, as well as those stated previously, the Court should deny the Motion.

## VI.  UPS'S RELIANCE ON *U.S. v. DISH NETWORK, LLC,* IS IRRELEVANT AND INCORRECT

UPS cites *U.S. v Dish Network, LLC*, 667 F. Supp. 2d 952, 956 (C.D. Ill., 2009), apparently for the proposition that knowledge of consumer complaints is necessary to show knowledge or conscious avoidance under the assisting and facilitating provision of the TSR. (Doc. 94, p. 10) If it were correct, this argument would still be irrelevant to the adverse interest question, the only legal basis for summary judgment presented in Defendant's motion. However, it is also incorrect. The *Dish Network* opinion makes no pretense of presenting criteria for a finding of knowledge. The page cited by UPS simply lists the allegations of facts constituting knowledge from the complaint in that case.

What constitutes knowledge or conscious avoidance thereof for purposes of the TSR is a fact-specific inquiry and no court has set forth precise factual criteria. For one analysis of the facts *see*, *FTC v. Chapman,* 714 F. 3d. 1211, 1217-19 (10th Cir. 2013).

## VII.  CONCLUSION

For the foregoing reasons, the Court should deny the Motion for Summary Judgment.

Respectfully Submitted,

Dated: September 16, 2013

  /s/ Michael Milgrom
**MICHAEL MILGROM**, Trial Counsel
OH Bar # 0012959
Federal Trade Commission
1111 E. Superior Ave., Suite 200
Cleveland, Ohio 44114
(216) 263-3419
(216) 263-3426 (facsimile)
mmilgrom@ftc.gov
Attorney for Plaintiff
FEDERAL TRADE COMMISSION

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the forgoing PLAINTIFF FEDERAL TRADE COMMISSION'S MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANT UNIVERSAL PROCESSING SERVICES OF WISCONSIN, LLC, on September 16, 2013, and all parties that are served by the operation of the Court's electronic system were so served. Defendant Willie Plancher, Valbona Toska, WV Universal Management LLC, Leading Production LLC and Global Financial Assist, LLC, were served by sending a copy via email to Valbona Toska and by first class mail to the following address:

140 Gardenridge Road, #304
Winter Springs, Florida 32708

Dated: September 16, 2013                   /s/ Michael Milgrom
                                         **MICHAEL MILGROM**
                                         Attorney for Plaintiff