FINDING REPORT
RESERVE ACCOUNT ISSUES
UPS WISCONSIN
January 21, 2013

**Background**

On Tuesday, January 15, 2013 I received a call from CEO Barry Sloane informing me of an issue that came to light in our merchant processing division in Milwaukee. Barry had received a call earlier from Derek DePuydt, president of our merchant processing unit Universal Processing Services of Wisconsin, LLC ("UPS"). UPS is an independent service organization in the business of intermediating between a bank conducting its merchant processing and merchants wishing to accept credit card payments and with whom UPS (or its authorized agents) have negotiated and executed Merchant Agreements. According to Barry, the earlier phone conversation he had with Derek disclosed that Derek admitted that he wrongfully directed funds associated with a large merchant account.

Barry asked if I could arrange to make a site visit to the UPS office to interview the key players and see if I could get to the bottom of the situation. He indicated there were abnormalities in a reserve account that could total $1.2 million. I flew to Milwaukee the next morning and sat with Bob Abromowski (accounting) and Derek Depuydt (President) on January 16, 2013. The next day I interviewed Kim Olszewski (SVP and COO) and Marcus Schaefer (VP Risk). I learned that Bob had discovered inconsistencies in a merchant reserve account Newtek maintains with West America Bank (WA), a sponsor bank. This particular reserve account is on the books of UPS-WI. He inquired about the discrepancy and was told by Kim that it was probably the Hal Smith (HES) accounts and that he should talk to Derek because Derek personally handled all the HES accounts. Hal Smith is a long-time client of Newtek's and has brought in over 100 accounts over the years. Though profitable, a large portion of these accounts were/are considered high risk and some required holdbacks as high as 30%. The interviews revealed that both Kim and Marcus were opposed to these accounts and repeatedly declined them only to be overridden by Derek. At some point all? new Hal Smith merchant accounts were no longer routed through Kim and Marcus, but were unilaterally approved by Derek. Further, both Kim and Marcus suggested some discomfort with Hal Smith, personally. Derek, on the other hand, was quite supportive of both Hal Smith (personally) and of his related accounts.

Some of the HES accounts began to incur chargebacks as far back as August 2011 but they started to significantly increase in September 2012. The chargebacks were first charged against the companies' individual DDA accounts, per procedure; however when those accounts reached a zero or deficit balance, the chargeback would be rejected. At this point the chargeback was properly reported on Newtek's chargeback report and was recognized by the Risk Department (see comments under Kim's interview). The normal process would have been for the accounts to be credit risk-rated and charged off against UPS' reserve account if deemed necessary by the risk department. The risk assessment is performed by the Risk Department

*Comments:*
- [j1]: Did you sit with them together or independently?
- [j2]: What does this sentence mean? Did they elaborate why?
- [j3]: In what way? Did Derek indicate Hal's accounts were profitable and low risk? Any comments on chargebacks? Hal's a good guy? Can we elaborate more here?
- [j4]: We had an 800K deficit in the reserve account at the end of 2011. That is significant. Brings into question why the issue was not brought up in mid-2011 when the chargebacks started to occur.
- [j5]: Who comprises the Risk Department? Kim and Marcus?

Exhibit 1
FTC Response to
UPS Sum. Judg. Mtn
Page 1 of 8

and approved by Derek. That reserve account (maintained on the books of UPS-WI) had a balance of under $200M at the time of the investigation. At the very least, a determination of the merchants' future permitted activities would be made at this point. However, before the normal process could be followed, Derek inappropriately directed the charges to the WA Merchant Reserve account. This account consists of high risk merchants and can holdback anywhere between zero and 30% or more of residuals. There should have been approximately $4 million in the reserve consisting of those merchants' holdbacks. However, due to the HES related chargebacks and Derek's unauthorized redirecting of the chargebacks, the reserve was depleted to approximately $12.8 million. This amount does not necessarily represent a high point in the deficit balance nor does it represent an end to the chargebacks. Only time will reveal if any more chargebacks will come in from either (or both) the defunct and still operating HES related entities that Newtek will have to cover. The approximate timeframe for these chargebacks to be honored is 455 days, an industry accepted standard.

**Interviews**

**Bob Abromowski**
My first question to Bob Abromowski was if he thought the events were control failures, lack of controls or circumvention of controls. He opined that it was likely a lack of control in the reserve area. However, he said that when he initially talked to Derek about the transfers and the deficit amount in the reserve account, he was given vague responses that did not settle Bob's concerns. He then went back to the accounts and still could not figure them out so he went to Derek a second time. That reportedly is when Derek admitted to Bob that he was directing the transfers into the larger referenced account to cover losses that 12 HES accounts (defunct businesses) were accruing due to large chargebacks. I learned from Bob that the account in question is a reserve account that is not on Newtek's books and is not normally reconciled by him because of that fact. He routinely reconciles the "reject account" which is carried on Newtek's books and should have reflected these losses. Because they were diverted to the reserve account, they went undiscovered for the period between August 2011 and January 2013. Bob reported that Derek told him that he (Derek) did not initially understand the impact of his actions and thought he was providing an alternate means of charging the reserve account until Hal Smith or his related merchants could make good on the chargebacks. It was Bob's opinion that there was no control in existence that would have tipped him off to the unauthorized activity and resulting deficit in the reserve account. He relied on the Risk Department (Kim) to identify unusual activity in the merchant reserve account. Bob also stated that it was his discomfort with the activity in the reserve account that led to his questioning Derek. Derek did not come to him first, nor did he provide any information to Bob during the seventeen month period that this went on.

Note – Derek's actions effectively paid HES chargebacks with other merchants' reserves. Because the account was not on Newtek's books or reconciled by accounting, this misdirection of funds went undetected for a prolonged period of time.

Exhibit 1
FTC Response to
UPS Sum. Judg. Mtn
Page 2 of 8

**Derek DePuydt**

In my interview with Derek, I questioned him at length about his relationship with Hal Smith and his assessment of the integrity and ability of Hal Smith to make good on the deficit. Derek was steadfast in his support of Hal Smith and told me that it was his belief that Hal Smith not only had the assets (real property located in Florida and Indiana), but the integrity to stand behind his obligations. Derek said it was his understanding that Hal Smith directly guaranteed his owned companies (about $221M in money owed Newtek), but may also be a guarantor on the paper that he brought in as an independent agent since he was a long-time business source and may have signed old agreements that contained language to the effect that he was guaranteeing these companies, even though he did not directly own them. Derek volunteered that Kim was fully aware of the increasing warning signs and had properly communicated her concerns to him. He reportedly told her that because of his personal relationship with the HES accounts and Hal Smith, he would handle all aspects of the accounts.

**Kim Olszewski**

Kim demonstrated both frustration and anger during the interview and those emotions led to a frank assessment of the situation and a much better understanding of the dynamics that led to the current situation. She was adamant that this was neither a reporting issue, an accounting issue, nor a reserve issue. It was in her opinion, a management issue. Her assessment of the quality of the paper that HES was bringing to Newtek was "garbage". She said that she never signed off on anything associated with Hal Smith or the HES accounts. She was equally as disdainful of Hal Smith personally saying that she deliberately avoided any contact with him on those occasions when he would visit the office. She reported that time after time, an HES application would be reviewed and declined by her only to have it subsequently approved and booked by Derek. When abnormalities began to surface in the treatment of chargebacks, she brought them to Derek's attention and was told that he would handle the problem personally. Kim said that Derek assured her that he was in communication with Bob on accounting issues and Barry with the approval and handling of the HES accounts. While she persistently disagreed with the decisions being made against her advice, she said she felt powerless in the eventual decision making process. At some point she told Derek to not bother bringing any more HES paper to her for review because she would decline it and he would approve it so, in her words, Derek eventually cut out the middle man and approved the accounts unilaterally. When she pressed Derek about the HES relationship and her concerns, Derek told her that the income from the HES accounts made it worth the risk and besides, "we have reserves and we have Hal Smith".

Kim disclosed that she had email proof that Derek was releasing residuals to keep some of the HES companies operating. Some of these releases were done by ACH transfer and others were done by wire. The wires had to be approved by accounting, so Bob's area should have been aware of the transactions. She also revealed that Derek reduced the reserve requirements on certain HES accounts from 30% to 15% and that the FTC had levied fines on the HES companies for violations of law.

> **Comment [j6]:** Are you describing the fact that Derek would pay Hal a residual and then Hal would return a portion of that residual to the Company and in turn UPS would wire or ACH those funds to WA to reduce the deficit? This should be clearly stated in this report.
>
> **Comment [j7]:** Who actually directed the wires from the WA account to pay the chargebacks? Was it Derek directing Rachel in accounting? Who had access to the WA reserve account? Was Derek directing accounting to make the wires and ACHs (a control failure).

Exhibit 1
FTC Response to
UPS Sum. Judg. Mtn
Page 3 of 8

Note   1. The disparity between Kim's and Derek's assessment of Hal Smith is striking. The two opinions could not be further at odds with each other.
2. Kim's state of mind regarding Derek's handling of the entire HES group is noteworthy because it provides a partial answer as to why existing controls and reports were obfuscated and the investigation and reporting of abnormalities did not go any further than Derek and the Risk Department.

**Marcus Schaefer**
My last on-site interview was with Marcus Schaefer, VP Risk. Marcus reports directly to Kim but generally does most of the risk assessment with new accounts. His comments closely mirrored Kim's assessment of Hal Smith (personally), his accounts, and Derek's relationship with Hal Smith. Specifically, Marcus said that he neither trusted nor liked Hal Smith. He refused to review and underwrite HES paper, and expressed the same frustration (as Kim) over the constant management overriding that Derek did regarding approvals. Marcus disclosed that in July 2012, all Newtek documentation regarding Hal Smith and his companies was subpoenaed by the Orange County, Florida Criminal Court system. The subpoena included all records, merchant agreements, and charge back information. The HES group was also reportedly subjected to a civil money penalty levied by the Federal Trade Commission. According to Derek, this action was successfully defended by HES but this assertion was not confirmed.

**Julie Vander Werff**
The following Monday, January 21, Kim contacted Mat Ash and me informing us that she had been contacted by Julie Vander Werff, a processor who reported directly to Derek. That same morning, Mat and I conducted a telephone interview with Julie and Kim. Julie was upset over email instructions she was receiving from Derek directing her to delete all emails emanating from him that directed her to place house accounts in the HES residual pool and place non-HES accounts in the HES pool. She also said she had emails from Derek directing her to charge the WA for HES chargebacks rather than the Newtek merchant reserve.

> Comment [j8]: I've seen the numerous emails between Derek and Julie changing pricing and assigning house accounts, but not an email asking Julie to delete these emails. Do we have that particular email?

**Recap of Derek's activities:**
- Diverted chargebacks from going to proper reserve; redirected them to the WA Merchant Reserve
- Released reserves to keep HES companies propped up
- Increased or placed surcharges on commissions to inflate residuals; then used those residuals to repay HES chargebacks
- Wrongfully recoded house accounts (having no commissions) to HES accounts and used residuals paid on those accounts to offset HES chargebacks. This manipulation is tantamount to Newtek using its own funds to pay itself for chargebacks incurred by the HES group.
- Claimed to be following Barry's instructions which effectively stopped staff from asking further questions
- Assured Kim that he was in contact with Bob regarding accounting treatment of entries
- Assured Bob that he was in contact with Kim regarding operational issues

Exhibit 1
FTC Response to
UPS Sum. Judg. Mtn
Page 4 of 8

- Moved other merchant accounts into HES pool to fraudulently increase revenues for the HES group
- Utilized direct instructions via email to staff in order to have these improprieties carried out
- Unilaterally approved new HES business without getting proper Credit Committee or Risk Department review and approval
- Covered up conditions of HES companies circumventing the controls that would have alerted the Risk Department to cap merchants' activities, thus increasing and prolonging Newtek's exposure and liability
- Jointly shared relationship manager (RM) duties with Steve Hauler regarding the HES accounts
- Ignored poor performance evaluation on Steve Hauler and made him RM to the largest, highest risk, most profitable, and highest maintenance accounts in the portfolio
- Derek only disclosed his activities to Barry after Bob uncovered the accounting abnormalities and reserve deficit associated with the improper transfers. Derek also told Bob not to inform Jenny Eddelson, CAO about the situation until he spoke with Barry.

**Comment [j9]:** Has Steve Hauler been interviewed? Per below he has not returned calls?

**Controls lacking**
- Reconciliation of WA Merchant Reserve by accounting department
- No flagging of accounts nearing a zero balance in the WA Reserve
- No reporting of individual merchant status (balances) in the WA Reserve
- Infrequent board meetings
- No Risk Management Committee
- No formal discussions of portfolio management or risk at board level

**Controls not followed**
- Whistleblower procedures ignored by staff and management
- Inaction by managers when Derek's instructions were violating policy and procedure could be construed as passively abetting the situation
- Poor communication between operations and accounting
- Poor communications between operations and Derek
- Poor communications between accounting and Derek
- Poor communications between management and Board
- Kept Derek's wife on staff reporting to Kim. Although her duties were technically segregated from Derek's, there has to be an assumption of knowledge on Kelly DePuydt's part.
- Updated financial information and a schedule of assets should have been obtained on HES companies and Hal Smith personally
- No indication that any of the HES companies were checked for validity or existence. When the Risk Department abdicated underwriting and reviewing responsibility with all HES related accounts, the reliance to perform these checks fell solely on the one person who was committing the improprieties from the start.

Exhibit 1
FTC Response to
UPS Sum. Judg. Mtn
Page 5 of 8

**Causes**

The fraudulent and improper activities were allowed to go on for a prolonged period of time due to the following reasons:

- Staff and management did or said nothing when clearly inappropriate activities were being promulgated by Derek. By their own admission, Kim and Marcus were well aware of the risks, the overrides, the instructions from Derek without supporting documentation
- Julie never questioned any suspicious instructions from Derek but simply followed those instructions until she finally contacted Kim on January 28, 2013.
- Breakdown in communication between staff
- Breakdown in communication at UPS board level
- Accounting should have reconciled and monitored WA Merchant Reserve account
- Derek used a wire transfer on at least one occasion to direct funds into the WA account. These wires require proper back-up documentation and independent sign-off by accounting. Failure of these controls allowed the wire to be processed without question or third party review. **Comment [j10]:** Have we seen any of the wire instructions? Was it always Derek directing the funds transfers?
- Risk Department abdicated underwriting and monitoring responsibility and permitted Derek to unilaterally handle all transactions associated with the HES accounts
- By allowing merchants to be approved without proper credit committee process violates prudency and policy
- No formal monthly risk committee meeting. There were credit committee meetings weekly to approve new merchants, but no general meetings to discuss risk overall.

**Subsequent Events**

- NBS put through a transfer of $1.255 million on January 28, 2013 to replenish the dollars in the WA Merchant reserve account. This amount does not necessarily represent an end to the deficit as future chargebacks are likely to surface from the HES group of defunct companies.
- The Company performed an analysis of future estimated chargeback losses related to the HES accounts and booked an appropriate reserve as of 12/31/12.
- Derek was initially placed on paid administrative leave but was terminated on January 28, 2013
- Derek refused to answer any more questions without his attorney present
- A call to Steve Hauler on January 28, 2013 has not been returned
- Kelly Depuydt, Derek's wife and part time employee reporting to Kim, was placed on paid administrative leave on ??.
- The Company engaged The Strawhacker Group to perform a forensic audit. **Comment [j11]:** Do you want to include the SOW as an attachment?
- A telephonic meeting was scheduled for January 29, 2013 between Mat Ash, Doug Keins, Stuart Wilkins, Derek DePuydt, and his attorney, Alex Flynn (that conversation consisted of a statement read by Derek (attached) and instructions from his attorney informing us that Derek will only respond to questions through Flynn and in writing.

Exhibit 1
FTC Response to
UPS Sum. Judg. Mtn
Page 6 of 8

- Hal Smith has not yet produced updated financial information but indicated to Barry on January 18, 2013 that he was prepared to allow the full amount of his monthly residuals (estimated at that time at $30-45M/month) to be applied to the $1.2MM deficit until it was repaid. However, further investigation uncovered the fact that Derek was "creating" and/or enhancing these residuals either by raising commission rates (surcharging) on HES accounts or by unauthorized manipulation of non-HES accounts into the HES group to give the appearance of a residual stream that was in fact Newtek funds to begin with.
- Newer analysis of HES "true" residuals reveals about $700 for the month of January
- Newtek received a Federal Grand Jury Subpoena for the Northern District of Texas dated January 24, 2013 demanding all documents and information on HES related companies and Hal Smith personally.

**Other**

- Need to check HES merchant agreements to see if there is language contained in those agreements that would obligate Hal Smith as a guarantor [Comment [j12]: Matt has reviewed both agreements. He can send you his memo recapping the 2 if you do not have it already.]
- Need to obtain more detail and determine the results of the FTC's attempt to levy fines and penalties on HES companies

Exhibit 1
FTC Response to
UPS Sum. Judg. Mtn
Page 7 of 8

Attachment 1

**Statement of Derek DePuydt**

The purpose of this statement is to relay the facts related to the situation involving Hal Smith.

1. Understanding that there is a large amount owed by the underlying customers, I believe that the revenues obtained in the past should be reviewed as well. Although I do not have access to the numbers, I would estimate that in total the relationship with Hal Smith over the past ten years has brought net profit to Newtek of between $4-$5 million. My intentions were clearly to continue creating this profit, but instead the underlying business snowballed into the receivable that is there today.

2. Up until about 2 weeks ago, I believed that Newtek held all liability for any losses due to merchants brought in by Hal Smith, as this is the case with all other Independent Sales Agents to my knowledge.

3. I have in no way benefitted personally via anything that was done and was always acting in the best interest of Newtek. I have never received anything from Hal Smith, or anyone, ever.

4. Newtek is not out in terms of cash in any way and although I do not have any access to show this, the records clearly show this to be the case.

5. I have clearly lost a significant amount personally due to recent events. In addition to a salary and benefits, I am told I have also been stripped of deferred stock and deferred stock options currently valued at over $150,000. This is in addition to the damage caused to my reputation. I had worked hard to build the processing division to what it is today and have always acted in the best interest of Newtek.

6. Due to my recent termination, this is all I have to say. I am willing to cooperate but should you have any further questions please submit them to my attorney in writing.

Exhibit 1
FTC Response to
UPS Sum. Judg. Mtn
Page 8 of 8