**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff,** | **Civ. No. 6:12-cv-1618-Orl-22-KRS** |
| **v.** | **JUDGE ANNE C. CONWAY** |
| **WV UNIVERSAL MANAGEMENT, LLC,** *et al.*, | **MAGISTRATE KARLA R. SPAULDING** |
| **Defendants.** | **DISPOSITIVE MOTION** |

**PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY**
**JUDGMENT AND MEMORANDUM IN SUPPORT**

**[DISPOSITIVE MOTION]**

# Table of Contents

I.     Introduction ........................................................................................................... 1
II.    The Parties ............................................................................................................ 3
A.     The Federal Trade Commission .......................................................................... 3
B.     The Original Defendants ..................................................................................... 3
C.     The Remaining Defendants ................................................................................. 5
       1.   Hal E. Smith and HES Merchant Services Company, Inc. .......................... 5
       2.   Jonathon E. Warren, Business First Solutions, Inc., and VoiceOnyx Corp................. 9
       3.   Ramon Sanchez-Ortega ............................................................................. 12
       4.   Universal Processing Services of Wisconsin, LLC, d/b/a Newtek Merchant Solutions,
            and Derek DePuydt ................................................................................... 14
III.   The TYS Defendants' Unlawful CCIRRS Scheme ........................................... 17
A.     The TYS Defendants Delivered Unwanted Robocalls (Count 8) and Robocalls that Did
       Not Make Required Disclosures Promptly (Count 9)...................................... 17
B.     The TYS Defendants Dialed Telephone Numbers that Were Registered on the National
       Do Not Call Registry (Count 6) and Failed to Pay the Fee to Access the Registry
       (Count 10). ........................................................................................................ 18
C.     The TYS Defendants Failed to Honor Do Not Call Requests (Count 7). ..................... 18
D.     The TYS Defendants Made Misrepresentations in Order to Induce Consumers to
       Purchase Their CCIRRS. ................................................................................... 19
       1.   Misrepresentations Regarding Substantial Interest Rate Reduction, Substantial
            Savings, and Faster Debt Repayment (Count 1 (§ 5) and Count 4 (TSR))................. 19
       2.   Misrepresentation Regarding the Timing of the Service Fee Charge or Payment
            (Count 2) .................................................................................................. 23
       3.   Unauthorized billing (Count 3 (§ 5) and Count 11 (TSR))....................... 24
E.     The TYS Defendants Charged Advance Fees for Their CCIRRS (Count 5)................. 24
F.     Newtek/DePuydt – assisting & facilitating (Count 12: Counts 4-6, 8, 9, & 11)............ 25
       1.   Newtek and DePuydt Provided Essential Services to the Treasure Your Success
            Enterprise. ................................................................................................ 25
       2.   Newtek and DePuydt Knew or Consciously Avoided Knowing the Deceptive Acts or
            Practices of the Treasure Your Success Enterprise................................... 26
G.     Amount of consumer redress........................................................................... 36
IV.    The Summary Judgment Standard .................................................................... 36
V.     The TYS Defendants' Practices Violate Section 5 of the FTC Act (Counts 1, 2, 3)............ 37
A.     Count One (Deception Under Section 5 of the FTC Act)................................ 38
B.     Count Two (Deception Under Section 5 of the FTC Act) ............................... 38
C.     Count Three (Unfairness Under Section 5 of the FTC Act) ............................ 38
VI.    The Defendants' Telemarketing Practices Violate the TSR: Counts Four to Eleven........ 39
VII.   Newtek/DePuydt – assisting and facilitating TSR violations (Count 12: liable for Counts
       4, 5, 6, 8, 9, and 11) ........................................................................................ 42
A.     Substantial assistance ...................................................................................... 43
B.     Knew or Consciously Avoided Knowing......................................................... 44
VIII.  GFA, TYS, HES, BFS, and VO Operated as a Common Enterprise. ........................... 45

IX.     The Individual Defendants are Liable for the Acts and Practices of the Corporate
         Defendants ................................................................................................................ 46
A.         Defendant Smith.......................................................................................................... 48
B.         Defendant Warren ....................................................................................................... 49
C.         Defendant Sanchez ...................................................................................................... 49
X.      Conclusion ........................................................................................................................ 50

## Table of Authorities

### CASES

*Auer v. Robbins*, 519 U.S. 452 (1997) ...................................................................... 42

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................. 37

*Del. Watch Co. v. FTC*, 332 F. 2d 745 (2d Cir. 1964).................................................. 45

*Fini v. Dish Network, L.L.C.*, 955 F. Supp. 2d 1288 (M.D. Fla. 2013) ........................ 37

*FTC v. 1st Guar. Mortg. Corp.*, No. 09-cv-61840, 2011 U.S. Dist. LEXIS 38152 (S.D. Fla. Mar. 30, 2011) ................................................................................................................. 37

*FTC v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009)............................................. 39

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989).................................46-48

*FTC v. Atlantex Assocs.*, No. 87-0045-CIV-NESBITT, 1987 U.S. Dist. LEXIS 10911 (S.D. Fla. Nov. 25, 1987) ................................................................................................ 46, 47

*FTC v. Chapman*, 849 F. Supp. 2d 1085 (D. Kan. 2011) .........................................42-44

*FTC v. Consumer Health Benefits Ass'n*, 10 Civ. 3551 (ILG) (RLM), 2012 U.S. Dist. LEXIS 72161 (E.D.N.Y. May 23, 2012) ................................................................................. 43

*FTC v. Direct Benefits Group, LLC*, Case No. 6:11-cv-1186-Orl-28TBS, 2013 U.S. Dist. LEXIS 100593 (M.D. Fla. July 18, 2013)................................................................................ 39

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005).............................. 37

*FTC v. Gem Merchandising Corp.*, 87 F.3d 466 (11th Cir. 1996) ...........................46-47

*FTC v. Global Marketing Group, Inc.*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008) ......... 43

*FTC v. Innovative Mktg., Inc.*, 654 F. Supp. 2d 378 (D. Md. 2009)............................. 37

*FTC v. Kennedy*, 574 F. Supp. 2d 714 (S.D. Tex. 2008) .............................................. 45

*FTC v. Tashman*, 318 F.3d 1273 (11th Cir. 2003)....................................................... 37

*FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012) ......................... 40, 45

*FTC v. Windward Mktg., Ltd.*, No. 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114 (N.D. Ga. Sept 30, 1997) ...........................................................................................................46-48

*FTC v. World Media Brokers*, 415 F.3d 758 (7th Cir. 2005) ....................................... 46

*Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992)......................................................... 37

*The Broadcast Team, Inc. v. FTC*, 429 F. Supp. 2d 1292 (M.D. Fla. 2006) ............... 40

*United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952 (C.D. Ill. 2009) ............. 43

### STATUTES

15 U.S.C. § 45.................................................................................................................. 37

15 U.S.C. § 57a(d)(3)....................................................................................................... 40

15 U.S.C. § 6102(a) ......................................................................................................... 39

15 U.S.C. § 6102(c) ......................................................................................................... 40

### OTHER AUTHORITIES

*FTC, Complying with the Telemarketing Sales Rule* ..................................................43-44

*Revised Notice of Proposed Rulemaking, Telemarketing Sales Rule*, 60 Fed. Reg. 30,406, 30,414 (June 8, 1995)................................................................................................................ 43

*Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule*, 60 Fed. Reg. 43,842 (Aug. 23, 1995) ................................................................................................................ 43

**RULES**

Fed. R. Civ. P. 56(e) .................................................................................................... 37

**REGULATIONS**

16 C.F.R. § 310.2(cc) ................................................................................................... 40
16 C.F.R. § 310.2(m) ................................................................................................... 40
16 C.F.R. § 310.3(a)(2)(x) ........................................................................................... 40
16 C.F.R. § 310.3(b) .................................................................................................... 42
16 C.F.R. § 310.4(a)(5)(i) ...................................................................................... 31, 41
16 C.F.R. § 310.4(a)(7) ................................................................................................ 42
16 C.F.R. § 310.4(b)(1)(iii)(A) ................................................................................... 41
16 C.F.R. § 310.4(b)(1)(iii)(B)(i) ................................................................................ 41
16 C.F.R. § 310.4(b)(1)(iii)(B)(ii) .............................................................................. 41
16 C.F.R. § 310.4(b)(1)(v)(A) ..................................................................................... 41
16 C.F.R. § 310.4(b)(1)(v)(B)(ii) ................................................................................ 41
16 C.F.R. § 310.4(d) .................................................................................................... 41
16 C.F.R. § 310.8 ......................................................................................................... 41

**MOTION FOR SUMMARY JUDGMENT**

Plaintiff Federal Trade Commission ("FTC" or "Commission") respectfully moves the Court for summary judgment on all twelve counts set forth in the Amended Complaint. As shown in the Memorandum and attached exhibits, summary judgment is appropriate in this case because there is no genuine issue as to any material fact, and the FTC is entitled to judgment as a matter of law. Once liability is established against the Defendants, the FTC will seek leave to file proposed Permanent Injunctions and a memorandum setting forth the applicable law regarding the need for, and proper scope of, the proposed injunctions.

**MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I.   Introduction

From November 2011 to July 2012, Treasure Your Success, a telemarketing enterprise that operated in Winter Park, Florida, bilked consumers throughout the country out of $2,592,427 with its credit card interest rate reduction service ("CCIRRS") by systematically engaging in deceptive and unfair business practices. Using unlawful robocalls and cold calls, the operation lured consumers into talking to its telemarketers, who, in turn, tricked consumers into signing up for the CCIRRS by promising them one or more of the following results: (1) a substantial reduction in their credit card interest rate, to as low as three percent; (2) thousands of dollars in savings, typically at least $2,500; and (3) cheaper, easier, and faster credit card debt repayment plans.

For this service, Treasure Your Success charged consumers substantial upfront fees, up to $1,493.93. To induce consumers, the company told them that it would not charge the service fee until they obtained the promised results or until they signed a written contract. In

reality, however, the company charged consumers the service fee on the same day or the day after the initial telemarketing call, long before consumers signed a contract or could realize any of the promised benefits.  In all known instances, Treasure Your Success failed to deliver the results that it promised to consumers.  In fact, given the existing credit card market realities at the time, delivering on the promised results was simply not feasible.

The Treasure Your Success enterprise was operated by several individuals – Defendants Willy Plancher, Valbona Toska, Hal E. Smith, and Jonathon E. Warren – who also acted through their respective companies – Defendants Global Financial Assist, LLC ("GFA"), WV Universal Management, LLC, also doing business as Treasure Your Success ("TYS"), HES Merchant Services Company, Inc. ("HES"), Business First Solutions, Inc. ("BFS"), and VoiceOnyx Corp. ("VO") (collectively, the "TYS Defendants").  Together, the TYS Defendants devised and operated a fraudulent scheme and, from the beginning, received substantial assistance from Defendant Universal Processing Services of Wisconsin, LLC, also doing business as Newtek Merchant Solutions ("Newtek"), and its then-president Defendant Derek DePuydt, resulting in significant injury to consumers.

This memorandum sets forth uncontroverted evidence of Defendants' violations of Section 5 of the Federal Trade Commission Act ("FTC Act") and the Telemarketing Sales Rule ("TSR"), as demonstrated by consumer declarations, Federal Trade Commission investigator declarations, third-party declarations, expert reports, discovery testimony from and admissions by Defendants, and extensive documentary evidence.  Even viewed in the light most favorable to Defendants, this evidence shows that there is no genuine issue of material fact and that the FTC is entitled to judgment as a matter of law.  Accordingly, the

Court should enter summary judgment on all twelve counts alleged in the First Amended

Complaint ("Complaint") (Doc. No. 61).

## II.  The Parties

A.  The Federal Trade Commission

The Federal Trade Commission is an independent agency of the United States

government that enforces the FTC Act's prohibitions on deceptive and unfair acts or

practices, 15 U.S.C. § 45(a), and the TSR, 16 C.F.R. Part 310.

B.  The Original Defendants[1]

GFA was a Florida LLC formed by Plancher and Toska that performed the

"qualification"[2] and "closing"[3] phases of the CCIRRS process.[4]  After GFA telemarketers

qualified and closed the deal, they transferred it to TYS, which took over from there.[5]

TYS was a Florida LLC also formed by Plancher and Toska that operated in the

office suite next door to GFA.[6]  TYS performed the "verification"[7] and "fulfillment"[8] phases,

including charging the service fee on consumer's credit card.[9]

A telemarketing training manual, used by Plancher and Toska and obtained from their

telemarketing boiler room, describes the typical CCIRRS process:

---

[1] On September 6, 2013, the Court entered a final order against the original defendants in this matter, *i.e.*, Plancher, Toska, GFA, TYS, and Leading Production, LLC.  Doc. No. 108.  For purposes of this memorandum, the relevant original corporate Defendants are GFA and TYS, whose business practices form the basis for the law violations alleged against all active Defendants in this matter.

[2] *See generally* PX 27, Toska Dep. 18:3-22 (Note: deposition transcripts are cited as "pp:ln1-ln2," where "pp" is the page, "ln1" is the first cited line, and "ln2" is the last cited line.  E.g., "Toska Dep. 18:3-22" refers to page 18, lines 3 through 22 of Ms. Toska's deposition transcript); *see also* PX 18, ¶¶ 9-10.

[3] *See generally* PX 27, Toska Dep. 18:23-22:5; 28:1-16; *see also* PX 18, ¶¶ 2, 11.

[4] *See* PX 27, Toska Dep. 70:4-6; 90:8-11.

[5] PX 27, Toska Dep. 69:19-70:9.

[6] *See* PX 27, Toska Dep. 64:24-65:5.

[7] *See* PX 27, Toska Dep. 22:6-16; 27:11-19; *see also* PX 18, ¶ 12.

[8] *See* PX 27, Toska Dep. 22:19-25; 23:5-27:4; *see also* PX 18, ¶ 13; PX 27, Toska Dep. 138:8-140:3.

[9] PX 27, Toska Dep. 70:7-9.

> After speaking with a fronter who pushes the client into giving
> their credit card number, a closer who convinces them it's in
> their best interest to spend between $600-$1,000 in order to get
> out of debt, and a verifier who confirms they understand a
> charge will be placed on their account now it's time for you,
> the financial advisor to help get on the phone with their lenders
> and get their rates lowered.  If you had a hard time following
> that imagine how the client feels.[10]

Tellingly, the manual also reveals other important aspects of the CCIRRS scheme:

> Most clients will originate from a live transfer.  By this point
> the client has been through almost 30-40 minutes of people
> promising them the world.  Most sales floors are vague as to
> who they are and how they are going to get the rates reduced.
> The main selling point is that the client will save $2,500 with
> the service but how the client will receive those savings isn't
> always clear.[11]

Further, it exposes the real motivation behind telemarketers' "promising [ ] the world" to

consumers, despite having no "clear" path to delivering on those promises, telling the

telemarketing sales force: "Understand this; YOU DON'T GET PAID UNTIL THE DEAL

APPROVES."[12]

Plancher and Toska added a step to the process described in the manual.  They

purportedly provided the consumer a copy of the TYS service agreement and required the

consumer to sign it, before moving to fulfillment.[13]  This was supposed to give the consumer

a chance to review the contract before agreeing to purchase TYS's service.[14]

---

[10] PX 28, FTC-TYS-0000163.
[11] PX 29, FTC-TYS-0000161.
[12] PX 30, FTC-TYS-0000180.
[13] *See* PX 27, Toska Dep. 66:16-67:21; 152:20-153:4.
[14] *See* PX 5, ¶¶ 4, 6.

Plancher and Toska are a couple,[15] and along with Smith, Warren, and their respective companies, they created[16] a "one-stop shop"[17] CCIRRS operation that enabled the TYS Defendants to perform "everything in-house"[18]—from the qualification to the fulfillment of the service.[19]

### C.    The Remaining Defendants

#### 1.    Hal E. Smith and HES Merchant Services Company, Inc.

HES Merchant Services Company, Inc. was a Florida company formally incorporated by Smith, as president, on March 31, 2010.[20]  HES conducted business in this district[21] and at varying times operated from Lebanon, Indiana and Kissimmee, Florida.[22]  HES was an independent sales agent of Newtek,[23] and it was the entity that Smith used to help Plancher, Toska, and TYS obtain two merchant accounts with Newtek.[24]

Hal E. Smith, also known as "H.E. Smith,"[25] currently resides in Lebanon, Indiana but also resided in Kissimmee, Florida.[26]  He was the owner, officer, and operator of HES[27] and controlled its business practices.[28]  From 2002[29] to 2012,[30] Smith, through HES, was an

---

[15] *See* PX 27, Toska Dep. 12:6-9; PX 31, Plancher Dep. 6:10-19.

[16] *See* PX 27, Toska Dep. 60:17-76:18; 73:19-76:19 (detailing the process of setting up and operating the Treasure Your Success enterprise in close collaboration with Smith, Warren, and their companies); PX 31, Plancher Dep. 70:7-72:10 (describing the "structur[ing]" of the enterprise "with the guidance of John [Warren], Maritza [Martinez, who was Warren's employee], and Hal [Smith]").

[17] PX 27, Toska Dep. 62:12; 71:21.

[18] PX 27, Toska Dep. 63:21-22.

[19] *See* PX 27, Toska Dep. 63:8-10.

[20] PX 32, Vega Decl., ¶ 4.  HES was dissolved on September 23, 2011.  *Id.*

[21] *See* PX 33, HES Admis., ¶ 1.

[22] *See* PX 34, Smith Dep. 10:22-11:15; 27:25-28:9.

[23] PX 34, Smith Dep.  7:19-8:3; 10:15-21.

[24] *See* PX 33, HES Admis., ¶¶ 4, 11; PX 35, Smith Admis., ¶¶ 5-6.

[25] PX 35, Smith Admis., ¶ 1.

[26] *See* PX 34, Smith Dep. 10:22-11:15; 27:25-28:9.

[27] Doc. No. 156, Smith & HES Answer, ¶ 14.

[28] PX 35, Smith Admis., ¶ 4; PX 33, HES Admis., ¶ 3.

[29] *See* PX 34, Smith Dep. 116:23-117:4.

independent sales agent of Newtek,[31] and he helped telemarketing companies, including TYS, obtain merchant accounts with Newtek.[32]  He was also directly involved with companies that telemarketed timeshares, vacation packages, and CCIRRS, among others.[33]  Before aligning with Plancher and Toska, he owned and operated a company that telemarketed CCIRRS until it was shut down by Florida state law enforcement.[34]

Smith and HES played crucial roles in setting up, running, and controlling the Treasure Your Success operation.  Along with Warren, Smith "propos[ed] a plan"[35] or "business venture"[36] to Plancher and Toska that became the TYS Defendants' CCIRRS operation, and, together, they implemented that plan.[37]  Smith helped TYS to obtain two merchant accounts with Newtek—which came to be known as the "Treasure Your Success" ("TYS 1")[38] and "Treasure Your Success 2" ("TYS 2")[39] merchant accounts—that enabled TYS to charge consumers' credit card accounts.[40]  In connection with the use of the merchant accounts, Smith monitored TYS's sales revenues and chargebacks[41] and he required Plancher

---

[30] *See* PX 34, Smith Dep. 9:20-25.

[31] *See* PX 34, Smith Dep. 9:8-25.

[32] *See* PX 33, HES Admis., ¶¶ 4, 11; PX 35, Smith Admis., ¶¶ 5-6.

[33] *See generally* PX 34, Smith Dep. 19:8-34:8; 43:3-47:17; PX 36, Smith Dep. Exh. 1 (list of Newtek merchant accounts referred by Smith).

[34] *See* PX 34, Smith Dep. 80:14-84:11; 85:18-87:25; PX 37, Sanchez Dep. 79:24-80:13; PX 27, Toska Dep. 113:10-20.

[35] Doc. No. 87, Motion to Dismiss, p. 5.

[36] Doc. No. 87, Motion to Dismiss, p. 9.

[37] *See* PX 34, Smith Dep. 39:12-43:2; PX 27, Toska Dep. 60:17-76:18; 73:19-76:19; PX 31, Plancher Dep. 70:7-72:10.

[38] *See* PX 35, Smith Admis., ¶¶ 23-24, 27-30; PX 33, HES Admis., ¶¶ 12-13.

[39] *See* PX 35, Smith Admis., ¶¶ 33-34; PX 33, HES Admis., ¶¶ 19-20.

[40] *See* PX 35, Smith Admis., ¶ 36; PX 33, HES Admis., ¶ 27; PX 27, Toska Dep. 74:18-25; 76:17-19; 77:10-12; PX 31, Plancher Dep. 85:20-25; Doc. No. 94-2, ¶ 17 (Olszewski Aff.); Doc. No. 94-1, ¶ 10 (Sloane Aff.); Doc No. 153, Newtek's Answer, ¶ 33.

[41] *See* PX 34, Smith Dep. 201:13-23; 207:15-208:12; *see also* PX 27, Toska Dep. 95:20-96:6; PX 38, Hauler Dep. Vol. 1 77:17-79:25.

and Toska to hire his hand-picked "Merchant Specialist"[42] to fight and attempt to reverse

chargebacks that consumers sought.[43]

    As the gatekeeper to Newtek's merchant accounts,[44] Smith controlled TYS's business

practices[45] and established rules and requirements governing its day-to-day operations.[46]  As

he testified, "[I] went over everything with them, and told them what they could and couldn't

do…."[47]  He personally vetted TYS's telemarketing scripts and consumer sales contracts.[48]

Significantly, he required corrections to be made on the sales scripts when he deemed them

necessary.[49]  He required Plancher and Toska to purchase and use Warren's consulting,

telephone, and information technology ("IT") services,[50] which allowed Warren and Smith to

monitor TYS's business practices.[51]  As Smith explained to Toska, "[Y]ou have to use John

[Warren], because John is monitoring you, and I pay John to monitor you."[52]  Smith also

required Plancher and Toska to send a computer tablet to each TYS customer and to buy the

---

[42] PX 27, Toska Dep. 101:24.

[43] *See* PX 27, Toska Dep. 101:21-108:9; 112:4-113:9; 162:20-163:11; PX 31, Plancher Dep. 85:1-16; PX 39, Warren Dep. 108:23-110:22; 112:12-113:19; PX 34, Smith Dep. 109:25-112:3.

[44] *See* PX 27, Toska Dep. 84:22-25; PX 38, Hauler Dep. Vol. 1 107:18-22; *see also* PX 37, Sanchez Dep. 55:14-19 ("[Smith] has total control.  He could shut their account down in a second….That's one thing about Hal, he was a control freak….[H]e'll let you know that he's in control….").

[45] *See* PX 34, Smith Dep. 33:3-8; 36:7-18; 65:2-17; 91:1-3; 91:22-23; 201:19-23; 203:3-9; *see also* PX 38, Hauler Dep. Vol. 1 107:18-22; PX 37, Sanchez Dep. 26:18-25; 34:12-14; 50:19-22; 55:12-23; 56:14-23; 118:9-119:4.

[46] *See* PX 34, Smith Dep. 40:17-23; 63:5-8; 70:13-24; 163:19-164:3; PX 27, Toska Dep. 111:25-112:10;

[47] PX 34, Smith Dep. 40:17-23; *see also* PX 40, Hauler Dep. Vol. 2 197:20-198:8 ("Hal…had a good system on what he was doing and everything. . . . 'You  have to do it my way or basically it's the highway.' That's what he always said.").

[48] *See* PX 35, Smith Admis., ¶ 53 (admitting that he was aware that TYS's business practices involved telemarketing to consumers); ¶ 55 (admitting that he read at least one of TYS's telemarketing scripts); ¶ 56 (admitting that he read at least one of TYS's consumer sales contracts); *see also* PX 33, HES Admis., ¶¶ 51, 54; PX 34, Smith Dep. 67:14-22; 157:1-158:13.

[49] *See* PX 34, Smith Dep. 150:1-18; *see also* PX 37, Sanchez Dep. 55:24-56:5.

[50] *See* PX 35, Smith Admis., ¶¶ 9, 13; PX 34, Smith Dep. 47:19-48:2; 148:18-149:10; *see also* PX 39, Warren Dep. 136:21-24; 139:24-140:6; PX 27, Toska Dep. 84:22-85:3; PX 38, Hauler Dep. Vol. 1 30:23-31:8; 32:18-33:8; 34:13-23.

[51] *See* PX 34, Smith Dep. 35:21-25; 37:14-38:2; 53:1-5; 160:16-161:8.

[52] PX 27, Toska Dep. 84:22-85:3.

computer tablets from a company that he owned, and he charged them for each tablet.[53]
Moreover, he controlled Plancher's and Toska's hiring decisions and prohibited them from
hiring telemarketers listed in his personal "blacklist [or] blackball list."[54]

    To ensure that Plancher and Toska obeyed his rules and requirements, Smith
regularly monitored TYS's business premises, personally and through his associates,
including his longtime friend[55] and hired hand,[56] Leon Williams.[57]  He and Williams
"walk[ed] the rooms"[58] to check who was working there,[59] and, "[t]wo or three times a
week,"[60] they listened in on telemarketing calls to make sure that Plancher's and Toska's
telemarketers stayed on script.[61]  Even the "tech guy"[62] that Plancher and Toska hired based
on Smith's advice "ke[pt] his ears open for [Smith]."[63]

    By virtue of his control over the merchant accounts, Smith was able to charge TYS
substantial merchant fees through Newtek.[64]  Indeed, Newtek employees knew that the
discount rates that Smith charged TYS were "high for any transaction"[65] and that "you would

---

[53] *See* PX 35, Smith Admis., ¶¶ 17, 22, 66; PX 33, HES Admis., ¶ 66; PX 34, Smith Dep. 73:8-79:19; 76:2-77:3; *see also* PX 27, Toska Dep. 68:8-17; 80:20-81:25; 84:22-85:1; 85:20-86:15; PX 31, Plancher Dep. 87:2-11; 110:15-111:3; PX 39, Warren Dep. 48:18-24; 137:19-138:2.

[54] PX 34, Smith Dep. 30:23; *see also* PX 34, Smith Dep. 30:23-31:8; 63:14-64:20.

[55] *See* PX 34, Smith Dep. 43:1-2.

[56] *See* PX 35, Smith Admis., ¶ 51; PX 33, HES Admis., ¶ 48.

[57] *See* PX 35, Smith Admis., ¶¶ 47-48 (admitting that he personally visited TYS premises to monitor business practices); PX 34, Smith Dep. 41:7-13; 70:13-24; 77:5-9; *see also* PX 38, Hauler Dep. Vol. 1 115:24-116:16.

[58] PX 34, Smith Dep. 33:3.

[59] *See* PX 34, Smith Dep. 32:19-33:8; 90:2-18

[60] PX 34, Smith Dep. 42:11-12.

[61] *See* PX 34, Smith Dep. 42:10-43:2; 90:16-91:3.

[62] PX 34, Smith Dep. 77:22.

[63] PX 34, Smith Dep. 77:5-14.

[64] *See* PX 34, Smith Dep. 7:23-8:3; 55:17-56:10; 56:18-57:5; *see also* PX 27, Toska Dep. 76:20-78:17; 97:2-98:14.

[65] PX 41, Olszewski Dep. 67:10-68:14 (Newtek's former Chief Operating Officer explaining that the average industry discount rate falls between 1.5% to 4%, so the rate that Smith charged TYS, between 14% to 15.5%, is "high for any transaction").

never see a rate like that."[66]  In addition to the merchant account-related fees and computer

tablet charges,[67] Plancher and Toska also had to pay, on a weekly basis, for the chargeback

reversal services that Smith required them to use.[68]

2.   Jonathon E. Warren, Business First Solutions, Inc., and VoiceOnyx Corp.

Business First Solutions, Inc. is a Florida corporation owned and operated by

Warren.[69]  BFS conducts business in this district[70] and maintains its principal place of

business in Orlando, Florida.[71]  BFS provided Plancher, Toska, and TYS with consulting and

IT services, including business website development and hosting and a business "CRM"[72] or

"customer relation manager"[73] to track customers' accounts.[74]

VoiceOnyx Corp. is a Florida corporation also owned and operated by Warren.[75]  VO

conducts business in this district[76] and also maintains its principal place of business in

Orlando, Florida.[77]  VO provided Plancher, Toska, and TYS with telephone equipment and

the local and long distance services.[78]

---

[66] PX 40, Hauler Dep. Vol. 2 197:20-198:8 (Newtek's relationship manager for the Smith relationship testifying that, compared to other Newtek sales agents, the discount rates that Smith charged were "very high" and "you would never see a rate like that").
[67] *See* PX 34, Smith Dep. 76:2-13; *see also* PX 35, Smith Admis., ¶¶ 17, 22.
[68] *See* PX 27, Toska Dep. 105:16-108:9.
[69] *See* Doc. No. 99, Warren, BFS, VO Answer, ¶ 15; *see also* PX 32, Vega Decl., ¶ 5.
[70] *See* Doc. No. 99, Warren, BFS, VO Answer, ¶ 12.
[71] PX 32, Vega Decl., ¶ 5.
[72] PX 39, Warren Dep. 11:12.
[73] PX 39, Warren Dep. 11:16.
[74] *See* PX 39, Warren Dep. 10:19-12:11; 35:23-36:23.
[75] *See* Doc. No. 99, Warren, BFS, VO Answer, ¶ 15; *see also* PX 32, Vega Decl., ¶ 6.
[76] *See* Doc. No. 99, Warren, BFS, VO Answer, ¶ 13.
[77] PX 32, Vega Decl., ¶ 6.
[78] *See* PX 39, Warren Dep. 35:23-36:7; *see also* PX 31, Plancher Dep. 86:3-9.

Jonathon E. Warren is the owner, president, and operator of BFS and VO.[79]  Since 1999, he has been involved in the telemarketing industry, and, like Smith, he has worked with companies that telemarketed timeshares and vacation packages.[80]  Warren met Smith through a mutual business relationship in 2002.[81]  Beginning in 2009, Smith referred the telemarketing companies for which he obtained merchant accounts to Warren and his companies to purchase and use Warren's consulting, telephone, and IT services.[82]

Warren, BFS, and VO were part of the group that set up, ran, and controlled the Treasure Your Success enterprise.  Warren directed the TYS Defendants' one stop shop CCIRRS operation[83] and was personally involved in and controlled its business practices.  At the outset, Warren and his "liaison or assistant,"[84] Maritza Martinez,[85] helped with the initial set up of TYS, including determining TYS's telephone and IT needs[86] and guiding Plancher and Toska through running the fulfillment end of the CCIRRS, which they had not previously done.[87]  Personally and through Martinez, Warren visited TYS's business premises approximately "once a week"[88] to monitor Plancher's and Toska's business

---

[79] *See* Doc. No. 99, Warren, BFS, VO Answer ¶ 15; *see also* PX 32, Vega Decl., ¶¶ 5-6.
[80] *See* PX 39, Warren Dep. 8:16-10:5.
[81] *See* PX 39, Warren Dep. 19:10-15; *see also* PX 34, Smith Dep. 48:15-21.
[82] *See* PX 39, Warren Dep. 20:8-23:14; *see also* PX 34, Smith Dep. 53:1-8.
[83] PX 34, Smith Dep. 39:12-43:2; PX 27, Toska Dep. 60:17-76:18; 73:19-76:19; PX 31, Plancher Dep. 70:7-72:10.
[84] PX 39, Warren Dep. 29:6.
[85] *See* PX 39, Warren Dep. 26:2-11; 28:22-29:20.  Like Warren, Martinez had considerable experience in the telemarketing industry.  *See* PX 39, Warren Dep. 28:22-29:7; 29:21-30:2.
[86] *See* PX 39, Warren Dep. 25:8-27:23; 30:23-33:4; PX 27, Toska Dep. 61:25-66:15; 71:12-13.
[87] *See* PX 27, Toska Dep. 71:14-72:4; 99:4-9; PX 34, Smith Dep. 53:6-11.
[88] PX 39, Warren Dep. 45:10-11.

practices.[89]  Warren and Martinez also helped put together TYS's merchant account application package, which was submitted to Newtek.[90]

Through VO, Warren provided all of the telephone equipment and the local and long distance services to TYS,[91] which handled the verification and fulfillment phases of the CCIRRS.[92]  Warren also provided the telephone numbers listed on TYS's website.[93]  In connection with providing the telephone services, Warren monitored telemarketing calls to make sure that TYS's telemarketers were staying on script.[94]

Through BFS, Warren provided TYS the CRM database that allowed TYS to keep track of its customers' information and records,[95] and he trained Plancher, Toska, and TYS negotiators how to use the CRM (customer relationship management) database.[96]  Warren also created and hosted TYS's website,[97] which contained false company information— including a fake Delaware telephone number, a fake Delaware office location, and fake company employees with impressive but also fake credentials[98]—to give consumers a false sense of legitimacy.[99]  In close collaboration with Plancher and Toska, Warren added a "user

---

[89] *See* PX 39, Warren Dep. 44:23-45:11; *see also* PX 27, Toska Dep. 83:6-17; 83:21-84:6; 99:6-8; PX 34, Smith Dep. 41:3-6.

[90] *See* PX 34, Smith Dep. 39:20-24; 53:12-14; *see also* PX 38, Hauler Dep. Vol. 1 117:8-12 (testifying that Smith and Warren typically would "set up the merchant, gather the application materials, and send it over to [Newtek]").

[91] *See* PX 39, Warren Dep. 35:23-36:7; *see also* PX 27, Toska Dep. 65:15-16; 66:13-15; 68:21-69:16; PX 31, Plancher Dep. 85:23-86:9.

[92] *See* PX 27, Toska Dep. 70:7-9.

[93] *See* PX 27, Toska Dep. 145:18-146:15; 182:17-183:2; PX 31, Plancher Dep. 90:24-91:18.

[94] *See* PX 34, Smith Dep. 35:21-25; 37:14-38:2; 53:1-5; 160:16-161:8; PX 27, Toska Dep. 84:22-85:3.

[95] *See* PX 39, Warren Dep. 10:19-12:11; 35:23-36:23; *see also* PX 27, Toska Dep. 16:14-17; 110:11-16; PX 31, Plancher Dep. 86:5-16.

[96] *See* PX 27, Toska Dep. 71:13-16; 99:6-8; 135:19-24.

[97] *See* PX 22 (TYS website printout); *see also* PX 27, Toska Dep. 65:20-21;144:10-155:17; 190:1-12; PX 31, Plancher Dep. 89:24-90:23; PX 39, Warren Dep. 36:8-9; 38:11-41:18; 118:2-127:20.

[98] *See* PX 27, Toska Dep. 146:4-6; 146:24-147:1; 150:4-15; 151:8-15; 151:18-152:1; 190:1-12; PX 31, Plancher Dep. 90:11-92:2.

[99] *See* PX 39, Warren Dep. 119:4-15.

portal"[100] on the website so consumers could follow the "progress" on their accounts.[101] Likewise, Warren trained TYS telemarketers to use the user portal, so that, in turn, they could guide consumers how to log in to their accounts.[102]  Warren also listed a customer service email address on the website that consumers could use to contact the company.[103] When consumers sent email to that address, Martinez received a copy of the message and would relay outstanding consumer issues directly to Plancher and Toska.[104]  Finally, Warren provided the template of the sales contract that TYS made consumers sign,[105] and he also posted a copy of the contract on the website.[106]

For setting up and monitoring TYS's operations and providing the CRM and website services, Warren and BFS charged Plancher and Toska a monthly consulting fee equal to one percent of TYS's monthly revenues.[107]  Warren and VO also charged Plancher and Toska separately for the telephone equipment and services.[108]

### 3.   Ramon Sanchez-Ortega

Ramon Sanchez-Ortega ("Sanchez") has considerable experience in the telemarketing industry.  He began in the industry approximately in 2009.[109]  He was a telemarketer for

---

[100] PX 27, Toska Dep. 150:21; PX 39, Warren Dep. 134:2.

[101] *See* PX 27, Toska Dep. 150:18-151:7; PX 39, Warren Dep. 98:25-99:7; 121:10-15; 133:22-134:4; *see also* PX 42, FTC-TYS-0000696 ("As part of our program (COMPANY) will create you a customized client portal….").

[102] *See* PX 39, Warren Dep. 133:16-134:4.

[103] *See* PX 27, Toska Dep. 65:16-19; 147:5-24.

[104] PX 27, Toska Dep. 148:4-17; *see also* PX 8, ¶ 9; PX 10, ¶ 13; PX 12, ¶ 15, p.22; PX 24, ¶ 11, p. 8.

[105] *See* PX 27, Toska Dep. 73:4-16; 152:25-153:4; PX 31, Plancher Dep. 110:8-14; 111:4-8.

[106] *See* PX 27, Toska Dep. 152:7-155:17.

[107] *See* PX 27, Toska Dep. 63:1-7; 71:2-11; PX 39, Warren Dep. 15:4-17:1; 45:12-48:17.  Warren monitored TYS's monthly sales which formed the basis for his monthly consulting fee charge.  *See* PX 39, Warren Dep. 16:15-22.

[108] *See* PX 39, Warren Dep. 45:12-17.

[109] *See* PX 37, Sanchez Dep. 13:8-16.

various telemarketing operations[110] and hawked different products to consumers, including

vacation packages[111] and CCIRRS.[112]  At one point, he worked for Smith's CCIRRS

company in different capacities involving telemarketing and IT work.[113]

Through his experience in the industry, he developed an understanding of the laws

governing telemarketing, including the National Do Not Call Registry ("Registry") and the

ban on unwanted robocalls.[114]  In fact, when the ban took effect, he recalled that "the rooms,

all the telemarketing industries[, e]verybody freaked out . . . . [b]ecause robocalls, it's like

the lifeline of telemarketing . . . automated messages [are] like the lifeline of telemarketing

world."[115]  Indeed, he testified that Smith's company used robocalls to solicit consumers.[116]

At GFA, Sanchez worked as a "marketer,"[117] where his main job was to generate

"qualified customers" for GFA.[118]  Specifically, Sanchez was an "IT type of guy,"[119] and he

was responsible for making sure that GFA's automated "dialers,"[120] which delivered the

robocalls, were "up and going."[121]  He also ensured that GFA's phones were working and

that its telemarketers were "getting calls."[122]  He was responsible for locating third-party

companies where GFA could buy its telemarketing leads or call lists[123] and, as his job

---

[110] *See* PX 37, Sanchez Dep. 14:11-14; 15:24-16:14; 19:5-20; 22:9-16.
[111] *See* PX 37, Sanchez Dep. 14:11-14.
[112] *See* PX 37, Sanchez Dep. 40:17-24; 79:24-80:12.
[113] *See* PX 37, Sanchez Dep. 16:15-17:5; 37:13-38:11; 40:17-48:5; 79:24-81:14.
[114] *See* PX 37, Sanchez Dep. 24:2-25:23; 63:23-64:2; 64:9-68:25; 102:2-25.
[115] PX 37, Sanchez Dep. 102:7-14.
[116] *See* PX 37, Sanchez Dep. 60:25-61:6.
[117] PX 27, Plancher Dep. 43:15; *see also* PX 27, Plancher Dep. 43:3-44:11; 59:18-24.
[118] PX 43, Sanchez Dep. Exh. 2; PX 27, Sanchez Dep. 99:2-12; *see also* PX 31, Plancher Dep. 43:3-44:11 (explaining that "marketers," like Sanchez, forwarded calls to GFA's telemarketing boiler room).
[119] PX 37, Sanchez Dep. 28:11; 88:5-9.
[120] PX 37, Sanchez Dep. 28:12.  In the telemarketing industry, a "dialer" has the same meaning as a "robocaller."  *See* Sanchez Dep. 24:1-25:2.
[121] PX 37, Sanchez Dep. 29:3; *see also* PX 37, Sanchez Dep. 28:10-29:3; 62:2-18; 99:21-100:18.
[122] PX 37, Sanchez Dep. 33:2; *see also* PX 37, Sanchez Dep. 32:18-33:2; 62:2-10; 88:5-9.
[123] *See* PX 37, Sanchez Dep. 31:21-32:8; 62:2-12; 88:10-16; PX 31, Plancher Dep. 81:11-16; 82:6-15.

description states, to make sure that those leads were "scrubbed for being on a DNC list."[124] For his services to GFA, Sanchez was paid at least $3,000 per week, and when business was good he was paid a greater amount,[125] up to "7,000, 8,000, depending."[126]

During his employment at GFA, he did not access the Registry and failed to ensure that GFA's telemarketing leads had been "scrubbed."[127]  He knew that Plancher and Toska were using illegal robocalls to solicit consumers,[128] yet he continued to work for them[129] and rationalized his participation in GFA's illegal telemarketing scheme, testifying, "Nobody was slinging dope across the counter, so I figured it was legal."[130]

4. <u>Universal Processing Services of Wisconsin, LLC, d/b/a Newtek Merchant Solutions, and Derek DePuydt</u>

Universal Processing Services of Wisconsin, LLC, also doing business as Newtek Merchant Solutions, is a New York limited liability company that is wholly owned[131] by Newtek Business Services, Inc., a New York corporation.[132]  Newtek, the subsidiary company, transacts business throughout the country[133] and is in the business of intermediating between a bank conducting its merchant processing and merchants that want

---

[124] PX 43, Sanchez Dep. Exh. 2; PX 37, Sanchez Dep. 99:2-12.  "Scrubbing" ensures that a company's telemarketing leads or call lists do not include phone numbers that are registered on the Registry or some other list, such as that company's internal do-not-call list.  At deposition, Sanchez denied signing the contract with GFA, but he admitted that the services described in the contract matched his assigned duties.  *See* PX 37, Sanchez Dep. 99:2-12.

[125] *See* PX 37, Sanchez Dep. 99:13-18; 88:17-90:1.

[126] PX 37, Sanchez Dep. 89:15.

[127] *See* PX 37, Sanchez Dep. 64:9-18; 66:11-16.

[128] *See* PX 37, Sanchez Dep. 69:17-70:5.

[129] *See* PX 37, Sanchez Dep. 112:13-113:3.

[130] PX 37, Sanchez Dep. 112:17-18.

[131] *See* Doc No. 94-1, ¶ 5 (Sloane Aff.).

[132] *See* Doc No. 94-1, ¶ 3 (Sloane Aff.).  The parent corporation is not a party to this lawsuit.

[133] *See* Doc No. 153, ¶ 17.

to accept credit card payments from consumers.[134]  To attract businesses to use its merchant

account services, Newtek enters into contractual relationships with and relies heavily on

independent sales agents, like Smith.[135]

As a third-party payment processor, Newtek provides the credit card merchant

account that allows a business, like TYS, to accept consumers' credit card payments.[136]

Indeed, without Newtek's merchant accounts, "it would have been impossible for TYS to

engage in illegal telemarketing to and advance billing of consumers for its [CCIRRS]."[137]  As

noted, Newtek provided TYS two merchant accounts[138]: TYS 1 on November 22, 2011[139]

and TYS 2 on May 3, 2012.[140]  Until July 23, 2012,[141] Newtek processed charges made by

TYS on consumers' credit cards totaling $2,592,427.[142]

Derek DePuydt has worked in the credit card industry since 1996.[143]  From April

2007 to January 2013, he served as Newtek's president.[144]  In this capacity, Newtek entrusted

him with the "final review"[145] of merchant account applications by businesses that were

---

[134] *See* PX 45, Doc. No. 110-1, p. 1 (Newtek Internal Report); *see also* PX 44, DePuydt Dep. Vol. 1 7:22-8:12.

[135] *See* PX 34, Smith Dep. 9:8-25.  Newtek maintains a modest internal sales force, too.  *See* PX 38, Hauler Dep. Vol. 1 18:3-19:4.

[136] *See* PX 46, Wilhelm Expert Rep., p. 17, ¶¶ 41-42; *see also* PX 35, Smith Admis., ¶ 36 ("[The TYS 1 and TYS 2] merchant accounts allowed TYS to process credit card payment charges made by its consumers."); PX 33, HES Admis., ¶ 27 ("Without [the TYS 1 and TYS 2] merchant accounts, TYS would not have been able to process credit card payment charges made by consumers.")

[137] PX 46, Wilhelm Expert Rep., p. 37, ¶ 90; *see also* PX 27, Toska Dep. 74:23-25 ("Q.  And you couldn't do business without the merchant account?  A.  Absolutely.").

[138] *See* Doc. No. 153, Newtek's Answer, ¶ 59.

[139] *See* PX 35, Smith Admis., ¶ 28.

[140] *See* PX 35, Smith Admis., ¶ 34.

[141] This is the termination date of both merchant accounts. *See* PX 47, DePuydt Dep. Vol. 2 125:12-14.

[142] PX 48, Newtek Resp. to Interrog. pp. 2-3 ($100,339.39 + $2,027,129.10 + $464,958.11 = $2,592.426.60).

[143] *See* PX 44, DePuydt Dep. Vol. 1 5:4-6.

[144] *See* Doc No. 85, DePuydt's Answer, ¶ 17; Doc No. 94-1, ¶ 6 (Sloane Aff.); Doc No. 153, Newtek's Answer, ¶ 18.

[145] PX 47, DePuydt Dep. Vol. 2 101:1.

referred by Smith.[146]  This was because the Smith relationship represented "some of [Newtek's] largest agencies"[147] and was important and profitable for Newtek.[148]  Notably, after his predecessor left in 2007,[149] DePuydt inherited the relationship with Smith.

DePuydt personally reviewed and approved both of TYS's merchant account applications.[150]  In connection with the TYS 1 merchant account, he reviewed the merchant account application and Plancher's and Toska's personal financial statements, tax returns, and credit reports.[151]  He admits reviewing the credit reports and seeing alerts, such as "serious delinquency," "too few accounts currently paid, as agreed," "number of accounts with delinquency,"[152] and "high risk fraud alert."[153]  Yet he approved TYS 1 because, as he put it, individuals with those alerts in their credit reports are "very common."[154]  Similarly, in connection with the TYS 2 merchant account, he reviewed the merchant account application and again reviewed Plancher's and Toska's credit reports.[155]  Remarkably, he approved TYS 2, even though he specifically knew at the time that TYS 1 had chargeback problems[156] and was "already on MasterCard's radar [for fraud]."[157]

---

[146] *See* Doc. No. 153, Newtek's Answer, ¶ 59; PX 35, Smith Admis., ¶ 41; PX 33, HES Admis., ¶ 30; PX 44, DePuydt Dep. Vol. 1 10:8-16; 11:3-6; PX 47, DePuydt Dep. Vol. 2 100:14-101:14.

[147] PX 44, DePuydt Dep. Vol. 1 11:6.

[148] *See* PX 44, DePuydt Dep. Vol. 1 10:8-16; 11:3-6; PX 47, DePuydt Dep. Vol. 2 100:14-101:14; *see also*, *infra*, Section III.F.2.

[149] *See* Doc. No. 94-2, ¶ 5 (Olszewski Aff.).

[150] *See* PX 44, DePuydt Dep. Vol. 1 24:16-25:6; 55:22-56:22; 69:7-2; PX 49, Depuydt Dep. Exh. 5, pp. 1-4, 107-110.

[151] *See* PX 44, DePuydt Dep. Vol. 1 31:17-35:24; 66:13-67:14; PX 47, DePuydt Dep. Vol. 2 97:8-100:6; *see also* PX 49, DePuydt Dep. Exh. 5, pp. 1-6, 23, 25-26, 28-46.

[152] PX 44, DePuydt Dep. Vol. 1 67:18-23.

[153] PX 44, DePuydt Dep. Vol. 1 68:12.

[154] PX 44, DePuydt Dep. Vol. 1 69:5-6.

[155] *See* PX 44, DePuydt Dep. Vol. 1 44:9-45:13; 69:20-71:23; 72:19-25; *see also* PX 49, Depuydt Dep. Exh. 5, pp. 107-111, 113, 125-130.

[156] *See* PX 44, DePuydt Dep. Vol. 1 45:5-13.

[157] PX 44, DePuydt Dep. Vol. 1 74:2-3; *see also id*. at 73:10-75:1; PX 49, DePuydt Dep. Exh. 6.

As detailed more fully below,[158] Newtek and DePuydt ignored numerous red flags in the underwriting of both TYS merchant accounts.  Had they followed standard underwriting due diligence, Newtek "would have uncovered conclusive evidence of TYS's fraudulent business practices before it agreed to provide its credit card processing services to TYS."[159]

### III. The TYS Defendants' Unlawful CCIRRS Scheme

A.  The TYS Defendants Delivered Unwanted Robocalls (Count 8) and Robocalls that Did Not Make Required Disclosures Promptly (Count 9).

The TYS Defendants used prerecorded voice messages or "robocalls" to solicit consumers who had not consented to receive robocalls.[160]  While the initial greeting purportedly came from "Rachel," "Samantha," or "Card Services,"[161] the robocalls typically instructed consumers, "To lower your credit card interest rate, press one."[162]  Additionally, the robocalls failed to promptly disclose the identity of any of the TYS Defendants or the name of the company or person on whose behalf the prerecorded voice message was sent.[163]

Even though they knew the illegality of these practices, the TYS Defendants made robocalls to consumers[164] and hired marketers to do the same.[165]  As Sanchez admitted, robocalls are "the lifeline of telemarketing."[166]  He explained the financial imperative of using robocalls instead of live-person callers, stating, "You wouldn't even make that much

---

[158] *See, infra*, Section III.F.2.

[159] PX 46, Wilhelm Expert Rep., p. 25, ¶ 59.

[160] *See* PX 4, ¶¶ 2, 32; PX 6, ¶¶ 3, 15; PX 7, ¶¶ 2, 21; PX 9, ¶¶ 2, 4, 13; PX 11, ¶¶ 2-3, 5, 7; PX 13, ¶¶ 2, 4; PX 14, ¶¶ 2-3; PX 24, ¶¶ 2-3; *see also* PX 18, ¶ 8 (former GFA/TYS employee stating that, to her knowledge, "[a]ll the telemarketing done by TYS is done through robo-calls").

[161] PX 37, Sanchez Dep. 69:18-70:6.

[162] *See* PX 4, ¶ 2; PX 6, ¶ 3; PX 7, ¶ 2; PX 11, ¶ 3; PX 13, ¶ 4; PX 14, ¶ 3; PX 24, ¶ 3; *see also* PX 51, FTC-TYS-176 (training manual: "Most people don't listen to the automated message, they just press 1….").

[163] *See* PX 4, ¶ 2; PX 6, ¶ 3; PX 7, ¶ 2; PX 9, ¶ 3; PX 11, ¶ 3; PX 14, ¶¶ 3-4.

[164] *See* PX 31, Plancher Dep. 41:1-43:9; PX 37, Sanchez Dep. 61:7-21; 61:22-62:18; 67:3-68:24; 112:4-113:3.

[165] *See* PX 31, Plancher Dep. 43:10-46:22; PX 27, Toska Dep. 121:8-123:10; 126:15-129:9; 134:7-25.

[166] PX 37, Sanchez Dep. 102:10-11.

money [using live dialers] because you know how many hundreds and thousands of calls

those [automated] dialers dial?  [T]hose dialers could dial anywhere from 10 to 150,000 calls

an hour.  How many guys is it going to take you to dial 150,000 calls an hour?  [A lot.]

Yeah."[167]  This financial reality is one of the reasons why the TYS Defendants ignored the

unlawful robocalling practices of the marketers that they hired to drum up customers.[168]

> B.     The TYS Defendants Dialed Telephone Numbers that Were Registered on the
>         National Do Not Call Registry (Count 6) and Failed to Pay the Fee to Access
>         the Registry (Count 10).

The TYS Defendants also cold-called consumers whose phone numbers were

registered on the National Do Not Call Registry and with whom the TYS Defendants had

never had previous dealings.[169]  Records prove that the TYS Defendants never paid the

Registry access fee to obtain the list of phone numbers that were registered on the Registry[170]

and thus should have been removed from their call lists.

> C.     The TYS Defendants Failed to Honor Do Not Call Requests (Count 7).

The TYS Defendants cold-called consumers repeatedly, even those who had

previously instructed the TYS Defendants not to call again and had requested that their phone

numbers be removed from the call lists.[171]  Indeed, the TYS Defendants had no effective

---

[167] PX 37, Sanchez Dep. 102:18-25.

[168] *See* PX 27, Toska Dep. 123:11-20; PX 31, Plancher Dep. 42:2-43:15.

[169] *See* PX 1, ¶ 11; PX 4, ¶¶ 31-32 (telephone number listed on the Registry since 2007); PX 7, ¶¶ 20-21 (since 2003); PX 8, ¶¶ 17-18 (since 2006); PX 9, ¶¶ 12-13 (since 2010); PX 10, ¶¶ 2-3; PX 11, ¶¶ 5-7 (since 2003); PX 12, ¶¶ 32-33 (since 2003); PX 13, ¶¶ 2, 4 (since 2008); PX 14, ¶¶ 2-3 (since 2005); PX 15, ¶¶ 2-3 (since 2008); PX 24, ¶¶ 2-3; PX 26, ¶¶ 2-3.

[170] *See* PX 1, ¶¶ 12-15; Attachment D.

[171] *See, e.g.*, PX 6, ¶ 17 (received calls even after requesting, on two separate occasions, to be removed from the call list); PX 9, ¶¶ 4-10 (requested on three separate occasions to be removed from the call list).

procedure for removing consumers' phone numbers from company call lists, even after those

consumers specifically complained to the company.[172]

> D.   The TYS Defendants Made Misrepresentations in Order to Induce Consumers to Purchase Their CCIRRS.

To induce consumers to sign up for the CCIRRS and pay up to $1,493.93, the TYS

Defendants misrepresented the benefits of their service.

> 1.   Misrepresentations Regarding Substantial Interest Rate Reduction, Substantial Savings, and Faster Debt Repayment (Count 1 (§ 5) and Count 4 (TSR))

The TYS Defendants promised consumers that they would reduce substantially

consumers' credit card interest rate, including to as low as three percent.[173]  Consumers

stated that, in some instances, telemarketers promised them specific rate reductions,[174] such

as a reduction "from 17.99% to 2.99%"[175] or a reduction to "about three or four percent"[176]

or "between 5% and 7%."[177]  Other consumers stated that, in some instances, telemarketers

made general promises of substantial rate reductions,[178] such as a reduction by "over half"[179]

or "at least half"[180] of the consumer's current interest rate.  Moreover, the TYS Defendants

---

[172]  *See* PX 18, ¶ 15 (former GFA/TYS employee: "On occasion, consumers would complain that they were on the Do Not Call List.  We were not trained to do anything special to remove their names from our system.").

[173]  *See* PX 4, ¶¶ 6, 8; PX 6, ¶ 7; PX 8, ¶ 4; PX 10, ¶ 5; PX 12, ¶ 5; PX 13, ¶ 5; PX 14, ¶ 6; PX 15, ¶ 3; PX 24, ¶ 6; PX 26, ¶¶ 5-7.

[174]  *See, e.g.*, PX 6, ¶ 7 (promised a reduction to "as low as 4.9% within a single billing period"); PX 8, ¶ 4 (reduction to "between 5% and 7%"); PX 12, ¶ 5 (reduction to "about three or four percent"); PX 14, ¶ 6 (for the first account, a reduction "from 17.99% to 2.99%"; for the second account, reduction "from 18.99% to 12.99%").

[175]  PX 14, ¶ 6.

[176]  PX 12, ¶ 5.

[177]  PX 8, ¶ 4.

[178]  *See, e.g.*, PX 4, ¶¶ 6, 8 (promised a reduction of "over half" of the consumer's current rates but later revised to "at least half"); PX 24, ¶ 6 (reduction that is "so low"); PX 10, ¶ 5 (reduction sufficient to result in substantial savings "in three to four months"); PX 13, ¶ 5 (reduction sufficient to result in substantial savings]; PX 15, ¶ 3 (same); PX 26, ¶¶ 5-7 (same).

[179]  PX 4, ¶ 6.

[180]  PX 4, ¶ 8.

represented that the reduced rates would be permanent, "lock[ed] in [as a] low fixed rate."[181]
The consumer testimony is consistent with the TYS Defendants' telemarketing scripts and
training materials.[182]

The TYS Defendants also promised that consumers would achieve thousands of
dollars in "guaranteed savings,"[183] typically at least $2,500.[184]  The TYS Defendants
routinely memorialized the promised "minimum savings"[185] in the TYS service agreement
that they made consumers sign.[186]  This promise is also evidenced by the telemarketing
scripts and training materials.[187]  As one manual puts it, "The main selling point is that the
client will save $2,500 with the service but how the client will receive those savings isn't
always clear."[188]

In addition to promising substantial interest rate reductions and guaranteed savings,
the TYS Defendants promised that consumers would be able to repay their credit card debt

---

[181] *See, e.g.*, PX 52, FTC-TYS-0000695 (rebuttal script: "All we are doing is locking in a low fixed rate and allowing you to continue making the payments on your own.").
[182] *See* PX 53, FTC-TYS-0000005 (qualification script); PX 54, FTC-TYS-0000174 (training manual); *see also* PX 33, HES Admis., ¶ 57; PX 35, Smith Admis., ¶ 57 (admitting that they were "aware that the telemarketing sales scripts of TYS involved representing to consumers that the company could reduce significantly consumers' credit card interest rates through its debt relief services").
[183] PX 4, ¶ 6.
[184] *See, e.g.*, PX 4, ¶¶ 6, 8 (promised "minimum savings" of $3,000.00); PX 7, ¶¶ 6-7 ($2,500); PX 8, ¶¶ 4 ($2,000); PX 10, ¶ 4-5 ($1,200); PX 12, ¶ 5 ($2,500); PX 13, ¶¶ 5-6 ($2,000); PX 14, ¶ 5 ("save a lot of money"; contract states $2,500); PX 15, ¶ 3 ($2,500); PX 26, ¶¶ 7-8 ($2,500 and then changed to "between $6,000 and $18,000").
[185] PX 4, p. 11.
[186] *See* PX 4, p. 11; PX 7, p. 6; PX 8, p. 8; PX 10, p. 8; PX 12, p. 10; PX 13, p. 5; PX 14, p. 4; PX 15, p. 6.
[187] *See* PX 42, FTC-TYS-0000696 (closing script); PX 55, FTC-TYS-0000708 (verification script); PX 56, FTC-TYS-0000671 (closing script); PX 29, FTC-TYS-0000161 (training manual); *see also* PX 33, HES Admis., ¶ 58; PX 35, Smith Admis., ¶ 58 (admitting that they were "aware that the telemarketing sales scripts of TYS involved representing to consumers that the company could save consumers a significant amount of money through its debt relief services").
[188] PX 29, FTC-TYS-0000161.

faster, typically three to five times faster.[189]  This promise, too, is well documented in the

TYS Defendants' telemarketing scripts and training materials.[190]

The TYS Defendants bragged that they could achieve these incredible results for

consumers because they have "special relationships"[191] with banks and financial

institutions,[192] including claiming to "have relationships with over 551 financial institutions

across the nation."[193]  In fact, this assertion was an outright lie.[194]

In reality, the TYS Defendants' failed to deliver the results that they promised to

consumers.[195]  While the CRM database contained consumers' contact information, payment

information, and status in the sales process, it was practically silent regarding the fulfillment

of the promises made to consumers.  In some instances, after failing to reduce the interest

rate on the consumer's existing credit card account, the TYS Defendants either opened or

attempted to open a new credit card account for the consumer, although the consumer had

never agreed to this option.[196]  In fact, it was part of the TYS Defendants' telemarketing

---

[189] PX 4, ¶ 5 ("[can] make repayment of credit card balances cheaper and faster"); PX 24, ¶ 6 ("[can] negotiate an interest rate that was so low that it would allow the consumer to pay off their debt faster"); PX 26, ¶ 7 ("would be able to pay [her] credit card 3 times faster").  The TYS Defendants also promised that repayment would be easier or cheaper under their CCIRRS.  *See* PX 4, ¶ 5; PX 5, ¶ 4; PX 10, ¶ 5.

[190] *See* PX 42, FTC-TYS-0000696 (closing script); PX 56, FTC-TYS-0000671 (closing script); PX 57, Plancher Dep. Exh. 23 (quality assurance script); PX 58, FTC-TYS-0000186-87 (training manual); *see also* PX 33, HES Admis., ¶ 59; PX 35, Smith Admis., ¶ 59 (admitting that they were "aware that the telemarketing sales scripts of TYS involved representing to consumers that the company could help consumers pay off their debt faster through its debt relief services").

[191] PX 10, ¶ 5.

[192] *See* PX 10, ¶¶ 5, 8; PX 59, Plancher Dep. Exh. 25.

[193] PX 59, Plancher Dep. Exh. 25, p. 2.

[194] *See* PX 27, Toska Dep. 180:24-181:7; PX 31, Plancher Dep. 98:21-99:3; *see also* PX 46, Wilhelm Expert Rep., p. 16, ¶ 37.

[195] *See* PX 4, ¶¶ 25-29; PX 5, ¶¶ 10-12, 15; PX 7, ¶ 15; PX 8, ¶14; PX 10, ¶¶ 11-12, 15; PX 12, ¶¶ 11-13, 31; PX 13, ¶ 14; PX 14, ¶¶ 10, 12; PX 15, ¶ 4; PX 24, ¶¶ 9, 15; PX 25, ¶ 7.

[196] *See* PX 12, ¶ 13; PX 14, ¶ 10.

script to tell consumers, who ask how their current credit card accounts would be affected, that "everything remains as is except for the rate."[197]

Indeed, given the realities in the credit card marketplace at the time, the TYS Defendants had little, if any, hope of delivering on their promises to consumers.[198]  The FTC's expert witness, Lisa Wilhelm, summarized her opinion concerning the TYS Defendants' promises:

> TYS's claims and representations made to consumers during telemarketing calls that they could reduce interest rates to as low as 2.99 percent, enable consumers to pay off their credit card and other debts three to five times faster, and save a substantial amount in interest (*e.g.*, $2,500 or more) were deceptive and neither credible nor feasible.[199]

To expose the deception behind the TYS Defendants' claims and representations, Wilhelm first emphasized the market reality that in 2012 the prevailing average interest rate was above 10.4 percent, with the lowest offer at 7.25 percent—"even for the best, most creditworthy customers."[200]  Thus, the core promise of substantial interest rate reductions, to as low as three percent—the raison d'être of the CCIRRS— was "simply false because virtually no credit card issuer was offering such ultra-low rates on credit cards in the 2012 marketplace except for time-limited promotional rates[201] on new balance transfer cards."[202] This testimony is uncontradicted.

---

[197] PX 60, Plancher Dep. Exh. 24, p. 2.
[198] *See generally* PX 46,Wilhelm Expert Rep., pp. 2, 5-17, ¶¶ 6, 14-40.
[199] PX 46, Wilhelm Expert Rep., p. 2, ¶ 6.
[200] *Id.*, pp. 12-13, ¶ 31.
[201] As noted, the TYS Defendants represented that the rates that they negotiated for consumers would be "fixed."  *See* PX 52, FTC-TYS-0000695.
[202] PX 46, Wilhelm Expert Rep., pp. 12-13, ¶ 31.

Then, Wilhelm tested the credibility of the other two promises—thousands in savings, typically $2,500, and faster debt repayment, typically three to five times faster—by analyzing three composite samples.[203]  For each sample, Wilhelm assumed that the TYS Defendants successfully secured an ultra-low interest rate, as promised.[204]  Even given this assumption, none of the composite samples resulted in savings and faster repayment that were even close to the TYS Defendants' promises:[205] the savings achieved ranged only from $631 to $1,318,[206] while the debt repayment was faster only by a maximum factor of 1.1 times.[207]  Put simply, the TYS Defendants' "promises of interest savings of at least $2,500 and payback period acceleration by [at least] three times…[were] not credible or achievable."[208]  Again, this testimony is uncontradicted.

        2.    <u>Misrepresentation Regarding the Timing of the Service Fee Charge or Payment (Count 2)</u>

The TYS Defendants charged a substantial fee for their CCIRRS, up to $1,493.93.[209]  The TYS Defendants routinely told consumers that they would not charge the fee until consumers achieved the promised savings or until consumers signed a written contract.[210]  Similarly, the TYS Defendants sometimes told consumers that, if they could not deliver the promised results, they guaranteed a full refund of the service fee.[211]  The TYS service

---

   [203] *See* PX 46, Wilhelm Expert Rep., pp. 12-16, ¶¶ 31-36.

   [204] *Id.* at pp. 15-16, ¶ 36.

   [205] *Id.*

   [206] *Id.* at pp. 13-15, ¶¶ 33-35.

   [207] *Id.* One of the three composite samples resulted in the same amount of repayment time.  *Id.* at pp. 14-15, ¶ 34.

   [208] *Id.* at pp. 15-16, ¶ 36.

   [209] *See* PX 4, ¶ 7.

   [210] *See* PX 5, ¶¶ 6-8; PX 7, ¶¶ 7-8, 16; PX 25, ¶ 6.  In at least some instances, the TYS Defendants did not disclose the billing, cancellation, and refund policies.  *See* PX 4, ¶¶ 7, 15; PX 8, ¶ 5; PX 10, ¶ 7; PX 12, ¶¶ 6, 9.

   [211] *See* PX 5, ¶¶ 4-5; PX 6, ¶¶ 8-10; PX 10, ¶¶ 7-8.

agreement reflected the promise not to charge consumers until delivering results,[212] and the TYS Defendants' telemarketing scripts also reflect this promise.[213]  As detailed below, these claims misrepresented the true timing of the service fee charge and the reality of the refund process.

   3. Unauthorized billing (Count 3 (§ 5) and Count 11 (TSR))

  The TYS Defendants typically charged consumers the service fee on the same day or the day after the initial telemarketing call, before consumers realized any promised results or received a copy of the TYS service agreement—thus, they billed without consumers' authorization.[214]  In fact, many consumers did not find out about the charges until they received their credit card account statements, usually weeks after the charges were made.[215]

  E. The TYS Defendants Charged Advance Fees for Their CCIRRS (Count 5).

  The TYS Defendants typically charged the service fee before consumers made at least one payment under new credit card account terms.[216]  Indeed, the TYS Defendants believed

---

[212] *See* PX 4, p. 11; PX 7, p. 6; PX 8, p. 8; PX 12, p. 10; PX 13, p. 5; PX 14, p. 4; PX 15, p. 6.

[213] *See* PX 42, FTC-TYS-0000696-97 (closing script); PX 54, FTC-TYS-0000708-09 (verification script); *see also* PX 33, HES Admis., ¶ 60; PX 35, Smith Admis., ¶ 60 (admitting that they were "aware that the telemarketing sales scripts of TYS involved representing to consumers that the company would not charge them for debt relief services until the company achieved the promised monetary savings through its debt relief services"); PX 33, HES Admis., ¶ 61; PX 35, Smith Admis., ¶ 61 (admitting that they were "aware that the telemarketing sales scripts of TYS involved representing to consumers that the company would not charge them for debt relief services until the consumers had signed a written contract").

[214] *See, e.g.*, PX 5, ¶¶ 6-8, 9 (same-day charge); PX 7, ¶¶ 7-8, 14, 16 (same-day charge); PX 25, ¶¶ 4, 6; Attachment B (same-day charge); *see also* PX 4, ¶ 14 (next-day charge); PX 8, ¶ 10 (same-day charge); PX 10, ¶ 14 (next-day charge); PX 12, ¶ 12 (same-day charge); PX 13, ¶ 7 (same-day charge); PX 15, ¶ 3 (same-day charge); PX 24, ¶ 8 (next-day charge); PX 26, ¶ 10 (same-day charge); *see also* PX 33, HES Admis., ¶ 63 (admitting that it was "aware that TYS charged consumers fees for its debt relief services within one day of the initial telemarketing call"); PX 33, HES Admis., ¶ 64; PX 35, Smith Admis., ¶ 64 (admitting that they were "aware that TYS charged consumers fees for its debt relief services before the company achieved the promised monetary savings for the consumers").

[215] *See* PX 4, ¶ 14; PX 5, ¶ 9; PX 7, ¶ 14; PX 8, ¶ 10; PX 10, ¶ 14; PX 12, ¶ 12; PX 13, ¶ 7; PX 15, ¶ 3; PX 24, ¶ 8.

[216] *See, e.g.*, PX 4, ¶¶ 25-27, 29 (even assuming that TYS eventually obtained a lower interest rate for this consumer, TYS charged the consumer on the same day of the initial telemarketing call); *see generally, supra*, Section III.D.3

that they could charge the service fee immediately after a negotiator purportedly secured a lower interest rate for the consumer or entered the consumer into some other bank program, well before the consumer made a payment under the new account terms.[217]  Smith, who ran his own CCIRRS operation before helping to set up TYS,[218] rationalized this illegal practice testifying, "It's like buying pest control.  You pay for the year, and you get the service the next twelve months[219]….[Y]ou pay your bug man for a year in advance to do your bugs, and he performs the first service when you do it…."[220]  Although the TSR does not address prepayment for pest control services, it prohibits advance fees for debt relief services.

Finally, the TYS Defendants also refused to refund consumers' money, despite failing to deliver on the promised results.[221]  Their refusal to provide refunds flies in the face of the "refund guarantee" repeatedly represented to consumers during their sales pitch.[222]

  F.  Newtek/DePuydt: Assisting and Facilitating (Count 12: Counts 4-6, 8, 9, 11)

    1. <u>Newtek and DePuydt Provided Essential Services to the Treasure Your Success Enterprise.</u>

Defendants Newtek and DePuydt provided substantial assistance to the Treasure Your Success enterprise, and the underlying facts are not in dispute.  As discussed above, Plancher and Toska aligned themselves with Smith because – as Newtek's sales agent – he had access to merchant accounts through Newtek.[223]  Indeed, without Newtek's and DePuydt's assistance in approving the TYS merchant accounts and providing payment processing

---

[217] *See* PX 27, Toska Dep. 208:11-209:18.
[218] *See* PX 34, Smith Dep. 80:14-84:11; 85:18-87:25; PX 37, Sanchez Dep. 79:24-80:13.
[219] PX 34, Smith Dep. 69:12-70:12.
[220] PX 34, Smith Dep. 144:2-8.
[221] *See* PX 4, ¶ 30; PX 5, ¶ 16; PX 7, ¶ 18; PX 8, ¶ 15; PX 10, ¶ 16; PX 12, ¶ 30; PX 13, ¶ 12; PX 14, ¶ 11; PX 15, ¶ 9; PX 24, ¶ 14; PX 25, ¶ 6.
[222] *See* PX 5, ¶ 4; PX 6, ¶ 8; PX 10, ¶ 7; PX 12, ¶¶ 13-29.
[223] *See, supra*, Section II.C.1, 4.

services, "it would have been impossible for TYS to engage in illegal telemarketing to and advance billing of consumers."[224]  Between November 2011 and July 2012, Newtek processed consumer credit card charges totaling $2,592,427.[225]

        2.     <u>Newtek and DePuydt Knew or Consciously Avoided Knowing the Deceptive Acts or Practices of the Treasure Your Success Enterprise.</u>

        a)     Newtek's History of High Risk – and High Reward – Clients

For years before TYS, Newtek provided credit card processing services to high-risk merchants.  Since at least 2002, Smith had been referring risky telemarketing merchants to Newtek,[226] creating a high-risk, high-reward portfolio.  Newtek's own internal report stated: (i) Newtek's Senior Vice President and Chief Operating Officer's "assessment of the quality of the paper that [Smith] was bringing to Newtek was 'garbage'";[227] (ii) Newtek described the Smith accounts as "the largest, highest risk, most profitable, and highest maintenance accounts in the portfolio";[228] (iii) some of the Smith accounts "began to incur chargebacks as far back as August 2011 [months before TYS submitted its application]";[229] and (iv) "a large portion of [the Smith] accounts were/are considered high risk and required holdbacks as high as 30%."[230]

---

[224] PX 46, Wilhelm Expert Rep., p. 37, ¶ 90; *see also* PX 27, Toska Dep. 74:23-25 ("Q.  And you couldn't do business without the merchant account?  A.  Absolutely."); PX 33, HES Admis., ¶ 27 ("Without merchant accounts, TYS would not have been able to process credit card payments made by consumers.").

[225] PX 46, Wilhelm Expert Rep., p. 36, ¶ 89.

[226] *See, e.g.*, PX 36, Smith Dep. Exh. 1 (list of Newtek merchant accounts referred by Smith).

[227] PX 45, Doc. 110-1, p.3.

[228] *Id.*, p. 5.

[229] *Id.*, p. 1.

[230] *Id.*

The officers' dislike of Smith and his accounts was well known within Newtek.[231] The Chief Operating Officer, who was also the head of Newtek's risk department, "never signed off on anything associated with Hal Smith or the HES accounts."[232]  In fact, "time after time, [a Smith] application would be reviewed and declined by [the COO] only to have it subsequently approved and booked by [DePuydt]."[233]  Eventually, the COO told DePuydt "to not bother bringing any more [Smith applications] to review because she would decline it and he would approve it. . . ."[234]  Similarly, the Vice President of the risk department, Marcus Schaefer, "neither trusted nor liked Hal Smith," and he "refused to review and underwrite [Smith] paper. . . ."[235]

However, the relationship was too lucrative for Newtek to walk away.  According to DePuydt, "the income from the [Smith] accounts made it worth the risk. . . ."[236]  He later estimated that "in total[,] the relationship with Hal Smith over the past ten years has brought net profit to Newtek of between $4 and $5 million."[237]  Notably, the profit was solely Newtek's; indeed, DePuydt did not profit personally from the Smith relationship.[238]

---

[231] *See, e.g.,* PX 38, Hauler Dep. Vol. 1 140:6-141:7; 143:16-24; 147:12-15; 149:11-150:2  (explaining that Newtek's risk department did not like the accounts that Smith brought to Newtek).

[232] PX 45, Doc. No. 110-1, p. 3.

[233] *Id.*

[234] *Id.*

[235] *Id.*, p. 4.

[236] PX 45, Doc. No. 110-1, p. 3; *see also* Doc. No. 94-2, ¶ 19 (Olszewski Aff.) ("[DePuydt] consistently stated . . . the revenue on the [Smith] accounts was too important to the company."); PX 40, Hauler Dep. Vol. 2 196:22-197:23 (testifying that "the deals [Smith] brought in were risky deals. [I] knew that upfront.  Derek [DePuydt] knew that upfront….But there was a lot of volume, a lot of money on it").

[237] PX 45, Doc. No. 110-1, p. 8.

[238] The discovery period has closed, and there remains no evidence that DePuydt benefitted personally from his relationship with Smith and his accounts.  As the Court stated in denying Newtek's prior motion for summary judgment, there was "no evidence that Mr. Depuydt misappropriated any of the income generated by the Smith accounts for his own personal use."  Doc. No. 155, p. 4.  There still is no such evidence, and any prior argument for the "adverse interest" exception (*see* Doc. No. 94, p. 10) is moot.

So Newtek and DePuydt removed the entire Smith portfolio of high-risk merchants and applications – which warranted *higher* scrutiny due to their high risk nature – from the normal underwriting process altogether.[239]  This was the state of affairs at Newtek when TYS submitted its first merchant account application.

b)  Treasure Your Success's Application Contained Several Red Flags.

TYS submitted its merchant account application to Newtek in November 2011.[240]  The FTC's expert witness, Ms. Wilhelm, identified at least nine "red flags" in the application and information that Newtek received during the underwriting of TYS's application.[241]  While none of the individual red flags would have been fatal to the application, taken together, they warranted additional follow-up and questioning.  Such follow-up would have discovered information that would have led to denial of the application.  However, DePuydt and Newtek did not investigate.

*First* TYS's application claimed, without any support, anticipated annual credit card sales of $2.7 million.[242]  "The underwriting documentation lack[ed] justification for this high projection, an omission that is particularly glaring because TYS was a brand new business with no track record."[243]  TYS lacked assets, and TYS's principals, Plancher and Toska, had no meaningful income.  For example, their 2010 personal tax returns showed less than $11,000 of combined income, and they did not provide bank statements to support the

---

[239] PX 45, Doc. No. 110-1, p. 3 ("Derek eventually cut out the middle man and approved the [Smith] accounts unilaterally.").

[240] PX 61, WAB 18-63.

[241] PX 46, Wilhelm Expert Rep., pp. 18-25, ¶¶ 44-58.

[242] *Id.*, pp. 18-19, ¶ 48.

[243] *Id.*

claimed personal assets.[244]  Newtek's expert witness, Laurie LeBoeuf, agreed that this warranted further investigation.[245]

*Second*, Newtek obtained credit reports on TYS's principals, and those reports warned of serious credit risks.[246]  Plancher's credit report revealed a credit score of 494, which is well below the cut-off for "very high risk" of 619.[247]  His report also showed eleven delinquent accounts, three accounts in collections, a history of serious delinquencies and chargeoffs, a high ratio of outstanding balances to credit limits, and no open credit accounts.[248]  Toska's credit report was not much better.  It included a "high risk fraud alert" and revealed that the address she and Plancher used as their alleged current address was, in fact, a truck stop.[249]  Again, these credit issues raised a red flag, but DePuydt and Newtek did not investigate further.  Newtek's expert witness agreed that these were negative factors to consider in the overall decision.[250]

*Third*, the TYS application plainly stated the company's plan to engage in the most risky type of business for credit card processing: outbound telemarketing with "card-not-present" transactions.[251]  "It is common industry knowledge that there are substantially higher rates of merchant fraud associated with card-not-present transactions and outbound telemarketing companies. . . ."[252]  Even worse, the application revealed that TYS planned to

---

[244] *Id.*

[245] PX 62, LeBoeuf Dep. 34:1-35:4.

[246] PX 46, Wilhelm Expert Rep., pp. 19-20, ¶ 48.

[247] *Id.*

[248] *Id.*

[249] *Id.*

[250] PX 62, LeBoeuf Dep. 41:7-24 ("Q. In your opinion, do the credit histories of the owners of [TYS] raise any kind of a red flag calling for further investigation?  A. It's a factor to keep in mind as you're looking at the overall decision of the account. . . . Q. And it's a negative factor, I assume?  A. Yes.").

[251] PX 46, Wilhelm Expert Rep., p. 20, ¶ 49.

[252] *Id.*

process only "MO/TO" (Mail Order/Telephone Order) transactions, "which are the highest risk type of card-not-present transactions."[253]  Again, DePuydt and Newtek did not investigate this red flag.

*Fourth*, the internal inconsistencies in the TYS application should have given Newtek pause.  The application stated that TYS sold "Computer Software,"[254] but later it claimed that it provided "services" for which card sales were processed upfront, on the "sale date," billed "on the date of service," and that the services were "completed within 30 days."[255] Obviously, these conflicting statements cannot all be true.  Even worse, the website listed in TYS's application ("treasureyoursuccess.com") described the company as a "life planning" company located in Delaware (not Winter Park, FL, as stated in the application), and it claimed that the company was founded by "Michael Stevens," a person not listed on the application.[256]  DePuydt and Newtek never asked for clarification or explanation of these inconsistencies.  Newtek's expert witness, however, believes that they should have and that, if they had investigated, they would have uncovered other red flags.[257]

*Fifth*, TYS's application revealed that TYS planned to bill consumers on the sale date, while the services it claimed to provide would be delivered over the next 30 days.  As

---

[253] *Id.*

[254] Even if the application had not included these inconsistencies, further investigation was warranted. Selling computer software is a higher risk business, according to Newtek's expert, Laurie LeBoeuf.  (PX 62, LeBoeuf Dep. 30:7-8.)  She also stated, "Anyone that's [selling via] mail order is a higher risk. . . . They have a tendency to have a higher ratio of charge-backs, . . . So you look at those a little – again, you look at those [companies] with more scrutiny because you do expect a higher percentage of charge-backs."  (PX 62, p. 30:9-20.)  In short, Ms. LeBoeuf agreed "that there were items [in TYS's application] that had the application have gone through the normal process, would have been challenged."  (PX 62, p. 31:1-5.)

[255] PX 46, Wilhelm Expert Rep., p. 20, ¶ 50.

[256] *Id.*

[257] PX 62, LeBoeuf Dep. 39:4-13 ("Q. So, . . . it's not just because they're selling debt reduction, but because they misrepresented what their business was in their application.  [W]ould that be another reason for refusing it?  A. No, actually, it wouldn't be a reason for refusing it, it would be a reason to do further investigations.  Which, some of the red flags down the way would have come out.").

of October 2010, the Telemarketing Sales Rule prohibited advance billing for debt relief services, such as TYS's CCIRRS.[258]

 *Sixth*, potentially fraudulent merchants are less likely to have or clearly communicate cancellation, return, or refund policies and terms.[259]  In its application, "TYS merely asserts that they have no cancellation policy and provide a refund only if they cannot meet the quoted (interest) savings."[260]

 *Seventh*, potentially fraudulent merchants often form new corporate entities and "doing business as" or "dba" entities in an effort to avoid detection and make it difficult for consumers to identify with whom they are really doing business.[261]  Here, TYS submitted a 2010 tax return for an entity named Global Financial Assist, LLC, and listed the business name on the application as WV Universal Management, LLC, dba Treasure Your Success.[262] Newtek's expert witness agreed that further investigation was required.[263]  Had DePuydt and Newtek investigated this discrepancy and investigated public records for Global Financial Assist, LLC, they could have found that the Florida Department of Agriculture and Consumer Services issued a Cease and Desist Order and fined the company $3,000 for operating without a telemarketing license.[264]

---

[258] PX 46, Wilhelm Expert Rep., p. 22, ¶ 52.
[259] PX 46, Wilhelm Expert Rep., p. 22, ¶ 53.
[260] *Id.*
[261] PX 46, Wilhelm Expert Rep., pp. 22-23, ¶ 54.
[262] *Id.*
[263] PX 62, LeBoeuf Dep. 65:17-21 ("Q.  [D]o you agree that the things she raises in [paragraph] 54 were a red flag requiring more investigation?  A.  I believe they required further investigation, yes.").
[264] PX 46, Wilhelm Expert Rep., pp. 22-23, ¶ 55.

*Eighth*, TYS left portions of its application blank and failed to provide all requested documentation.[265] These deficiencies were yet another red flag that DePuydt and Newtek chose not to investigate. Ms. LeBoeuf agreed that this omission "required further investigation."[266]

*Ninth*, the other merchant accounts Smith had referred to Newtek were experiencing unacceptably high chargeback-to-transaction ratios.[267] Chargeback-to-transaction ratios ("CTRs"), or chargeback rates, are usually very low for non-fraudulent merchants.[268] Even for the "relatively riskier industry of Internet sales, chargebacks average only one out of every 500 transactions" or 0.2 percent.[269] In fact, a chargeback rate of even one percent is much too high and can lead to the merchant being placed in a risk monitoring and compliance program.[270] Card networks (*e.g.*, Visa and MasterCard) set the threshold at one percent because "that is the point at which consumer complaints to federal and state consumer protection agencies and public forums, such as the BBB and social media sites begin multiplying" thus "creat[ing] a broader negative reputation and distrust effect across all players in the card ecosystem."[271]

When TYS applied in November 2011, 14 of the 19 active Smith merchant accounts had a chargeback ratio of more than 19 percent (from 19.6% to 67.6%) for 2011.[272] These extremely high chargeback ratios warranted further investigation of the relationship with

---

[265] PX 46, Wilhelm Expert Rep., pp. 23-24, ¶ 56.
[266] PX 62, LeBoeuf Dep. 67:1-7 ("Q. Assuming that it's true [that portions of the application were left blank], would it raise a red flag requiring further investigation? A. The ownership of the business would, but a lot of time, that's just handled with a – with a quick call. But again, it would require further investigation.").
[267] PX 46, Wilhelm Expert Rep., pp. 24-25, ¶ 57.
[268] *See* PX 46, Wilhelm Expert Rep., pp. 28, ¶¶ 65-66.
[269] *Id.*, p. 29, ¶ 68.
[270] *Id.*, p. 28, ¶ 66.
[271] *Id.*, p. 29, ¶ 67.
[272] *Id.*, pp. 24-25, ¶ 57.

Smith and the high-risk merchant accounts that he was bringing to Newtek.[273]  Ms. LeBoeuf

agreed and testified that she may have questioned the Smith relationship even sooner.

> Q.  Well, let's assume that Mr. Smith was a sales agent that Newtek and Derek Depuydt trusted, but in November, 2011, he had 19 active accounts and 14 had an average charge-back rate above 19 percent.  Wouldn't that cause you to question the relationship?
>
> A.  Yeah.  But, I mean, I might have questioned the relationship two months prior.  I don't know.  I don't know what the circumstances were at the time.
>
> Q.  Wouldn't it cause you to look with much more care at new accounts that [Smith] was bringing in?
>
> A.  Yes, it would.
>
> Q.  Especially if they raised all the other issues that the application for Treasure Your Success raised?
>
> A.  It would.[274]

"In sum, during its underwriting of TYS, [DePuydt and Newtek] was presented with

at least nine red flags of merchant fraud.  These red flags, individually and collectively,

signaled a clear and substantial risk that TYS was engaged in merchant fraud."[275]  Again,

Newtek's internal investigation confirms that, at the least, Depuydt and Newtek consciously

avoided knowing the truth of TYS's deceptive operation.  The internal report admitted that

the following:  (i) "Staff and management did or said nothing when clearly inappropriate

activities were being promulgated by [DePuydt]"; (ii) "By their own admission, [Chief

Operating Officer] Kim [Olszewski] and Marcus [Schaefer] were well aware of the risks, the

overrides, the instructions from [DePuydt] without supporting documentation. . . ."; (iii) the

---

[273] *Id.*
[274] PX 62, LeBoeuf Dep. 70:4-21.
[275] PX 46, Wilhelm Expert Rep., p. 25, ¶58.

"Risk Department abdicated underwriting and monitoring responsibility and permitted [DePuydt] to unilaterally handle all transactions associated with the [Smith] accounts. . . ."; and (iv) "By allowing merchants to be approved without proper credit committee process violates prudency and policy."[276]

Had Newtek and DePuydt followed standard underwriting due diligence – instead of consciously ignoring these serious warning signs – they "would have uncovered conclusive evidence of TYS's fraudulent business practices before [they] agreed to provide [] credit card processing services to TYS."[277]  Newtek and DePuydt recognized the risks posed by TYS but took steps only to protect Newtek (*e.g.*, by establishing high merchant account reserves).[278]

Moreover, Newtek and DePuydt should have obtained copies of TYS's telemarketing scripts, according to Newtek's general practice.[279]  Even a cursory review of those scripts would have raised other serious concerns.  The scripts contained statements like, "Write down #1, getting out of debt 3/5 times faster," and "Write down #2, guaranteed minimum debt analysis savings ($1,500 to $8,000, depending on size of debt)."[280]  Clearly, these scripted statements, along with the other information in TYS' application, reveal that TYS was planning to engage in the risky business of outbound telemarketing of interest rate

---

[276] PX 45, Doc. 110-1, p. 6.
[277] PX 46, Wilhelm Expert Rep., p. 25, ¶ 59.
[278] *See, e.g.,* Olszewski Dep. 122:25-123:14 (former Newtek COO: "Reserves are basically set up to protect against chargeback loss…[because] you deem that an account could be a problem, might be a problem, and you want to protect *yourself* from that.") (emphasis added).
[279] *See* PX 38, Hauler Dep. Vol. 1.  31:11-19; 48:15-51:14; 54:16-55:22  (Newtek's relationship manager for the Smith relationship testifying about Newtek's general practice of receiving and reviewing the telemarketing scripts and sales contracts of businesses referred by Smith); *see also* PX 34, Smith Dep. 147:20-149:6; 154:14-157:19 (explaining his general practice of submitting telemarketing scripts to Newtek as part of the merchant account application).  Indeed, Newtek arguably *did* receive the TYS scripts, but because those facts are in dispute, the FTC does not cite them in support of this Motion for Summary Judgment.
[280] PX 21, pp. 16, 25 (closing and verification scripts); *see generally, supra,* Section III.D.1-2.

reduction services.  It would have also been clear that TYS would be selling debt relief

services, not computer software, as stated on its merchant account application.

> c)   Five Months Later, TYS Applied for a Second Merchant
> Account that Newtek Approved Without Proper Investigation,
> Despite the Existence of Even More Red Flags.

In April 2012, Plancher and Toska applied for a second TYS merchant account with

Newtek.[281]  Again, almost all of the nine red flags present in the first application existed in

the second application.[282]  And again, Newtek and DePuydt declined to obtain copies of the

telemarketing scripts and contracts, as required by Newtek's company procedures.[283]  Even

worse, Newtek and DePuydt had five months' worth of chargeback data from the first TYS

merchant account, and that data was disturbing.

Lisa Wilhelm's analysis of the chargeback reason codes for the first TYS account

from December 2011 through April 2012 (the month of the second TYS account application)

confirms the high chargeback ratios and indicates a "high likelihood of fraud."[284]  The chart

shows that just 0.5% of the chargebacks were "processing error-related," such as "an

incorrect transaction amount or account number."[285]  The reasons for the remaining 99.5% of

chargebacks, coupled with the ever-growing chargeback ratios and volumes, proved TYS's

"unmistakable and sustained pattern of misrepresentation, fraud, deception, and unauthorized

billing [that is] common to fraudulent merchants."[286]  Certainly by April 2012, when TYS

applied for the second processing account, Newtek and DePuydt *knew* that TYS was engaged

---

[281] PX 63, WAB 124-147.
[282] PX 46, Wilhelm Exp. Rep., p. 33, ¶ 80.
[283] *Id.*
[284] PX 46, Wilhelm Expert Rep., p. 35, ¶ 83.
[285] *Id.*, p. 35, ¶ 84.
[286] *Id.*, pp. 35-36, ¶¶ 84-88.

in merchant fraud.[287]  While Newtek's expert witness took issue with the term "fraud," she agreed that there was a "high likelihood of fraud",[288] or "a high indication of somebody not conducting their business appropriately because the customers are having to dispute."[289]

Unfortunately, DePuydt and Newtek only took steps to protect the company from the risks associated with TYS's operations; consumers, who had no access to the information and red flags available to Newtek, were left to fend for themselves.[290]  In Ms. Wilhelm's opinion, Newtek's "main concern throughout its relationship with TYS, up until July 23, 2012, was to hedge against the risks [Newtek] recognized TYS posed."[291]

G.    Amount of consumer redress

The TYS Defendants – assisted and facilitated by Newtek and DePuydt – charged consumers' credit cards a total of $2,592,427.[292]  Based on information obtained from Newtek, a total of $857,455[293] has been returned to consumers by way of refunds and chargebacks.  Therefore, the proper amount of consumer redress in this matter is $1,734,972.

## IV. The Summary Judgment Standard

To prevail on a motion for summary judgment the movant must show that "there is no genuine issue of material fact, and … that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The movant bears the initial burden of identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[287] *Id.*, p. 36, ¶ 88.
[288] PX 62, LeBoeuf Dep., 126:10-14.
[289] PX 62, LeBoeuf Dep., 126:15-19; *see also id.*, 127:17-20; ("Q.  So this would be more indication of a merchant who's misrepresenting their product in some way?  A. Correct.").
[290] PX 46, Wilhelm Expert Rep., pp. 26-27, ¶¶ 60-63; pp. 38-39, ¶¶ 93-99.
[291] *Id.*, p. 39, ¶ 98.
[292] PX 48, Newtek Resp. to Interrog., pp. 2-3.
[293] PX 32, Vega Decl. ¶ 20.  Chargebacks were $839,849, and refunds were $17,606.  *Id.*

together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue

of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323(1986) (quoting former version

of Fed. R. Civ. P. 56(c)); s*ee also Fini v. Dish Network, L.L.C.*, 955 F. Supp. 2d 1288, 1292

(M.D. Fla. 2013).  Once the movant has done that, the non-moving parties "must set out

specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).

## V.  The TYS Defendants' Practices Violate Section 5 of the FTC Act (Counts 1, 2, 3)

Counts One and Two of the Complaint allege that the TYS Defendants committed

deceptive practices in violation of Section 5 of the FTC Act.  To prove a deceptive practice

under Section 5,  the FTC must prove: (1) that there was a representation; (2) that the

representation was likely to mislead consumers; and (3) that the representation was material.

*See, e.g., FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. Innovative Mktg.,*

*Inc.*, 654 F. Supp. 2d 378, 385 (D. Md. 2009).  The materiality requirement is satisfied if the

misrepresentation or omission involves information that is likely to affect a consumer's

choice of, or conduct regarding, a product or service.  *See Kraft, Inc. v. FTC*, 970 F.2d 311,

322 (7th Cir. 1992); *see also FTC v. 1st Guar. Mortg. Corp.*, No. 09-cv-61840, 2011 U.S.

Dist. LEXIS 38152, at *49 (S.D. Fla. Mar. 30, 2011) (citing *Kraft* and finding that

representations at issue "were material to consumers since they were instrumental in

affecting consumers' decisions to pay for goods and services").  Neither proof of scienter nor

proof of reliance are required.  "Because the primary purpose of § 5 is to protect the

consumer public rather than to punish the wrongdoer, the intent to deceive the consumer is

not an element of a § 5 violation."  *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202

(10th Cir. 2005).

A.      Count One (Deception Under Section 5 of the FTC Act)

Count One alleges that the TYS Defendants deceived consumers by representing that,

through the CCIRRS, they could reduce consumers' credit card interest rates substantially, to

as low as three percent.  They also claimed that consumers would save thousands of dollars,

typically $2,500, and would be able to pay off their debts much faster, typically three to five

times faster, as a result of using the CCIRRS.  Consumer testimony, telemarketing scripts

and other documents, and unrebutted expert testimony show that the TYS Defendants made

these material representations and that they were false.[294]

B.      Count Two (Deception Under Section 5 of the FTC Act)

Count Two alleges that the TYS Defendants deceived consumers with two more

misrepresentations in connection with their contracting procedures.  First, they represented

that they would not charge consumers for the service until after consumers realized the

promised savings.  Second, they told consumers that they would not charge the service fee

until after consumers could review, sign, and return a written contract.  Similarly, consumer

declarations, GFA's and TYS's own documents, and Plancher's and Toska's testimony show

that these material representations were made and that they were false.[295]

C.      Count Three (Unfairness Under Section 5 of the FTC Act)

Count Three alleges that the TYS Defendants committed an unfair practice prohibited

by Section 5 of the FTC Act.  To show an unfair practice under Section 5, the FTC must

show that the practice is "one that '(1) causes or is likely to cause substantial injury to

consumers (2) which is not reasonably avoidable by consumers themselves and

---

[294] *See, supra*, Section III.D.1.
[295] *See, supra*, Section III.D.2.

(3) not outweighed by countervailing benefits to consumers or to competition.'" *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009); s*ee also FTC v. Direct Benefits Group, LLC*, Case No. 6:11-cv-1186-Orl-28TBS, 2013 U.S. Dist. LEXIS 100593, *39 (M.D. Fla. July 18, 2013).

Count Three alleges that the TYS Defendants committed an unfair practice by engaging in unauthorized billing.  As the unrebutted consumer declarations prove, the TYS Defendants charged consumers' credit cards before consumers had consented to be billed; indeed, the charges typically occurred on the same or immediately following day of the TYS Defendants' initial telemarketing call.[296]  Since consumers did not know that they would be billed, they could not avoid being victims of this practice.  The unauthorized billing could cause substantial injury as the amount billed exceeded $500.  Finally, there is obviously no countervailing benefit to unauthorized billing.  Thus, all three prongs of the test are satisfied.

## VI. The Defendants' Telemarketing Practices Violate the TSR: Counts Four to Eleven

Counts Four through Eleven allege violations of the Telemarketing Sales Rule, 16 C.F.R. Part 310.  The TSR is a detailed set of regulations covering the telemarketing industry, promulgated by the FTC under a directive from Congress in the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6102(a).  The TSR prohibits deceptive and abusive telemarketing practices, including several engaged in by the TYS Defendants.

For purposes of the TSR, a "telemarketer" is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor."

---

[296] *See, supra*, Section III.D.3.

16 C.F.R. § 310.2(cc).  Since the Defendants have initiated numerous calls to consumers, they are telemarketers subject to the TSR.  *See, e.g.*, *The Broadcast Team, Inc. v. FTC*, 429 F. Supp. 2d 1292, 1295-96 (M.D. Fla. 2006).

When applying the TSR, courts use the same principles of deception used in applying Section 5 of the FTC Act.  A violation of the TSR is a deceptive (or unfair) act or practice and a violation of the FTC Act.  15 U.S.C. § 6102(c), 15 U.S.C. § 57a(d)(3); *see also FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1273 (M.D. Fla. 2012).

The TSR contains a provision that prohibits deceptive acts and practices in connection with the sale of a debt relief service, which is defined as "any program or service represented, directly or by implication, to renegotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecured creditor or debt collector."  16 C.F.R. § 310.2(m).  That TSR provision prohibits the misrepresentation of "[a]ny material aspect of any debt relief service, including, but not limited to, the amount of money or the percentage of the debt amount that a customer may save by using such service" and "the amount of time necessary to achieve the represented results."  16 C.F.R. § 310.3(a)(2)(x).

Count Four alleges violations of this TSR provision.  Here, the CCIRRS, whose core purpose is to reduce consumers' credit card interest rates, falls within the definition of a debt relief service.  Further, the same facts that show the Section 5 violations alleged in Counts One and Two support the allegations of Count Four.[297]

---

[297] *See, supra*, Section III.D.1-2.

Indeed, providing debt relief services has been so problematic that, since October 27, 2010, the TSR has explicitly prohibited requesting or receiving any advance payment for debt relief services.  *See* 16 C.F.R. § 310.4(a)(5)(i).  Count Five alleges a violation of this TSR provision.  Here, unrebutted consumer declarations and the unrebutted testimony of Toska, Plancher, and Smith prove that advance fees were charged for the CCIRRS.[298]

Count Six alleges that the Defendants called telephone numbers listed on the National Do Not Call Registry, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(B)(i) and (ii).  Count Seven alleges that they failed to honor consumers' do not call requests, in violation of 16 C.F.R. § 310.4(b)(1)(iii)(A).  Count Eight alleges violation of 16 C.F.R. § 310.4(b)(1)(v)(A) by initiating outbound telemarketing calls using pre-recorded messages or robocalls without first getting the express permission of the recipient.  Count Nine alleges that the Defendants violated 16 C.F.R. § 310.4(b)(1)(v)(B)(ii) and (d), which requires outbound robocallers to disclose at the outset of the call, clearly and conspicuously, the identity of the seller, that the purpose of the call is to sell goods or services, and the nature of the goods and services.  Count Ten alleges that the Defendants made outbound telemarketing calls without first accessing the Registry and paying the required fee, in violation of 16 C.F.R. § 310.8.

Here, the unrebutted facts establish the violations of the TSR by delivering unwanted robocalls[299] and robocalls that did not provide required disclosures promptly,[300] by calling phone numbers registered on the Registry[301] and failing to access the Registry (and failing to

---

[298] *See, supra*, Section III.E.
[299] *See, supra*, Section III.A.
[300] *Id.*
[301] *See, supra*, Section III.B.

pay the required fee)[302] in order to remove the registered numbers from the list of numbers called, and by failing to honor consumers' requests that they not be called again.[303]

Count Eleven mirrors the violation of Section 5 alleged in Count Three.  The TSR prohibits charging for goods and services without the express informed consent of the consumer.  16 C.F.R. § 310.4(a)(7).  The facts that support Count Three also support Count Eleven.[304]

The TYS Defendants are charged with the violations of the TSR alleged in Counts Four, Five, and Eleven.  The TYS Defendants and Defendant Sanchez are charged with the violations alleged in Counts Six through Ten.

## VII.   Newtek/DePuydt: Assisting and Facilitating TSR Violations (Count 12: Counts 4-6, 8, 9, 11)

The TSR also prohibits a person from providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any act or practice that violate Sections 310.3(a), (c) or (d), or 310.4 of the [TSR]."  16 C.F.R. § 310.3(b).  "There is adequate guidance in the [TSR] itself, the case law, and the FTC's interpretation of the rule, in order to decide the issues presented by these summary judgment motions."  *FTC v. Chapman*, 849 F. Supp. 2d 1085, 1115 (D. Kan. 2011).  "The FTC's interpretation of the TSR is entitled to deference."  *FTC v. Chapman*, 849 F. Supp. 2d 1085, 1115, n.66 (D. Kan. 2011) citing *Auer v. Robbins*, 519 U.S. 452, 457-58 (1997).

---

[302] *Id.*
[303] *See, supra*, Section III.C.
[304] *See, supra*, Section III.D.3.

A.      Substantial Assistance

"The threshold for what constitutes 'substantial assistance' is low: there must be a connection between the assistance provided and the resulting violations of the core provisions of the TSR.'" *FTC v. Consumer Health Benefits Ass'n*, 10 Civ. 3551 (ILG) (RLM), 2012 U.S. Dist. LEXIS 72161, *17 (E.D.N.Y. May 23, 2012) (quoting *United States v. Dish Network, L.L.C.*, 667 F. Supp. 2d 952, 961 (C.D. Ill. 2009)); *see also FTC v. Global Marketing Group, Inc.*, 594 F. Supp. 2d 1281 (M.D. Fla. 2008) (granting FTC's motion for summary judgment on TSR assisting and facilitating count).

No "direct connection" to the misrepresentations made to consumers is required. *FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013).  "Although the originally proposed [Telemarketing Sales Rule] would have applied only where 'such substantial assistance is related to the commission or furtherance of that act or practice,' *Revised Notice of Proposed Rulemaking, Telemarketing Sales Rule*, 60 Fed. Reg. 30,406, 30,414 (June 8, 1995), the FTC rejected this requirement in the final rule, *see Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule*, 60 Fed. Reg. 43,842, 43,851 (Aug. 23, 1995)."  *Id.* at 1216. "As the FTC's published guidance states, the substantial assistance standard will not be met if the third party provides only 'casual or incidental' help to the telemarketer.  *FTC, Complying with the Telemarketing Sales Rule*, available at http://business.ftc.gov/documents/ bus27-complying-telemarketing-sales-rule#assisting (Feb. 2011)."  *Id.*  "Thus, 'cleaning a telemarketer's office, delivering lunches to the telemarketer's premises, or engaging in some other activity with little or no relation to the conduct that violates the Rule would not be

enough to support liability as an assistor or facilitator.'"  *Id.* (quoting *Complying with the Telemarketing Sales Rule*).

Here, Newtek's and DePuydt's approval of the TYS merchant accounts and subsequent processing of millions of dollars of credit card charges against consumers scammed by the TYS Defendants constitute substantial assistance.  As shown above,[305] it would have been impossible for the TYS Defendants to engage in illegal telemarketing and advance billing of consumers for their CCIRRS without the account.  Put simply, TYS could not have done business without the merchant accounts—this is more than mere casual or incidental help to the telemarketer.  Therefore, the rule's "low" threshold is met.

B.      Knew or Consciously Avoided Knowing

"As the FTC has explained in its Compliance Guide, 'taking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability.'"  *FTC v. Chapman*, 714 F.3d 1211, 1219 (10th Cir. 2013), quoting *FTC, Complying with the Telemarketing Sales Rule*, available at http://business.ftc.gov/documents/bus27-complying-telemarketing-sales-rule#assisting (Feb. 2011).  In *Chapman*, the defendant "could easily have reviewed the defendants' marketing materials to see what representations they were making to consumers," but she "chose not to review" the materials.  *FTC v. Chapman*, 714 F.3d 1211, 1219 (10th Cir. 2013).

Here, Newtek and DePuydt easily could have obtained and reviewed TYS Defendants' telemarketing scripts, which reveal the true nature of the TYS Defendants' deceptive practices, but they chose not to do so.  Similarly, Newtek and DePuydt chose not to

---

[305] *See, supra*, Sections II.C.4; III.F.1.

follow-up on any of the numerous red flags detailed in Section III.F.2.  Like the defendant in *Chapman*, Newtek and DePuydt consciously avoided knowing of TYS's unlawful behavior and are jointly and severally liable for full consumer redress of $1,734,972.

## VIII.   GFA, TYS, HES, BFS, and VO Operated as a Common Enterprise.

A common enterprise exists where multiple corporate defendants knowingly act together to create and implement the unlawful practices done in the name of one of them. *See., e.g., Del. Watch Co. v. FTC,* 332 F.2d 745, 746 (2d Cir. 1964); *FTC v. Wash. Data Res.,* 856 F. Supp. 2d 1247, 1271-72 (M.D. Fla. 2012).  "Companies participating in a common enterprise are jointly and severally liable for the injuries caused by their conduct."  *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008)

Numerous factors can justify a finding of common enterprise, and "the pattern and frame-work of the whole enterprise must be taken into consideration."  *Del. Watch*, 332 F.2d at 746.  "It is not necessary that the FTC prove any particular number of entity connections and any specific connection.  Instead, it must be proved that the defendants maintained an 'unholy' alliance."  *Kennedy*, 574 F. Supp. 2d at 22.

Here, the corporate Defendants, owned, controlled, and operated by Plancher, Toska, Smith, and Warren, maintained an "unholy" alliance.  Each company played its role in furtherance of their fraudulent enterprise: qualifying and closing (*i.e.*, GFA); verification and fulfillment (*i.e.*, TYS); establishing and maintaining the essential payment processing relationship (*i.e.*, HES); providing the website and CRM database services (*i.e.*, BFS); and delivering the telephones and long distance services that are vital to any telemarketing scheme (*i.e.*, VO).  Each entity served a crucial purpose in the scheme; with and through their

respective principals, they executed it.  Therefore, they should be jointly and severally liable for the harm that their enterprise inflicted on consumers.

## IX. The Individual Defendants are Liable for the Acts and Practices of the Corporate Defendants

Once corporate liability is established, individual defendants may be held personally liable for the company's violations if the FTC proves (1) that they "participated directly in the practices or acts or had authority to control them," and (2) that they "had some knowledge of the practices."  *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 1996).

In determining whether an individual defendant had the authority to control the company's unlawful practices, the court looks to evidence of the individual's actual exercise of control over the practices in question.  *See Amy Travel*, 875 F.2d at 573; *FTC v. Atlantex Assocs.*, No. 87-0045-CIV-NESBITT, 1987 U.S. Dist. LEXIS 10911, at *32 (S.D. Fla. Nov. 25, 1987).  Such evidence is more probative than the individual defendant's official position, if any, within the offending company.  *See, e.g., FTC v. Windward Mktg., Ltd.*, No. 1:96-CV-615-FMH, 1997 U.S. Dist. LEXIS 17114, at *15-16 (N.D. Ga. Sept 30, 1997) ("[T]he Court does not look solely to a person's position, but also considers the control that a person actually exercises over given activities.  [The individual defendant] did not have to be [an] employee, or even an officer, to control [the corporate defendant's] activities.").  Indeed, whether an individual defendant "personally made misrepresentations is irrelevant so long as the FTC has shown that he had authority to control the corporations' deceptive practices." *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005).

In a case against an individual defendant involved in a telemarketing operation, the FTC can satisfy the control requirement by putting forth any combination of the following probative facts about that individual: (1) "designed and on a day-to-day basis oversaw the sales operation with the clear purpose of inducing consumer purchases," *Amy Travel*, 875 F.2d at 574, "controlled the day-to-day affairs," *Gem Merchandising*, 87 F.3d at 467, or "controlled the day-to-day activities," *Windward Mktg., Ltd*., 1997 U.S. Dist. LEXIS 17114 at *41-42; (2) "hired personnel," *Amy Travel*, 875 F.2d at 574, "[had] authority to hire and fire salespeople and thus with authority to control representations made by those salespeople," *Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911 at *31, or "was in a position to control the salespeople's behavior," *Gem Merchandising*, 87 F.3d at 468; (3) "wrote or reviewed…the [telemarketing] scripts…" *Amy Travel*, 875 F.2d at 575, or "draft[ed] the [ ] drive script," *Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911 at *31; (4) "participated in the drafting of the [ ] sales brochure," *Id*. at *5, that touted the purported value of the company's product and the company's affiliation with individuals with "excellent track records," *Id*. at *14; and/or (5) "were aware of…customer complaints and the excessive chargebacks" and "reviewed the sales reports."  *Amy Travel*, 875 F.2d at 574.

Further, the FTC can satisfy the knowledge requirement "by showing that the individual had actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth."  *Amy Travel*, 875 F.2d at 574; *see also Atlantex Assocs.*, 1987 U.S. Dist. LEXIS 10911 at *33.  "Regarding [S]ection 5's knowledge requirement, the FTC need not demonstrate . . . that the individual defendants possessed the

intent to defraud." *Windward Mktg., Ltd.*, 1997 U.S. Dist. LEXIS 17114 at *39; *see also Amy Travel*, 875 F.2d at 573-74.

A.      Defendant Smith

Smith is individually liable for the law violations alleged in Counts One through Eleven of the Complaint.  The corporate TYS Defendants committed deceptive and unfair business practices in connection with the telemarketing, sale, and billing of their CCIRRS, in turn, violating multiple provisions of Section 5 of the FTC Act and the TSR.[306]

Furthermore, uncontroverted evidence shows that Smith directly participated in and controlled the corporate TYS Defendants' unlawful actions in furtherance of the Treasure Your Success enterprise.  As detailed above,[307] Smith helped design the one-stop shop CCIRRS operation and, personally and through Williams and other affiliates, oversaw its sales practices through frequent on-site visits.  He controlled the hiring of telemarketers and office personnel, including a so-called Merchant Specialist to fight consumer chargebacks. He reviewed and required changes to the telemarketing scripts and, personally and through Williams, regularly listened in on telemarketing calls with consumers.  Through his control over TYS's merchant accounts, he monitored the company's sales revenues and chargebacks. These facts reveal that Smith had actual and constructive knowledge of the corporate TYS Defendants' unlawful practices.  Indeed, having operated his own CCIRRS company, he was fully aware of and sanctioned these practices.  Therefore, Smith is liable for the violations alleged in Counts One through Eleven.

---

[306] *See, supra*, Sections III.A-E; V; and VI.
[307] *See, supra*, Section II.C.1.

B.      Defendant Warren

The FTC alleges that Warren violated Section 5 and the TSR, as alleged in Counts One through Eleven.  As with Smith, Warren's liability is based on his direct participation in and control over the illegal practices of the corporate TYS Defendants.  As set forth above,[308] Warren directed the creation of the one stop shop CCIRRS operation, and he set up and provided the telemarketing technology, know-how, and documents.  Personally and through Martinez, he oversaw the operation through regular visits to the business premises, and he monitored the telemarketing calls.  In close collaboration with Plancher, Toska, and Martinez, he created the website that touted the purported benefits of the CCIRRS and TYS's affiliation with individuals with excellent track records and that essentially served as a "sales brochure" for the scheme.  Personally and through Martinez, he monitored consumer concerns and issues and tracked TYS's sales revenues.  Finally, coupling these facts with his over decade-long work in the telemarketing industry demonstrates that Warren had actual and constructive knowledge of the corporate TYS Defendants' violative practices.  These uncontroverted facts prove that Warren is liable for the violations alleged in Counts One through Eleven.

C.      Defendant Sanchez

The FTC alleges that Sanchez committed the unlawful practices alleged in Counts Six through Ten.  He is liable based on his direct participation in and control over those practices.  As discussed,[309] as a marketer, he sent illegal robocalls and cold calls to consumers.  Although it was part of his responsibilities, he did not access the Registry, and he failed to

---

[308] *See, supra*, Section II.C.2.
[309] *See, supra*, Section II.C.3.

scrub the leads or call lists to remove phone numbers listed on the Registry and phone numbers of consumers who have previously requested not to be called again.  Finally, he admits that he knew the illegality of his and the TYS Defendants' practices.  These undisputed facts show that he is liable for the violations alleged in Counts Six through Ten.

## X.  Conclusion

As demonstrated above, the unrebutted evidence in this case is not in dispute, and the legal issues in this case are ripe for decision.  Indeed, summary judgment is appropriate because there is no genuine issue as to any material fact, and the FTC is entitled to judgment as a matter of law.  Once liability is established against the Defendants, the FTC will seek leave to file proposed Permanent Injunctions and a memorandum setting forth the applicable law regarding the need for, and proper scope of, the proposed injunctions.


Dated: June 30, 2014

*/s/ Michael Milgrom*
Michael Milgrom, OH Bar # 0012959
        Trial Counsel
Jonathan L. Kessler, CO Bar # 15094
Fil M. de Banate, OH Bar # 0086039
Christopher D. Panek OH Bar # 0080016
Federal Trade Commission
1111 Superior Avenue East, Suite 200
Cleveland, Ohio 44114
(216) 263-3419 (telephone) (Milgrom)
(216) 263-3426 (facsimile)
*mmilgrom@ftc.gov*
*jkessler@ftc.gov*
*fdebanate@ftc.gov*
*cpanek@ftc.gov*

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that I electronically filed the forgoing dispositive motion, PLAINTIFF

FEDERAL TRADE COMMISSION'S MOTION FOR SUMMARY JUDGMENT AND

MEMORANDUM IN SUPPORT, on June 30, 2014.  The parties and the Court-appointed

Receiver, Michael L. Gore, were served by operation of the Court's electronic system.

Defendants H.E. Smith and HES Merchant Services Company, Inc. were served by

FedEx delivery at the following address: 1709 Lafayette Avenue, Lebanon, Indiana 46052.


Dated: June 30, 2014                    */s/ Michael Milgrom*
                                        Michael Milgrom, OH Bar # 0012959
                                        One of the Attorneys for Plaintiff